1   William Lee Kelly

2   6126 Leaning Rock Ct. N. Las Vegas, NV 89031

3   P: 702-427-2763

4   Email: William.Lee.Kelly@gmail.com

5   Pro Se Plaintiff

```
 X  FILED          RECEIVED
____ ENTERED      ____ SERVED ON

    JULY 09, 2025

   CLERK, U.S. DISTRICT COURT
     DISTRICT OF NEVADA
BY:_____ DEPUTY
      /s/ RJDG
```

6

7                 **IN THE UNITED STATES DISTRICT COURT**

8                  **FOR THE DISTRICT OF NEVADA**

9

10   William Lee Kelly                    Case Number:_____

11   Plaintiff,                           **FIRST AMENDED COMPLAINT**

12   vs.

13   Financial Industry Regulatory Authority       DEMAND FOR JURY TRIAL

14   (FINRA)                               Yes ◉    No ☐

15   Defendant.

16                              **JURISDICTION**

17   1.  This Court has subject matter jurisdiction over this action pursuant to **28 U.S.C. § 1331**

18       because the claims arise under the Constitution and laws of the United States, including

19       alleged violations of the **Due Process Clause of the Fifth Amendment** and relevant

20       provisions of the Securities Exchange Act of 1934. Jurisdiction is also proper under

21       **diversity jurisdiction** because none of the plaintiffs live in the same state as any of the

22       defendants and the amount of damages is more than $75,000.

23                                **VENUE**

24   2.  Venue is proper in the District of Nevada under **28 U.S.C. § 1391**(b)(2) because a

25       substantial part of the events or omissions giving rise to the claim occurred within this

26       District. Plaintiff resides in this District, and the harm resulting from Defendant's conduct

27       was felt here.

28   3.  FINRA maintains its principal place of business in Washington, D.C., but its conduct had

29       direct and harmful effects on investors nationwide, including the Plaintiff in this District.

30

31

## INTRADISTRICT ASSIGNMENT

4. Because this lawsuit arose in Clark County, it should be assigned to the Southern Division of this Court.

## PARTIES

5. Plaintiff is a United States Army veteran residing at 6126 Leaning Rock Ct. North Las Vegas, Nevada 89031 and can be contacted at 702-427-2763. Plaintiff was an investor in the security known as MMTLP and suffered direct financial harm and due process violations as a result of actions taken by Defendant FINRA.

6. Defendant Financial Industry Regulatory Authority, Inc. (FINRA) is a private corporation acting under Congressional mandate as a self-regulatory organization (SRO) for broker-dealers in the United States. FINRA is headquartered at 1735 K Street NW, Washington, D.C. 20006. It is tasked with overseeing securities markets, regulating broker-dealers, and enforcing compliance with financial industry rules. FINRA operates under the oversight of the U.S. Securities and Exchange Commission ("SEC").

## COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

## INTRODUCTION

7. This action is brought by Plaintiff, a retail investor and shareholder of MMTLP, seeking redress for actions taken by the Financial Industry Regulatory Authority, Inc. ("FINRA") that exceeded the scope of its lawful authority and resulted in significant financial harm and constitutional due process violations.

8. Plaintiff alleges that on or around December 8, 2022, FINRA published a revised corporate action notice regarding the security MMTLP. This notice omitted the *Pay Date* for the distribution of shares in Next Bridge Hydrocarbons, Inc., and stated that the MMTLP symbol would be deleted effective December 13, 2022 (Exhibit C). This contradicted the public statements made by Meta Materials Inc., which had clearly communicated that the record date would be December 12, 2022, and the distribution (Pay) date would occur after market close on December 14, 2022 (Exhibit A).

9. Rather than correcting the confusion introduced by the revised corporate action, FINRA imposed a **U3 trading halt** on MMTLP effective December 9, 2022—prior to the record date—freezing trading activity and preventing shareholders from buying, selling, or managing their positions in what would have been the final days of trading (Exhibit E).

10. Plaintiff contends that FINRA's publication of an incomplete and misleading corporate action notice, and its subsequent decision to halt trading based on the very instability it helped create, constitutes an abuse of discretion, a violation of procedural due process,

67  and an overreach beyond its statutory and delegated authority as a self-regulatory
68  organization.

69  11. Plaintiff seeks declaratory relief, damages, and other appropriate remedies to hold FINRA
70  accountable for the harm caused by its mismanagement and failure to adhere to
71  fundamental principles of fairness, accuracy, and transparency.

72

73                                    **FACTUAL BACKGROUND**

74  12. The preferred share known as MMTLP was created as a result of the reverse merger
75  between Torchlight Energy Resources, Inc. ("TRCH") and Meta Materials Inc. ("Meta
76  Materials" or "MMAT"), in which TRCH shareholders were issued preferred shares to
77  retain rights to TRCH's legacy oil and gas assets. These assets were later designated for
78  spinoff into a new entity, Next Bridge Hydrocarbons, Inc. ("Next Bridge"). In connection
79  with the planned spinoff, Meta Materials issued a corporate communication to its
80  shareholders stating that the distribution date of Next Bridge shares would be December
81  14, 2022, with a record date of December 12, 2022. Following the distribution, Next
82  Bridge would become a privately held company, and the Series A Preferred shares
83  (MMTLP) would be canceled (Exhibit A).

84  13. On December 6, 2022, FINRA published an initial Corporate Action Notice that
85  incorrectly stated MMTLP shares would be canceled effective December 13, 2022, one
86  day prior to the issuer's stated Pay Date. This misalignment with Meta Materials' public
87  disclosures caused immediate concern among investors and market participants (Exhibit
88  B & AO).

89  14. On December 7, 2022, Jeff Mendl, Vice President of OTC Markets, publicly stated that
90  the last day for trading MMTLP would be December 12, 2022, aligning with Meta
91  Materials' record date. During the interview, Mendl used the term "deleted," which did
92  not appear in FINRA's initial corporate action notice but was later introduced in FINRA's
93  revised notice on December 8, 2022. This suggests that Mendl may have had prior
94  knowledge of the upcoming revision to the corporate action notice. His emphasis on the
95  December 12th trading date underscores the disruption caused by FINRA's premature U3
96  trading halt on December 9, 2022, and highlights the confusion surrounding FINRA's
97  action. (Exhibit AF)

98  15. On December 8, 2022, FINRA published a revised Corporate Action Notice that further
99  compounded the confusion. The revised notice omitted any reference to the distribution
100  or pay date of December 14th and changed the status of MMTLP shares from being
101  "cancelled" to "deleted," still listing the effective date as December 13, 2022 (Exhibit C).
102  The omission of the Pay Date, along with the premature deletion date, created a material
103  inconsistency with the issuer's guidance. By effectively terminating trading one day prior

104  to the correct distribution date and omitting critical information, this revised notice
105  introduced market confusion, undermined fair access, and contributed to the basis for the
106  U3 trading halt.

107  16. As a result of FINRA's revised corporate actions, concern grew regarding how unsettled
108  trades would be handled, and whether purchasers in the final trading days would receive
109  the distribution. FINRA cited these concerns as justification to implement a U3 trading
110  halt on MMTLP effective December 9, 2022, three days prior to the final anticipated
111  trading day of December 12, the record date. FINRA's decision to halt trading effectively
112  froze all trading activity and blocked investors from managing or liquidating positions
113  ahead of the spinoff. (Exhibit E)

114  17. As a result of FINRA deleting the MMTLP symbol the U3 halt became permanent.
115  MMTLP was never reopened for trading, and investors were forcibly transitioned into
116  holding shares of a non-traded, privately held company—Next Bridge Hydrocarbons—
117  without an opportunity to respond, exit, or otherwise manage their investments during the
118  final days of public trading. (Exhibit AA)

119  18. FINRA later issued a public FAQ attempting to justify the U3 halt on the basis of risks to
120  orderly settlement (Exhibit D). However, the disruption cited by FINRA was directly
121  caused by its own failure to accurately reflect the issuer's timeline in the December 8
122  Corporate Action Notice and its failure to adhere to FINRA Rule 6490 and FINRA Rule
123  3110 (Exhibit I & AP). This flawed revision introduced market uncertainty, failed to
124  include the critical Pay Date, and conflicted with Meta Materials' public guidance even
125  though they had 3 months to review the corporate action (Exhibit AT).

126  19. Prior to the trading halt, the Next Bridge Hydrocarbons prospectus, filed with the SEC,
127  explicitly referenced the potential for a short squeeze and the possibility that the value of
128  MMTLP shares could "rise significantly" (Exhibit AH). This statement, which was
129  specifically required by the SEC before approval, reveals the significant market pressure
130  and potential volatility that FINRA "ignored" when it decided to impose the U3 trading
131  halt on December 9, 2022. FINRA failed to account for the real possibility of a
132  significant market disruption caused by excessive short interest and, instead, protected
133  the interests of those involved in the manipulation of MMTLP. By doing so, FINRA acted
134  with willful disregard for its duty to protect investors and ensure market fairness. This
135  coordinated failure to act on the potential for market volatility and manipulation further
136  supports the claim that FINRA's actions were not only arbitrary but may have been
137  designed to shield certain market participants from the consequences of their illegal
138  activities, including the failure to cover short positions. As a result, broker-dealers like
139  TradeStation ran out of shares to transfer into NextBridge Hydrocarbons (Exhibit AZ).

140

20. In the 9 days leading up to the reverse merger between TRCH and MMAT, an estimated 320 million shares were shorted (Exhibit AL) despite a TRCH float of only 165 million shares (Exhibit AM), indicating naked short selling and potential market manipulation. When MMTLP began trading shortly after the merger, it opened at $0.01, with about 3 million shares quickly bought at that price, allowing hedge funds to cover their massive short positions at the lowest possible price. This trading event, which was initially intended to be a non-tradable preferred share (Exhibit AN & AW), directly correlates with the failure to cover short positions prior to the merger and further underscores the manipulation that FINRA failed to address. By allowing MMTLP to become tradable without an accurate Form 211 (Exhibit G & AX), FINRA effectively facilitated the protection of illegal short selling activities while further depriving investors of their property rights.

21. On December 8, 2022, (the last day of trading before the U3 halt) the short volume reached an all-time high, with over 9 million shares shorted—three times the daily short volume, marking the largest single-day short interest in MMTLP's history (Exhibit AV). This extraordinary spike in short sales occurred just one day before the U3 halt, raising questions as to whether short-sellers were tipped off about the impending halt, as it is highly unlikely that this level of short interest was due to market forces alone, especially given the timing of the halt and the lack of transparency surrounding its justification (Exhibit AS).

22. FINRA's actions in halting the trading and deleting the symbol allowed brokers to carry the short position into a privately held company (NextBridge Hydrocarbons) without the need for them to close their short positions (Exhibit L). This effectively shielded the short-sellers from the consequences of the distribution, as brokers simply issued placeholders and random CUSIPs for the shares, enabling short positions to remain open without any resolution. FINRA's actions, therefore, deprived investors of their property rights and ability to liquidate and manage their positions, while simultaneously protecting the short-sellers from having to cover their positions. This series of events underscores the arbitrary and capricious nature of FINRA's conduct, which led to the deprivation of investors' property (MMTLP shares) without proper due process.

23. FINRA's failure to act, despite detecting fraud (Exhibit AD), and its reliance on "coding errors" to explain the removal of MMTLP from the Threshold List (Exhibit K), raises significant concerns about both regulatory oversight and investors' due process rights. Despite MMTLP being on the Threshold List for 45 days (Exhibit AU), indicating substantial short interest and potential failure-to-deliver issues, FINRA failed to adequately address these concerns, leading to the U3 trading halt and symbol deletion. This failure to act promptly, coupled with the subsequent claim of a coding error, suggests that FINRA's actions were arbitrary and capricious, depriving investors of their

179    property (MMTLP shares) without proper notice or an opportunity for recourse, directly
180    violating their due process rights.

181    24. Furthermore, on February 8, 2024, Greg McCabe, CEO of Next Bridge Hydrocarbons,
182    publicly disclosed that foreign firms had approached Next Bridge seeking to purchase
183    shares far exceeding the 2.65 million short shares FINRA reported (Exhibit AJ). McCabe
184    also pointed out the limitations of FINRA's ability to oversee foreign firms and disputed
185    FINRA's characterization of the short interest position as "nominal." This disclosure
186    directly contradicts FINRA's short interest estimate, highlighting the significant investor
187    demand that FINRA failed to account for when imposing the trading halt. The failure to
188    recognize the scale of investor interest, coupled with the inability to properly oversee
189    foreign firms involved in the transaction, further underscores the unjustified and arbitrary
190    nature of FINRA's actions and the continuing harm caused by its decision to halt trading.

191    25. Greg McCabe and George Palikaras (Former MMAT CEO) disputes FINRA's role in the
192    corporate actions, emphasizing the discrepancy between Meta Materials' stated
193    distribution date of December 14, 2022, and FINRA's deletion date of December 13,
194    2022 (Exhibit AK & AO). McCabe pointed out that this discrepancy exacerbated
195    confusion for investors and further highlights the flaws in FINRA's handling of the
196    corporate action. This misalignment in dates further supports the claim that FINRA's
197    actions were arbitrary, violated FINRA rule 6490, and led to the deprivation of investors'
198    rights without due process.

199    26. Moreover, in April 2024, a Schedule 13D filed by BiTech Technologies Corporation
200    disclosed the reuse of CUSIP 89102U103 (Exhibit X)— the same identifier originally
201    assigned to Torchlight Energy Resources which eventually became MMTLP during the
202    reverse-merger (Exhibit Y & Z). This duplication, occurring well over a year after the U3
203    trading halt, reflects a continuing breakdown in regulatory oversight by FINRA and the
204    SEC. The failure to prevent the reassignment of a known, controversial CUSIP—without
205    investor notice, guidance, or corrective action—demonstrates ongoing procedural
206    negligence. This event further underscores Plaintiff's claim that FINRA has not only
207    deprived investors of property without due process but continues to perpetuate systemic
208    confusion and harm within the marketplace.

209    27. Plaintiff contends that FINRA's conduct constituted more than administrative error; it
210    represented a misuse of regulatory discretion. By publishing materially incomplete and
211    misleading corporate action data—and subsequently using that misinformation as
212    justification for halting all trading—FINRA acted in a manner inconsistent with its duties
213    to protect market integrity and ensure fair access.

214    28. Additionally, Plaintiff asserts that the following FINRA Rules may have been violated
215    throughout FINRA's handling of MMTLP—from the initial phases of its trading through

216  the U3 halt and beyond. These potential violations include systemic regulatory failures
217  and a pattern of conduct that undermined transparency, trading integrity, and shareholder
218  rights.

219  **Rule 6490(d)(3)**: Failure to verify that issuer documentation supported corporate action
220  timing. (Exhibit A, B, C, AO & AP)

221  **Rule 6440**: Imposing a U3 halt without sufficient transparency or justified extraordinary
222  circumstances. (Exhibit D, E, & I)

223  **Rule 6432**: Failure to ensure compliance with required Form 211 filings prior to quoting
224  or trading a security. (Exhibit G, AN, & AX)

225  **Rule 4320**: Mishandling of trading in OTC securities subject to corporate actions.
226  (Exhibit A, B, C, & K)

227  **Rule 2010**: Failure to observe high standards of commercial honor and just and equitable
228  principles of trade. (Exhibit H, L, M, X, Y & Z)

229  **Rule 3310**: Potential failure to maintain an adequate anti-money laundering compliance
230  program amid irregular trading behavior. (Exhibit H, AU, & AV)

231  **Rule 2261**: Failure to make financial and operational condition disclosures to investors.
232  (Exhibit K)

233  **Rule 3110**: Inadequate supervisory systems in reviewing and approving the corporate
234  action timeline. (Exhibit A, B, C, & I)

235  **Rule 6140**: Misleading dissemination of trading information. (Exhibit B, C, & K)

236  **Rule 8210**: Failure to respond fully and transparently to lawful requests for information
237  by investors and third parties. (Exhibit H & F)

238  29. Moreover, FINRA's conduct may implicate the following SEC Rules and Regulations:

239  **SEC Rule 10b-5**: Engaging in manipulative or deceptive practices by failing to disclose
240  material information accurately. (Exhibit C, J, K, L, X, Y, & Z)

241  **SEC Rule 17a-4**: Failure to maintain required records related to the corporate action and
242  halt decision. (Exhibit K)

243  **SEC Rule 15c2-11**: Potential irregularities in initiating or continuing quotations in
244  MMTLP without adequate issuer information. (Exhibit G, X, Y, Z, AN, & AX)

245  **SEC Rule 15(b)(6)**: Failure to enforce compliance with rules designed to prevent
246  fraudulent and manipulative acts, promote just and equitable principles of trade, and

247    protect investors, thereby abdicating statutory responsibilities delegated by the SEC.
248    (Exhibit L & M)

249    **Reg SHO Rule 204**: Concerns of persistent settlement failures and failure to close out
250    short positions in MMTLP. (Exhibit J, K, L, M, AU, & AV)

251    30. In a Congressional hearing, former SEC Chair Gary Gensler was questioned about the
252    MMTLP halt. He explicitly stated that the SEC did not authorize or oversee FINRA's
253    actions regarding the U3 trading halt, further separating responsibility for the halt from
254    the SEC. This testimony, where Gensler feigned ignorance and declined to confirm any
255    investigation into FINRA's actions, highlights the lack of regulatory oversight and
256    accountability in the actions taken against MMTLP (Exhibit AY).

257    31. The lack of corrective action, public transparency, or investor remedies by FINRA over
258    the subsequent two and a half years has resulted in sustained financial and procedural
259    harm to Plaintiff and thousands of similarly situated investors. As of the filing of this
260    complaint, the U3 trading halt remains unresolved, and affected investors have not been
261    afforded due process or restitution. This ongoing neglect has drawn concern from
262    members of Congress (Exhibit F), including Congresswoman Barbara Lee, who in a letter
263    dated December 4, 2023, called for accountability and transparency regarding the
264    handling of MMTLP and the unresolved trading halt (Exhibit AE).

265    32. These failures represent not merely a technical misstep, but a systemic breakdown in
266    FINRA's execution of its regulatory duties. All the events leading up to and following the
267    U3 halt merit judicial scrutiny, declaratory relief, and legal redress.

268

269                              **CLAIMS FOR RELIEF**

270    **Count I: Abuse of Regulatory Authority Resulting in Due Process Violations committed by**
271                                  **FINRA**

272    33. Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully
273    set forth herein

274    34. The Fifth Amendment to the United States Constitution provides that no person shall be
275    "deprived of life, liberty, or property, without due process of law." This constitutional
276    guarantee applies not only to governmental entities but also to quasi-governmental
277    organizations, such as FINRA, when acting under the color of federal authority.

278    35. FINRA, acting in its capacity as a self-regulatory organization (SRO) under delegated
279    authority from the U.S. Securities and Exchange Commission (SEC), issued a revised
280    Corporate Action Notice on or around December 8, 2022, which removed the issuer-
281    designated Pay Date of December 14, 2022 and instead listed the MMTLP symbol as
282    "deleted" effective December 13, 2022 (Exhibit C). This directly contradicted the

283     distribution schedule publicly disclosed by Meta Materials Inc. (Exhibit A & AO),
284     generated widespread confusion among market participants, and destabilized orderly
285     trading.

286     36. FINRA subsequently imposed a sudden an indefinite U3 trading halt on December 9,
287     2022 (Exhibit E), three days before the final anticipated trading day and record date. This
288     abrupt action deprived Plaintiff and other shareholders of the opportunity to sell, transfer,
289     or manage their securities, effectively locking their assets without advance notice, an
290     opportunity to be heard, or any form of recourse.

291     37. The trading halt was justified by FINRA on the grounds of "uncertainty in settlement and
292     clearance processes" (Exhibit I), including DTC ineligibility and the potential for trades
293     not to settle before the record and distribution dates. However, the very uncertainty
294     FINRA cited was a direct consequence of its own flawed notice—which omitted the Pay
295     Date, designated a premature share deletion, and failure to adhere to applicable SEC &
296     FINRA regulations.

297     38. In issuing that notice and then citing the resulting confusion as justification for halting the
298     market, FINRA acted as both the cause and enforcer of the disruption — thereby abusing
299     its regulatory discretion. Brokers, including TradeZero (Exhibit AB), Interactive Brokers
300     (Exhibit AC), and Ameritrade (Exhibit AG) had already communicated to holders that
301     MMTLP would remain tradable through December 12 and that Short Positions would be
302     forcibly closed (Exhibit AB). Even OTC Markets Vice President Jeff Mendl publicly
303     affirmed trading continuity as late as December 7 on Trader TV Live (Exhibit AF). The
304     halt thus interrupted a knowingly functional market, making FINRA's action even more
305     arbitrary and harmful. These actions violated the Fifth Amendment guarantee of due
306     process by depriving Plaintiff of property rights without proper notice or legal procedure.
307     The ability to buy, sell, or liquidate securities is a fundamental economic liberty protected
308     under the Constitution when government-delegated entities act in ways that carry the
309     force of law.

310     39. FINRA is not immune from judicial review when it operates beyond the scope of its
311     delegated authority, or in a manner that is arbitrary, capricious, or contrary to law. Its
312     conduct in this case represents a gross overreach and a fundamental breakdown of its
313     duty to maintain market integrity and protect investors.

314     40. As a direct result, Plaintiff has suffered financial losses (Exhibit N), emotional distress,
315     and an ongoing deprivation of property rights, and seeks compensatory and equitable
316     relief as determined by this Court.

317

318

319

320

**Count II: Negligent Failure to Adhere to Mandated Regulatory Procedures committed by FINRA**

41. Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

42. As a self-regulatory organization operating under the authority of the Securities Exchange Act of 1934, FINRA is required to adhere to established regulatory protocols, including its own rules—such as FINRA Rules 6490, 6440, and 2010—as well as relevant SEC oversight and guidance (Exhibit AP). These rules exist to ensure transparency, accuracy, and investor protection in market activity.

43. In publishing a Corporate Action Notice for MMTLP on December 8, 2022, that omitted the issuer-designated Pay Date and prematurely listed the MMTLP symbol as deleted effective December 13, 2022 (Exhibit C), FINRA failed to align its notice with the information publicly disclosed by Meta Materials Inc. (Exhibit A & AO). This discrepancy breached FINRA Rule 6490(d)(3), which mandates verification of issuer-submitted data for completeness and accuracy prior to publication (Exhibit AP).

44. Rather than correcting this procedural failure, FINRA invoked Rule 6440 to impose a U3 trading halt, citing the confusion and settlement disruption caused by the flawed corporate action (Exhibit I). According to a statement by George Palikaras, FINRA took three months to review the corporate action and, as late as December 5, 2022, still had not informed Meta Materials whether the corporate action was deficient (Exhibit AT). Importantly, FINRA did not immediately provide a reason for the halt (Exhibit AS). This lack of transparency, combined with the U3 halt, amplified the harm to investors and created an immediate market closure that denied Plaintiff and others the opportunity to manage or divest their positions.

45. FINRA's conduct reflects gross regulatory negligence, a failure to supervise and communicate transparently, and a dereliction of its duty to ensure orderly market functioning. This negligence directly contributed to the deprivation of property rights, a collapse in investor trust, and market dysfunction. Internal communications obtained via FOIA reveal that Sam Draddy, FINRA's Head of Market Regulation, was aware of "fraud detected" related to MMTLP prior to the halt, yet no meaningful enforcement, disclosure, or investor protection followed (Exhibit AD). This failure to act on known indicators of fraud further exemplifies the depth of FINRA's regulatory breakdown and abandonment of its oversight responsibilities.

46. As a direct result, Plaintiff suffered economic damages (Exhibit N), emotional distress, and loss of due process protections. FINRA's failure to fulfill its procedural obligations is actionable under both statutory and constitutional principles and warrants judicial intervention and appropriate remedies.

358    **Count III: Deprivation of Property Without Due Process of Law (Fifth Amendment**
359    **Violation) Committed by FINRA**

360    47. Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully
361    set forth herein.

362    48. The Fifth Amendment to the United States Constitution provides that no person shall be
363    "deprived of life, liberty, or property, without due process of law." This constitutional
364    guarantee applies not only to governmental entities but also to quasi-governmental
365    organizations, such as FINRA, when acting under the color of federal authority.

366    49. Plaintiff held a legitimate property interest in MMTLP securities—lawfully acquired and
367    publicly traded shares—which entitled Plaintiff to sell, transfer, or otherwise dispose of
368    these securities in the open market.

369    50. By imposing a sudden, indefinite U3 trading halt on December 9, 2022 (Exhibit E),
370    FINRA effectively froze Plaintiff's assets, denying all market access, communications,
371    and transactional options—without prior notice, public justification, or an opportunity for
372    investors to be heard.

373    51. This halt was not triggered by external volatility or issuer misconduct, but by FINRA's
374    own conflicting and inaccurate corporate action notices—first on December 6, which
375    incorrectly indicated cancellation prior to the actual distribution date, and then on
376    December 8, which omitted the distribution date entirely and introduced further
377    ambiguity. These procedural missteps manufactured the settlement concerns FINRA
378    subsequently cited to justify the halt, rendering it both the architect and executor of the
379    disruption.

380    52. FINRA's actions in halting MMTLP trading contradict the very limitations they set forth
381    in their own correspondence. As outlined in FINRA's letter to NextBridge Hydrocarbons,
382    FINRA does not have the authority to restrict trading unless certain regulatory conditions
383    are met (Exhibit AQ & AR). However, in the case of MMTLP, FINRA immediately
384    imposed a U3 trading halt and deleted the symbol without providing investors adequate
385    notice or an opportunity to manage their holdings. This arbitrary and capricious action,
386    taken without appropriate regulatory authority, violated investors' due process rights by
387    depriving them of their property (MMTLP shares) and acted in direct contradiction to
388    FINRA's stated role and responsibilities.

389    53. Despite FINRA's acknowledgment that over 2.6 million short positions exist in the now-
390    private Next Bridge Hydrocarbons (Exhibit L), no resolution or path to restitution has
391    been offered (Exhibit AI). This prolonged inaction demonstrates a failure to fulfill
392    FINRA's core regulatory obligations and reflects a disregard for its statutory duty to

393 protect investors, ensure market fairness, and remedy harm caused under its supervision.
394 Such inaction supports claims of violations under SEC Rule 15A(b)(6), showing a failure
395 to enforce compliance with anti-fraud provisions and to uphold just and equitable
396 principles of trade. The absence of corrective action, clear investor communication, or
397 meaningful post-halt remedies—despite widespread outcry and repeated requests—
398 reflects a deliberate indifference to the procedural protections guaranteed by law.

399 54. Plaintiff has submitted formal complaints to multiple oversight and enforcement
400 authorities regarding FINRA's conduct in connection with the MMTLP trading halt,
401 including the U.S. Securities and Exchange Commission (SEC) (Exhibit O), the SEC
402 Office of Inspector General (OIG)(Exhibit P), the SEC Office of the Ombudsman
403 (Exhibit Q), the Internet Crime Complaint Center (IC3) affiliated with the Federal Bureau
404 of Investigation (Exhibit R), the Nevada Secretary of State (Exhibit S), and the Nevada
405 Attorney General (Exhibit T). Additionally, Plaintiff has written letters to U.S.
406 Congressman Steven Horsford (Exhibit U & V) and U.S. Senator Catherine Cortez Masto
407 (Exhibit W) seeking intervention and transparency. Despite these extensive efforts, no
408 corrective action, formal investigation findings, or meaningful restitution has been
409 provided. This widespread institutional inaction further underscores the denial of
410 procedural protections and supports Plaintiff's claim of a Fifth Amendment due process
411 violation.

412 55. FINRA's conduct constitutes a clear violation of the Fifth Amendment, as Plaintiff and
413 similarly situated investors were deprived of property without due process of law through
414 actions taken under the color of delegated federal authority.

415 56. As a direct and proximate result of this constitutional violation, Plaintiff has suffered
416 monetary loss (Exhibit N), emotional harm, and a profound erosion of trust in the
417 institutions charged with safeguarding investor rights and market integrity.

418

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in his favor and against Defendant FINRA, and grant the following relief:

I.  **Declaratory Relief** – A judicial declaration that Defendant FINRA acted ultra vires (beyond the scope of its regulatory authority) and in violation of applicable laws, rules, and constitutional protections in connection with the publication of the MMTLP corporate actions and the imposition of the U3 trading halt, specifically including a failure to adhere to relevant SEC and FINRA rules and regulations.

II. **Compensatory Damages** – An award of compensatory damages in an amount to be determined at trial, but not less than the total value of Plaintiff's MMTLP shares as of the date of the U3 trading halt (December 9, 2022). This includes, but is not limited to, any loss of investment value, unrealized gains, and the financial harm caused by the inability to manage or liquidate Plaintiff's MMTLP shares due to FINRA's actions, including the loss of opportunity during the trading halt.

III. **Punitive Damages** – An award of punitive damages in an amount sufficient to punish and deter similar future conduct by FINRA and other self-regulatory organizations operating under governmental oversight.

IV. **Equitable Relief**

    a.  An order compelling FINRA to produce all records, communications, and internal documentation related to its handling of the MMTLP corporate action, the U3 halt decision, and any known anomalies in short interest, broker-dealer conduct, or settlement failures.

    b.  Correct and clarify the mistakes and omissions in the corporate action notices and provide affected investors with a mechanism to regain control over their investments or receive restitution, including potential financial compensation for the ongoing freeze on MMTLP shares.

V.  **Costs and Fees** – An award of all reasonable costs incurred in bringing this action, including court filing fees and any future litigation-related expenses. Attorney's fees are not requested at this time but may be sought if counsel is retained during the course of this action

VI. **Any Further Relief** – Any other and further relief that the Court deems just, proper, and equitable under the circumstances.

451  VII.  **Reservation of Rights to Amend** – Plaintiff reserves the right to amend this Complaint,
452        including the demand for damages, upon the discovery or disclosure of additional
453        material facts. This includes, but is not limited to, evidence of MMTLP trades executed at
454        significantly higher valuations that were reversed, blocked, or otherwise interfered with
455        as a result of Defendant FINRA's actions.

456                        **DEMAND FOR JURY TRIAL**

457        ◉ Plaintiff demands a jury trial on all issues.

458  Respectfully Submitted,

459  Dated: July 8, 2025

460  **William Lee Kelly**
461  **Plaintiff, Pro Se**
462  6126 Leaning Rock Ct.
463  North Las Vegas, NV 89031
464  Email: William.Lee.Kelly@gmail.com
465  Phone: (702)427-2763                    Signature: /s/___William Lee Kelly____

466

467

468

469

470

471

472

473

474

475

476

477

478

479

**EXHIBIT INDEX**

| Exibit | Description |
|--------|-------------|
| A | Meta Materials Inc. Press Release – November 23, 2022 |
| B | FINRA Corporate Action Notice – December 6, 2022 |
| C | FINRA Corporate Action Notice – December 8, 2022 |
| D | FINRA MMTLP Trading Halt FAQ – Released March 16, 2023 |
| E | FINRA Uniform Practice Advisory #35-22 – December 9, 2022 (U3 Halt) |
| F | 74 Member Congressional Letter to the SEC & FINRA – Dec. 22, 2023 |
| G | Response from FINRA CEO to Congressional Letter – Jan. 31, 2024 |
| H | Response from FINRA CEO to Congressional Letter – Jan. 31, 2024 |
| I | Response from FINRA CEO to Congressional Letter – Jan. 31, 2024 |
| J | Market Frauds Article claiming Anson Funds admits to Short Selling |
| K | FINRA MMTLP Trading Halt FAQ Referencing FTD's – March 16, 2023 |
| L | FINRA FAQ - Short Positions In a Private Company – Nov. 6, 2023 |
| M | FINRA FAQ – "Naked" Short Selling FTD Estimates – Nov. 6, 2023 |
| N | Charles Schwab Personal Account Statement -  Dec. 31, 2022 |
| O | Copy of Complaint submitted to the SEC – Dec. 12, 2022 |
| P | Copy of Complaint submitted to SEC OIG – May 6, 2025 |
| Q | Copy of Complaint submitted to SEC OMBUD – Feb. 18, 2025 |
| R | Copy of Complaint to FBI IC3 – Feb. 14, 2025 |
| S | Copy of Complaint to Nevada Secretary of State – Jan. 28, 2025 |
| T | Copy of Complaint to Nevada Attorney General – June 14, 2024 |
| U | Initial Response letter from Congressman Horsford – June 6, 2024 |
| V | Second Response letter from Congressman Horsford – June 12, 2024 |
| W | Response letter from the office of Senator Cortez-Masto – May 15, 2025 |
| X | BiTech Technologies utilization of MMTLP CUSIP – April 24, 2024 |
| Y | TRCH/MMTLP filing verifying CUSIP Number – December 31, 2020 |
| Z | Further Verification of the TRCH/MMTLP CUSIP – June 25, 2021 |

| 508 | Exhibit | Description |
|---|---|---|
| 509 | AA | Trading Data for MMTLP from Nov 21, 2022 to the U3 Halt |
| 510 | AB | TradeZero's Correspondence to MMTLP Holders Pre-Halt |
| 511 | AC | Interactive Brokers Correspondence to MMTLP Holders |
| 512 | AD | FOIA Request Showing Sam Draddy's Correspondence With the SEC |
| 513 | AE | Letter From Congresswoman Barbara Lee – Dec. 4, 2023 |
| 514 | AF | VP of OTC Jeff Mendl Video discussing MMTLP Deletion - Dec. 7, 2022 |
| 515 | AG | Ameritrade Correspondence to MMTLP Holders Pre-Halt |
| 516 | AH | Next Bridge Prospectus referencing an MMTLP Short Squeeze |
| 517 | AI | NBH acknowledgement of Attempts to Resolve Share Imbalance |
| 518 | AJ | NBH Disputes 2.65m Short Estimated Provided by FINRA in FAQ |
| 519 | AK | NBH Disputes FINRA's Role in the Corporate Actions |
| 520 | AL | Short Volume Data for TRCH Final days Before Reverse Merger |
| 521 | AM | Outstanding Share count of the Series A Preferred Share (MMTLP) |
| 522 | AN | Former CEO of TRCH Discussing Trading of the Series A preferred Share |
| 523 | AO | Legal Declaration by George Palikaras regarding FINRA's Corp. Action |
| 524 | AP | FINRA letter to Next Bridge Reference to Rule 6490 – May 19, 2023 |
| 525 | AQ | FINRA Does Not Determine When a Security Stops Trading – May 2023 |
| 526 | AR | Clarification on FINRA's Role on Restricting Trades – May 19, 2023 |
| 527 | AS | Legal Declaration from Georgios Palikaras - Aug. 15 2024 |
| 528 | AT | Palikaras Declaration Whether The Corporate Action was Deficient |
| 529 | AU | MMTLP On Theshold List for over 30 Days (FINRA Deleted Data) |
| 530 | AV | Johnny Tabacco confirms 15 million Shares on Loan in MMTLP |
| 531 | AW | Legal Declaration from George Palikaras Regarding MMTLP Trading |
| 532 | AX | Legal Declaration from George Palikaras Regarding False Information |
| 533 | AY | Gary Gensler Questioned by Congress on MMTLP Sept. 12, 2023 |
| 534 | AZ | TradeStation Confirming They Don't Have Shares Available for Investors |

535    **EXHIBIT A**

536    **Meta Material Inc. Press Release – November 23, 2022**

537    **Subject:** Announcement of Distribution of Next Bridge Hydrocarbons, Inc. Shares and Series A
538    Preferred Stock Cancellation (Support for violating FINRA Rule 6490)

539    **Source:** https://metamaterial.com/meta-materials-inc-board-of-directors-approves-
540    planned-completion-of-the-spin-off-of-next-bridge-hydrocarbons-
541    inc/?utm_source=chatgpt.com

542

# META MATERIALS INC. BOARD OF DIRECTORS APPROVES PLANNED COMPLETION OF THE SPIN-OFF OF NEXT BRIDGE HYDROCARBONS INC.

**HALIFAX, NS / ACCESSWIRE / November 23, 2022 /** Meta Materials Inc. (the "Company" or "META®") (NASDAQ:MMAT, FSE:MMAT), a developer of high-performance functional materials and nanocomposites, today announced that its board of directors has approved the distribution to the holders of META's Series A Non-Voting Preferred Stock ("Series A Preferred Stock" which is currently traded over-the-counter, or OTC, under the symbol MMTLP) of 100% of the common stock of META's wholly owned subsidiary, Next Bridge Hydrocarbons, Inc. ("Next Bridge") in accordance with the Distribution Agreement between META and Next Bridge. Upon completion of the distribution, Next Bridge will be an independent public reporting company, but the Next Bridge common stock is not and will not be publicly traded and will not be eligible for electronic transfer through the Depository Trust Company book-entry system or any other established clearing corporation.

Subject to certain conditions, including, among others, completion of all necessary actions and filings with regard to applicable state securities or "blue sky" laws and final FINRA approval, for which there can be no assurances that such approval will be given, each holder of Series A Preferred Stock as of 4 p.m. ET on December 12, 2022, (the record date for the distribution), will be entitled to receive one share of Next Bridge common stock for every one share of Series A Preferred Stock held as of the record date. The shares of Next Bridge common stock will be distributed on December 14, 2022 after the close of the trading markets, at which time (i) all of the shares of Series A Preferred Stock will be automatically cancelled, (ii) the holders of such Series A Preferred Stock will cease to have any rights with respect to such shares and (iii) the shares of Series A Preferred Stock, MMTLP, will no longer be tradable on the OTC market.

**Archives**

2024
2023
2022
2021
2020
2019
2018
2017
2016
2014

543

544

545

546

547   **EXHIBIT B**

548   **FINRA Corporate Action Notice – December 6, 2022**

549   **Subject:** Initial Corporate Action for MMTLP – Cancellation Date and Distribution Terms
550   (Support for violating FINRA Rule 6490, Rule 6140)

551   **Source:** https://otce.finra.org/otce/dailyList

552



553

554

555

556

557   **EXHIBIT C**

558   **FINRA Corporate Action Notice – December 8, 2022**

559   **Subject:** Revised Corporate Action for MMTLP – Symbol Deletion Effective 12/13/2022
560   (support for violating FINRA rule 6490 and 6140 and SEC Rule 10b-17)

561   **Source:** https://otce.finra.org/otce/dailyList

562



563

564

565

566

567

568    **EXHIBIT D**

569    **FINRA Frequently Asked Questions (FAQ) Regarding the MMTLP Trading Halt – March**
570    **16, 2023** (Support for Violating FINRA Rule 6440)

571    **Subject:** FINRA's Public Explanation for the U3 Trading Halt and Related Market Disruption
572    **Source:** https://www.finra.org/investors/insights/FAQ-MMTLP-corporate-action-and-trading-
573    halt?utm_source=chatgpt.com

### 1. Why did FINRA halt trading in MMTLP?

FINRA is permitted under its rules to impose a quoting and trading halt in an OTC equity security where FINRA determines that an extraordinary event has occurred or is ongoing that has had a material effect on the market for the security or has caused or has the potential to cause major disruption to the marketplace or significant uncertainty in the settlement and clearance process. FINRA made such a determination for MMTLP and halted trading on December 9.

Among FINRA's concerns were the facts that, after December 12, the MMTLP shares would cease to be DTC-eligible; MMTLP shares would be cancelled at the time of the distribution (*i.e.*, December 14); and Next Bridge common stock was not expected to be DTC-eligible—raising uncertainty regarding how transactions executed after December 8 would settle in an orderly manner in relation to these dates. Had MMTLP continued trading after December 8, there was the possibility that investors buying MMTLP during that time period may not have realized that those shares were about to be cancelled by Meta Materials, that they may not receive MMTLP shares before they were cancelled, and that they would not be recorded on December 12 as MMTLP holders eligible to receive Next Bridge common stock in the distribution.

### 2. Why did FINRA halt trading on December 9 if shareholders as of December 12 were entitled to receive the Next Bridge distribution?

FINRA halted trading in MMTLP on Friday, December 9, because securities transactions typically must settle within two business days in accordance with SEC rules. This means that trades in MMTLP executed on December 8 typically would settle on December 12, while trades executed on December 9 or December 12 typically would not settle until after December 12. This is important because a seller ceases to be a holder of shares and a purchaser becomes a holder of shares only after a transaction settles. Therefore, for purposes of the Next Bridge / MMTLP corporate action, only those trades in MMTLP that were executed on or before December 8 typically would have settled in time to establish the purchaser as a new holder of the shares as of December 12.

In addition, after December 12, the MMTLP shares would no longer be DTC-eligible (and the Next Bridge shares were not expected to be DTC-eligible). This means that, after December 12, any unsettled trades in MMTLP would have needed to be handled through broker-to-broker processes outside of DTC. Thus, there was uncertainty about whether trades executed *after* December 8 would settle in an orderly manner, including whether they would settle before the MMTLP shares were cancelled on December 14.

In other words, for trades in MMTLP executed after December 8, the seller of MMTLP shares would still have been recorded as the holder eligible to receive Next Bridge shares as part of the corporate action distribution, and the buyer would not be recorded as eligible to receive Next Bridge shares in the distribution. Moreover, the buyer would have purchased shares that would be cancelled on December 14, and there was uncertainty as to whether these trades would be settled in an orderly manner before the cancellation date. *See also* Question # 7 below.

574

575

576    **EXHIBIT E**

577    **Subject:** FINRA Trading Halt Advisory – U3 Halt and Symbol Deletion of MMTLP  - December
578    9, 2022 (Support for Violating FINRA Rule 6440)

579    **Source:** https://www.finra.org/sites/default/files/2022-12/UPC-35-2022-
580    MMTLP%28Halt%29_2.pdf?utm_source=chatgpt.com

581



### Attn: Trading and Market Making/Legal and Compliance/Operations/Systems
### UNIFORM PRACTICE ADVISORY (UPC # 35-22) 12/09/2022

### Trading and Quotation Halt for META MATERIALS PFD SER A (MMTLP)

Effective Friday, December 09, 2022, the Financial Industry Regulatory Authority, Inc. ("FINRA") halted trading and quoting in the Series A preferred shares of Meta Materials Inc. (OTC Symbol: MMTLP). Pursuant to Rule 6440(a)(3), FINRA has determined that an extraordinary event has occurred or is ongoing that has caused or has the potential to cause significant uncertainty in the settlement and clearance process for shares in MMTLP and that, therefore, halting trading and quoting in MMTLP is necessary to protect investors and the public interest.

The trading and quoting halt will end concurrent with the deletion of the symbol effective Tuesday, December 13, 2022. *See* updated FINRA Daily List announcement of December 8, 2022, regarding MMTLP; available here: https://otce.finra.org/otce/dailyList.

*See also* Form S1 Registration Statement for Next Bridge Hydrocarbons, Inc. stating that **"...immediately after the Spin-Off, all shares of Series A Non-Voting Preferred Stock of Meta shall be cancelled."**  Available here: https://www.sec.gov/Archives/edgar/data/1936756/000119311522281275/d302576ds1a.htm.

Questions regarding this notice can be directed to: FINRA Market Operations at (866) 776-0800, Option 2.

582

583

584

585

586    **EXHIBIT F**

587    **Subject:** Letter from Congressman Ralph Norman to FINRA CEO Robert Cook and SEC Chair
588    Gary Gensler - December 22, 2023 (Support for Violating FINRA Rule 8210)

589    **Source:** https://norman.house.gov/uploadedfiles/rep-norman-mmtlp-letter-2023-12-22-
590    final.pdf?utm_source=chatgpt.com

Please provide a response to the following questions and requests no later than January 31, 2024:

1.  Provide a timeline of trading of MMTLP on the OTC markets; the actions taken by the SEC, self-regulatory organizations, the issuers, the transfer agent, and any other relevant parties during the time MMTLP was traded; and the transaction that produced Next Bridge Hydrocarbon shares.

2.  The Former CEO of Torchlight Energy Resources stated that "MMTLP was never designed to trade."[5] Please provide a detailed explanation, including the relevant statutory authority and procedures, that allowed for MMTLP shares to trade on the OTC market.

3.  Provide the relevant statutory authority, jurisdiction, and adherence to established industry standards regarding the U3 trading halt of MMTLP issued on December 9, 2022.

4.  Provide the exact date and circumstances surrounding FINRA's determination to implement the U3 halt, including all unredacted communications between FINRA, SEC, governmental agencies, any outside organizations, FINRA members and non-FINRA members, and any other individuals. Also include all information surrounding the SEC or FINRA's knowledge of the share price in any public or non-public exchange before issuance of the U3 halt.

5.  Provide the first date and time that FINRA or its agents advised any market participant in any manner that MMTLP would no longer trade on December 9, 2022. Include any relevant documents or communication.

6.  Did FINRA issue a Blue Sheet request for MMTLP during the period of October 2021 through December 2022? Why or why not?

7.  How many questions, complaints, and/or inquiries have you received regarding MMTLP?

8.  Provide the statutory or legal justification used by the SEC and FINRA to ignore public requests and congressional inquiries regarding MMTLP.

9.  Provide the delivery of a certified audited and consolidated count of shares that were held by all U.S. and foreign financial institutions, together with their clearing firm counter-brokers including trades not reported in the consolidated audit trail (CAT), related to MMTLP on the date of December 12, 2022. Please include all shares/holdings of long and short positions, as well as IOUs held by each participating broker and market participant as record owner, beneficial owner, or in any other capacity (each reported separately) including but not limited to: all shares registered at AST, all shares held in

591
592
593

594    **EXHIBIT G**

595    **Subject:** Letter from FINRA CEO Robert Cook to Congressman Ralph Norman - Jan. 31, 2024

596    (Support for violating FINRA Rule 6432 & SEC Rule 15c2-11)

597    **Source:** https://norman.house.gov/uploadedfiles/2024-01-31-finra-response-to-rep-norman-

598    regarding-mmtlp.pdf?utm_source=chatgpt.com

599

  -  Assigning the "MMTLP" symbol upon request of a broker-dealer was standard
     practice given the circumstances, and appropriate to further market transparency.
     When a security trades OTC, FINRA broker-dealers are required by FINRA rules to
     request a stock symbol (if one does not already exist) and report the trade.  Then they
     must electronically report the price and size of the executed transaction, which
     FINRA disseminates to the public to provide transparency.  This is what occurred in
     the case of MMTLP.  Given that a trade had been executed and the company had
     obtained a unique identifier for the security,[4] FINRA assigned the "MMTLP" symbol
     in October 2021.  The MMTLP symbol was *not* assigned in connection with a Form

---

[3]    "Examining the Agenda of Regulators, SROs, and Standards-Setters for Accounting, Auditing,"
       Tuesday, December 12, 2023, Capital Markets Subcommittee, House Committee on Financial
       Services.  Testimony of Mr. Robert Cook, President and CEO, Financial Industry Regulatory
       Authority (FINRA), available at https://docs.house.gov/meetings/BA/BA16/20231212/116638/HHRG-
       118-BA16-Wstate-CookR-20231212.pdf.

[4]    The issuer had obtained a CUSIP number for the Series A Preferred Shares, which is a unique
       identifier for a security assigned by CUSIP Global Services and used to facilitate trading and
       settlement.

The Honorable Ralph Norman
January 31, 2024
Page 3

  211 submission, contrary to some claims made on social media that trading in
  MMTLP began based on a Form 211 submitted using fraudulent information.

600

601

602    **EXHIBIT H**

603    **Subject:** Letter from FINRA CEO Robert Cook to Congressman Ralph Norman - Jan. 31, 2024
604    (Support for violating FINRA Rule 2010, Rule 3310, Rule 8210)

605    **Source:** https://norman.house.gov/uploadedfiles/2024-01-31-finra-response-to-rep-norman-
606    regarding-mmtlp.pdf?utm_source=chatgpt.com

- FINRA has reviewed its members' U.S. trading activity in MMTLP, including short
  sale activity, and has found no evidence that there was significant naked short
  selling (which some social media sources refer to as "counterfeit shares") in MMTLP. The
  total number of U.S. short positions identified at FINRA members represent only a
  nominal percentage of the total shares issued and outstanding as of December 12,
  2022. Further, U.S. reported short positions at FINRA members dramatically
  decreased leading up to the last regular day of trading in MMTLP. In sum, FINRA is
  not aware of any data that supports social media claims of significant naked short
  selling or "counterfeit shares."

- FINRA cannot perform a "certified audited and consolidated count of shares."
  FINRA's regulatory authority does not extend to domestic or foreign non-member
  entities that could act as custodians or agents holding securities for others, including
  foreign-registered broker-dealers. Further, the regulatory tools available to FINRA
  do not provide the data that would enable FINRA to perform a share count (*e.g.*, the
  Consolidated Audit Trail, Electronic Blue Sheets, and FINRA's trade reporting
  facilities do not contain information about securities *positions* as described in more
  detail below). The transfer agent[5] retained by Next Bridge would be the best source
  of information regarding recordholders in Next Bridge common stock.

607
608
609
610
611
612
613
614
615
616
617
618

619    **EXHIBIT I**

620    **Subject:** Letter from FINRA CEO Robert Cook to Congressman Ralph Norman - Jan. 31, 2024
621    (support for violating FINRA Rule 6440)

622    **Source:** https://norman.house.gov/uploadedfiles/2024-01-31-finra-response-to-rep-norman-
623    regarding-mmtlp.pdf?utm_source=chatgpt.com

> Some investors continue to question FINRA's reasons for imposing the halt, and we continue to observe inaccurate information circulating on some social media about trading in MMTLP and the trading halt. While we discuss these questions in greater detail below and in our FAQs, it is helpful to first highlight several key facts about trading in MMTLP and FINRA's role:
>
> - FINRA's decision to halt trading was due to clearance and settlement concerns in light of the structure and timing of the corporate action. As a result, ongoing trades after December 8, 2022 would not be settled by December 12, 2022, or predictably thereafter, risking significant investor confusion and harm. Contrary to some theories circulated on social media, FINRA did not initiate the halt because there were problems with a "share imbalance" and "counterfeit shares," or because of short positions held by hedge funds. FINRA also did not provide advance notice of the trading halt to broker-dealers, hedge funds, or any other market participant.
>
> - Investors have expressed confusion regarding whether Meta Materials needed to approve the commencement of trading in MMTLP. Generally, an issuer's approval is not needed for a security to trade outside of a securities exchange, *i.e.*, "over the counter" (OTC), although an issuer may take steps to limit such trading. The issue of whether a security can be publicly traded is governed by the Securities Act and SEC rules; for purposes of these provisions, it does not appear that Meta Materials took effective steps to restrict public trading in MMTLP.

624

625

626

627

628

629

630

631

632

633

634

635    **EXHIBIT J**

636    **Subject:** Article claiming to have documented Evidence of Anson Funds request to cover 10
637    million shorted shares 6 months after MMTLP U3 Halt (Support for violating FINRA Rule 2010,
638    3310, SEC Rule 17a-4 and REG SHO 204)

639    **Source:** https://marketfrauds.to/anson-funds-naked-short-fraud-with-mmtlp/

**Anson Funds admits it was naked short 10 million shares**

What happened 6 months later (after Nextbridge was halted) was also interesting: Anson Funds contacted Roth Capital seeking to buy shares of Nextbridge. 10 million shares at $0.30 cents a share to cover their short position. This is all documented

Roth's response was, wait a second, don't you have a borrow?

Anson's response was "no". And the Fund claimed that it wasn't necessary to have a borrow because it was doing an arbitrage play. (This is utterly meaningless and doesn't even make sense, but it was their excuse.)

**Anson Funds openly admitted it had a 10 million share naked short position that had been failing for years, without a borrow.**

Anson pretends to be naive and fumbling its way through the markets, which couldn't be further from the truth. The Fund has top law firms representing it in every endeavor, and is well aware of the legality or illegality of every action. Quite simply, Anson believes it is above the law and can get away with it. And so far, the Fund HAS been operating above the law, with high-level collaborators.

Anson's standard argument is that it didn't understand the rules correctly, and this is what it did with the American Airlines trade, claiming the Fund merely made a mistake on the understanding of the rules which it was subsequently fined for.

https://www.sec.gov/files/litigation/admin/2023/34-98775.pdf

640
641
642
643
644
645
646
647
648
649
650

651    **EXHIBIT K**

652    **Subject:** FINRA MMTLP Trading Halt FAQ Referencing FTD's – March 16, 2023

653    **Source:** https://www.finra.org/investors/insights/FAQ-MMTLP-corporate-action-and-trading-
654    halt?utm_source=chatgpt.com

655

*Fails-to-Deliver:* The SEC publishes data on the total quantity of "fails-to-deliver" per security as of each reporting settlement date. As the SEC has explained, a fail-to-deliver can occur as the result of either a long or a short sale. For example, a fail-to-deliver can result from a "naked" short sale—where the seller does not borrow or arrange to borrow shares in time to make delivery to the buyer within the standard settlement period. A fail-to-deliver also may result from a long sale where there was a delay in the delivery of shares within the standard settlement period.

Among other things, SEC Regulation SHO imposes close-out requirements for fails-to-deliver in equity securities. These requirements include close-outs of fails-to-deliver in threshold securities. A "threshold security" is a security that meets defined criteria designed to address concerns regarding large and persistent failures to deliver and potentially abusive "naked" short selling. Regulation SHO's threshold security criteria include quantitative standards that apply to the securities of issuers that are SEC-reporting companies. FINRA has a separate rule, with a different quantitative threshold, for the securities of issuers that are not SEC-reporting companies.

Due to a systems coding issue, FINRA incorrectly classified MMTLP as the security of a non-SEC-reporting company and, as a result, incorrectly published its "Threshold Securities List" showing that MMTLP met the FINRA threshold standard from October 22, 2021, through January 4, 2022, and from October 17, 2022, through December 13, 2022. While MMTLP did meet the quantitative criteria under FINRA Rule 4320, it was subject to the Regulation SHO standard instead because MMTLP was issued by an SEC-reporting company. Since it began trading in October 2021, MMTLP did not have fails-to-deliver of the size or duration that would have rendered it a threshold security under Regulation SHO, and it was therefore an error to publish it on the Threshold Securities List. FINRA has now removed MMTLP from the Threshold Securities List.

656

657

658

659

660

661

662

663

664    **EXHIBIT L**

665    **Subject:** FINRA FAQ - Short Positions In a Private Company – Nov. 6, 2023

666    **Source:** https://www.finra.org/investors/insights/supplemental-faq-mmtlp-corporate-action-and-
667    trading-halt

668

**14. How much short selling was there in MMTLP around the time of the Next Bridge / MMTLP corporate action? Was there a large short position in MMTLP shares?**

FINRA periodically collects short interest information from broker-dealers and publishes short interest reports twice each month based on that information. As explained in the March 16, 2023, MMTLP FAQs, Question No. 8, these reports reflect a snapshot of the total open short positions existing in a security on the books and records of broker-dealers on a given reporting settlement date. The last short interest reporting settlement date available for MMTLP was November 30, 2022, because the issuer cancelled the MMTLP shares and the symbol was deleted prior to the next short interest reporting settlement date. Thus, short interest data for MMTLP around the time of the corporate action was not made publicly available.[11]

Based on FINRA's subsequent regulatory efforts, FINRA estimates that there was an aggregate short interest position in MMTLP in accounts held at broker-dealers as of December 12[12] of approximately 2.65 million shares out of 165.47 million total shares outstanding, which is not a significant percentage—only 1.6%—of the total shares outstanding.[13] The short interest position in MMTLP had therefore decreased substantially—by nearly 60%—between November 15 and December 12. Specifically, short interest in MMTLP as of November 15, 2022, (approximately 6.4 million shares) declined around 27% to approximately 4.7 million shares as of November 30, 2022, and declined about a further 32% to approximately 2.65 million shares as of December 12.

669

670

671

672

673

674

675

676

677

678

679

680  **EXHIBIT M**

681  **Subject:** FINRA FAQ – "Naked" Short Selling FTD Estimates – Nov. 6, 2023

682  **Source:** https://www.finra.org/investors/insights/supplemental-faq-mmtlp-corporate-action-and-
683  trading-halt

### 15. Was there excessive "naked" short selling resulting in "counterfeit shares" in MMTLP at the time of the corporate action?

While it is not clear what is meant by the term "counterfeit shares," it has been used in social media when discussing "naked" short selling and FTDs in a security.[15] A "naked" short sale is generally understood to mean a short sale where the seller does not borrow or arrange to borrow the securities in time to make delivery within the standard settlement period—resulting in a FTD[16] when delivery is due.[17]While certain trades are required to be marked "short" pursuant to SEC Regulation SHO, "naked" short sales are not identified as such in the relevant short sale data.[18] Nonetheless, where there is significant "naked" short selling in a security, we would expect to see indicators in the data—particularly, a high number of FTDs. The SEC publishes data obtained from the National Securities Clearing Corporation's (NSCC) Continuous Net Settlement (CNS) system on the total quantity of FTDs per security as of each reporting settlement date.[19]

FINRA has found no evidence that there was significant naked short selling in MMTLP at the end of its trading, which appears to run counter to the social media claims regarding "counterfeit shares." The SEC did not publish FTD data for MMTLP for December 12 because transactions in MMTLP executed on the last day of its trading—December 8—were not cleared through CNS. However, FTDs as of December 9 were very low—215,238 shares. In addition, while CNS FTD data is not available for transactions in MMTLP due to settle on December 12, FINRA estimates that a very small number (0.03% of MMTLP's total shares outstanding) of the short positions in MMTLP as of December 12, 2022, would have potentially resulted in FTDs. Broker-dealers had stock borrows or margin securities available to cover almost 100% of the open short positions.

The limited number of FTDs through December 9 together with other factors—such as the availability of shares (stock borrows or margin securities) to cover almost 100% of the open short positions on December 12 (as discussed above), the successful distribution of Next Bridge shares (as discussed above in Question No. 12), and the low amount of short interest positions in MMTLP relative to total shares outstanding as of December 12 (as discussed above in Question No. 14)—run counter to claims that there was extensive "naked" short selling near the end of trading resulting in "counterfeit shares," or that the distribution of Next Bridge common stock to many MMTLP shareholders was disrupted by such activity.

684

685

686

687

688

689

690

691

692  **EXHIBIT N**

693  **Subject:** Charles Schwab Personal Account Statement -  Dec. 31, 2022

694  **Source:** https://client.schwab.com/app/accounts/statements/#/



|  | Schwab One® Account of<br>WILLIAM LEE KELLY | Account Number<br>1712-6093 | Statement Period<br>December 1-31, 2022 |
|---|---|---|---|

**Account Value as of 12/31/2022: $ 174.19**$^\Delta$

| Change in Account Value | This Period | Year to Date |
|---|---|---|
| Starting Value | $ 187,445.87 | $ 36,815.47 |
| Credits | 0.02 | 0.07 |
| Debits | 0.00 | (0.02) |
| Transfer of Securities (In/Out) | 0.00 | 0.00 |
| Income Reinvested | 0.00 | 0.00 |
| Change in Value of Investments | (187,271.70) | (36,641.33) |
| Ending Value on 12/31/2022$^\Delta$ | $ 174.19 | $ 174.19 |
| Total Change in Account Value | $ (187,271.68)<br>(99.91)% | $ (36,641.28)<br>(99.53)% |

Account Value [in Thousands]



| Asset Composition | Market Value | % of Account Assets |
|---|---|---|
| Bank Sweep$^{X,Z}$ | $ 58.65 | 34% |
| Equities | 103.15 | 59% |
| Exchange Traded Funds | 12.39 | 7% |
| Total Assets Long$^\Delta$ | $ 174.19 | |
| Net Loan Balance | 0.00 | |
| Total Account Value$^\Delta$ | $ 174.19 | 100% |



- ■ 34% Bank Sweep [X,Z]
- ▨ 59% Equities
- □ 7% Exchange Traded Funds

695

696

697

698

699

700

701

702    **EXHIBIT O**

703    **Subject:** Initial Complaint Filed with the U.S. Securities and Exchange Commission (SEC)

704    **Source:** Personal Email Account



Dear William Kelly:

Thank you for contacting the U.S. Securities and Exchange Commission (SEC).

The SEC's Office of Investor Education and Advocacy processes many comments from individual investors and others. We keep records of the correspondence we receive in a searchable database that SEC staff may make use of in inspections, examinations, and investigations. In addition, some of the correspondence we receive is referred to other SEC offices and divisions for their review. If they have any questions or wish to respond directly to your comments, they will contact you.

Please note that securities exchanges and self-regulatory organizations (SROs), not the SEC, determine whether to impose a trading halt in a stock. Please see https://www.finra.org/investors/investing/investment-products/stocks/trading-halts-delays-suspensions for more information.

Information regarding the trading halt of Meta Materials (MMTLP) is available at https://www.finra.org/sites/default/files/2022-12/UPC-35-2022-MMTLP%28Halt%29_2.pdf

Sincerely,

Office of Investor Education and Advocacy
U.S. Securities and Exchange Commission
(800) 732-0330
www.sec.gov
www.investor.gov
705    www.twitter.com/SEC_Investor_Ed

706

707

708

709

710

711 **EXHIBIT P**

712 **Subject:** Complaint Filed with the SEC Office of Inspector General (OIG)

713 **Source:** Personal Email Account

Complaint received by the SEC OIG; Hotline Report No. 2025066507   MMTLP Lawsuit ×

**OIG**
to me ▾                                                                                         Wed, Jun 11, 10:54 AM (6 days ago)

Thank you for contacting the U.S. Securities and Exchange Commission (SEC) Office of Inspector General (OIG).  We received the report of your complaint.

We will evaluate the information provided and determine an appropriate action.  Options include opening an OIG review; referring the matter to a SEC Division or Office for review, if warranted; and taking no further action.  In this regard, please note the following:

- The SEC OIG is an independent office within the SEC that conducts audits and evaluations of SEC programs and operations and investigates allegations of fraud, waste, or abuse at or against the SEC.
- The OIG derives its authority from the Inspector General Act of 1978, as amended.  In accordance with that statute, we cannot perform SEC operating responsibilities, such as investigation of alleged securities law violations.
- Our authority is limited to issues that relate to SEC programs, operations, and personnel.
- We have no authority to direct SEC action with regard to SEC operations, such as (1) change its policies, (2) commence or conclude any particular investigation, (3) implement new securities rules for market participants, or (4) initiate administrative disciplinary action.
- Due to privacy interests, we do not provide complainants with updates on, or the results of, a complaint or investigative matter.  However, our audit reports are published on www.sec.gov/office-inspector-general.
- General questions about the Federal securities laws and complaints about financial investment professionals can be directed to the SEC's Office of Investor Education and Advocacy at www.sec.gov/oiea/QuestionsAndComments.html, www.sec.gov/oiea/Complaint.html, help@sec.gov, 202-551-6500 or 1-800-732-0330.  [Note: The SEC staff cannot act as a personal representative or attorney.  Thus, they cannot represent investors and may be unable to assist you in private disputes with other parties.]
- Allegations of Federal securities law violations should be reported using the online Web form located at www.sec.gov/tcr.  You should detail how the individual(s) violated U.S. Federal securities laws.  Tips, Complaints, and Referral Filing Guidance is available at www.sec.gov/complaint/info. [Note: SEC investigations are conducted confidentially.  As a result, the SEC generally will not confirm or deny the existence of an investigation unless and until it becomes a matter of public record.  www.sec.gov/answers/investg.htm.]

Respectfully,

The Office of Inspector General
U.S. Securities and Exchange Commission
100 F Street, NE, Washington, DC  20549-2977
714    oig@sec.gov

715

716

717

718

719

720

721    **EXHIBIT Q**

722    **Subject:** Submission to the SEC Office of the Ombudsman

723    **Source:** Personal Email Account

SEC Ombuds Matter Management System (OMMS) Submission - Matter ID Number 20250214-00015901  MMTLP Lawsuit ×



**Ombuds OMMS** <ombudsmanomms@sec.gov>                                Tue, Feb 18, 9:22 AM
to me

                    U.S. SECURITIES AND
                    EXCHANGE COMMISSION

Dear William Kelly:

Thank you for contacting the Ombuds of the U.S. Securities and Exchange Commission (SEC) regarding your concerns about preferred shares issued by Meta Materials Inc. (Meta Materials) previously trading over-the-counter as MMTLP. The Office of the Ombuds handles retail investor recommendations, questions and complaints about the SEC and the self-regulatory organizations (SROs) that it oversees.

The Ombuds generally treats matters as confidential and takes reasonable steps to maintain the confidentiality of communications. However, our Office may need to contact other SEC divisions or offices, SROs, entities, and/or individuals to disclose information without permission under certain circumstances including, but not limited to: a threat of imminent risk or serious harm; assertions, complaints, or information relating to violations of the securities laws; allegations of government fraud, waste, or abuse; or if otherwise required by law. Information received by the Ombuds may also be used in future recommendations to the SEC.

With regard to your specific requests, seeking: (1) "a complete independently audited share count of the TOTAL outstanding shares of MMTLP and the 2 days of trading that investors should have had, so all outstanding positions can be closed and settled"; and (2) "answers from the SEC regarding their oversight of FINRA for breaking rule 6490, FINRA Rule 6432, SEC Rule 15c2-11, FINRA Rule 2010, and FINRA Rule 6440 which they used to issue the U3 Halt," please be advised that our Office has been, and continues to be, in communication with certain individuals, Offices, and Divisions here at the SEC regarding these and similar investor concerns.

724    Thank you again for contacting the SEC Ombuds. We appreciate your views.

725

726

727

728

729

730

731

732

733

734    **EXHIBIT R**

735    **Subject:** FBI IC3 Complaint Submission

736    **Source:** Personal Email Account



William Kelly <william.lee.kelly@gmail.com>                    Fri, Feb 14, 4:22 PM
to me ▾

**Submission ID:**

02eda4cc184849d5b5ee772771514181

**Date Filed:**

2/14/2025 7:20:36 PM EST

**Were you the one affected in this incident?**

Yes

↩ Reply     ↪ Forward     ☺

737

738

739

740

741

742

743

744

745

746

747

  
748   **EXHIBIT S**

749   **Subject:** Complaint Filed with Nevada Secretary of State

750   **Source:** Personal Email Account

## Nevada Secretary of State: Online Securities Complaint Submission

Inbox x   MMTLP Lawsuit x

**nvsec@sos.nv.gov**                            Tue, Jan 28, 11:34 AM
to me

A new entry to a form/survey has been submitted.

| | |
|---|---|
| **Form Name:** | Securities Complaint |
| **Date & Time:** | 01/28/2025 11:34 AM |
| **Response #:** | 311 |
| **Submitter ID:** | 9678 |
| **IP address:** | 167.154.231.5, 198.143.33.41 |
| **Time to complete:** | 40 min. , 40 sec. |

751

752

753

754

755

756

757

758

759

760

761

762

763

764

765

766    **EXHIBIT T**

767    **Subject:** Complaint Filed with the Nevada Attorney General

768    **Source:** Personal Email Account

---

[agdb.ag.state.nv.us #63955] AutoReply: Complaint :Kelly ,William |Agency - FINRA  Inbox ×  MMTLP Lawsuit ×  🖶

**AG Intake Investigations Department via RT** <agrequest...  Fri, Jun 14, 2024, 4:00 PM  ⭐  😊  ↩  ⋮
to me ▾

Greetings,

The Office of the Nevada Attorney General, Constituent Services Unit acknowledges receipt of your complaint. You will be notified upon completion of the review process between 14 to 45 business days. We do not provide emergency services. If additional information is required, you will be contacted by a member of our staff. Please note that pursuant to NRS 241.039(7), Open Meeting Law complaints are public records.

----------------------------------

This message has been automatically generated in response to the creation of a trouble ticket regarding **Complaint :Kelly ,William |Agency** - FINRA, a summary of which appears below.

There is no need to reply to this message right now. Your ticket has been assigned an ID of **[agdb.ag.state.nv.us #63955]**.

Please include the string **[agdb.ag.state.nv.us #63955]** in the subject line including the brackets of all future correspondence about this issue. To do so, you may reply to this message. Ex: [agdb.ag.state.nv.us #42]

Thank you,

--------------------Section 1 Requestor Information----------------------------
1.Please Enter Your Email Address

769    william.lee.kelly@gmail.com

770

771

772

773

774

775

776

777

778  **EXHIBIT U**

779  **Subject:** Response Letter from the Office of Congressman Steven Horsford

780  **Source:** Personal Email Account



781

782

783

784

785    **EXHIBIT V**

786    **Subject:** Second Response Letter from the Office of Congressman Steven Horsford

787    **Source:** Personal Email Account

June 12, 2024

Dear Mr. Kelly,

Here is the response I received from the SEC:

*June 12, 2024*

*The Honorable Steven Horsford*
*U.S. House of Representatives*
*2250 Las Vegas Blvd. North, Ste. 500*
*North Las Vegas, NV 89030*
*Attention: Ruby Scott (via email)*
*Re: Mr. William Kelly ES#162455/HO::~01395772~::HO*

*Dear Representative Horsford:*

*Thank you for your June 6, 2024 letter to the U.S. Securities and Exchange Commission (SEC) on behalf of the above-referenced constituent. Your correspondence was forwarded to the SEC's Office of Investor Education and Advocacy.*

*Mr. Kelly seeks assistance with the Financial Industry Regulatory Authority's (FINRA) trading halt of Meta Materials Inc. (MMTLP). FINRA, which imposed the halt, has posted information regarding the MMTLP trading halt on its website. Please see FAQ: MMTLP Corporate Action and Trading Halt | FINRA.org. Securities exchanges and self-regulatory organizations, rather than the SEC, determine whether to impose a trading halt in a stock. For more information about trading halts generally, please see "Trading Halts and Delays" in the SEC's Investor.gov glossary.*

*The SEC's Office of Investor Education and Advocacy processes many comments and complaints from individual investors and others. We keep records of the correspondence we receive in a searchable database that SEC staff may make use of in inspections, examinations, and investigations. In addition, some of the correspondence we receive is referred to other SEC offices and divisions for their review. If they have any questions or wish to respond directly to Mr. Kelly's complaint, they will contact Mr. Kelly.*

*Sincerely,*

788    *Ruby Scott*

789

790

791   **EXHIBIT W**

792   **Subject:** Response Letter from the Office of Senator Catherine Cortez Masto

793   **Source:** Personal Email Account

---

### Contact for Agencies to Reach Out to Regarding MMTLP    Inbox ×    MMTLP Lawsuit ×

**Hoffecker, Craig** <choffecker@lcb.state.nv.us>    Thu, May 15, 10:06 AM    ☆ ☺ ↩ ⋮
to me ▾

William Lee Kelly
William.lee.kelly@gmail.com

Dear Mr. Kelly,

I am sorry to hear of you situation with MMTLP. I learned of your situation as you recently contacted members of the Nevada Legislature.

It appears that you have already contacted the United States Securities and Exchange Commission (SEC) with your concerns. I found the same comments you sent to the Nevada Legislature also listed on the SEC's website as "File No. 365-28" dated March 4, 2025. There is an "investor complaint form" and "investor question form" where you may submit your concerns and explanation to the SEC if you have further concerns to make to the agency. The federal agency may be the best route for you to voice your concerns about MMTLP, possible early close of trading, and related matters.

The Financial Industry Regulatory Authority (FINRA) you may have also already reached out to with your concerns. Since FINRA may have more involvement with regulation of brokers and their firms, I do not know if contacting FINRA will be as useful to you as the SEC. However, you may wish to contact FINRA in Washington, D.C. at (301) 590-6500 to see what type of information or service it may provide to you.

Finally, if you wish to call or write your federal officials representing Nevada regarding the MMTLP, you may find their contact information within the attached file for Nevada's major elected officers.

Thank you for taking the time to reach out and all the best to you in finding a resolution to the issues with MMTLP.

Craig



**Craig Hoffecker**
Manager of Constituent Services
Nevada Legislative Counsel Bureau, Research Division
Constituent Services
401 S. Carson St., Carson City, NV 89701-4747
(775) 684-6740 | https://www.leg.state.nv.us/Division/Research/

794

795

796

797

798

799   **EXHIBIT X**

800   **Subject:** BiTech Technologies utilization of MMTLP Cusip – April 24, 2024

801   **Source:**

802   sec.gov/Archives/edgar/data/1066764/000149315224018725/formsc13d.htm?utm_source=chatg

803   pt.com

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, D.C. 20549

## SCHEDULE 13D

#### (Rule 13d-101)

INFORMATION INCLUDED IN STATEMENTS FILED PURSUANT TO RULE 13d-1(a)

AND AMENDMENTS THERETO FILED PURSUANT TO RULE 13d-2(a)

## BITECH TECHNOLOGIES CORPORATION

#### (Name of Issuer)

Common Stock, $0.001 par value

#### (Title of Class of Securities)

89102U103

#### (CUSIP Number)

895 Dove Street, Suite 300
Newport Beach, CA 92660

Tel: (855) 777-0888

#### (Name, Address and Telephone Number of Person Authorized to Receive Notices and Communications)

April 24, 2024**

#### (Date of Event which Requires Filing of this Statement)

804

805

806

807

808

809

810

811   **EXHIBIT Y**

812   **Subject:** TRCH/MMTLP filing verifying CUSIP Number – December 31, 2020

813   **Source:**
814   https://www.sec.gov/Archives/edgar/data/1431959/000175392621000039/g082087_sc13ga.htm?
815   utm_source=chatgpt.com

### SECURITIES AND EXCHANGE COMMISSION
#### Washington, D.C. 20549

## SCHEDULE 13G

**Under the Securities Exchange Act of 1934**
**(Amendment No. 1)\***

TORCHLIGHT ENERGY RESOURCES, INC.

(Name of Issuer)

Common Stock, $0.001 Par Value

(Title of Class of Securities)

89102U103

(CUSIP Number)

December 31, 2020

(Date of Event which Requires Filing of this Statement)

816

817

818

819

820

821

822

823

824

825

826

827    **EXHIBIT Z**

828    **Subject:** Further Verification of the TRCH/MMTLP CUSIP – June 25, 2021

829    **Source:** https://www.nasdaqtrader.com/TraderNews.aspx?id=ECA2021-

830    118&utm_source=chatgpt.com

---

Friday, June 25, 2021

**Equity Corporate Actions Alert #2021 - 118**
Information Regarding the Business Combination of Torchlight Energy Resources, Inc. (TRCH) & Meta Materials Inc.

**Category:**

☐ Industry Announcement

**Markets Impacted:**

☐ The Nasdaq Stock Market

**Contact Information:**

☐ Nasdaq Corporate Data Operations at +1 877 308 0523
☐ Nasdaq Trading Services at +1 212 231 5100

**Resources**

☐ Press Release

The business combination of Torchlight Energy Resources, Inc. (TRCH) and Meta Materials Inc. will become effective tomorrow Saturday, June 26, 2021. As a result, the common shares of Torchlight Energy Resources, Inc. will undergo a one-for-two (1-2) reverse stock split along with a change of corporate name, symbol, and CUSIP number.

The details regarding the corporate name, symbol, and CUSIP changes are as follows:

| | |
|---|---|
| Current Company Name/Issue: | Torchlight Energy Resources, Inc. Common Stock |
| New Company Name/Issue: | Meta Materials Inc. Common Stock |
| Current CUSIP: | 89102U103 |
| New CUSIP: | 59134N104 |
| Current Symbol: | TRCH |
| New Symbol: | MMAT |
| Ratio of Reverse Split: | 1 for 2 |
| Marketplace Effective Date: | Monday, June 28, 2021 |

831

832

833

834

835

836

837

838

839

840

841

842    **EXHIBIT AA**

843    **Subject:** Trading Data for MMTLP from Nov 21, 2022 to the U3 Halt

844    **Source:** https://stockinvest.us/stock-price/MMTLP

845

# Historical Meta Materials Inc. prices

| Select Range | YTD | 12m | 2024 | 2023 | | JSON | CSV |

| Date | Open | High | Low | Close | Volume |
|------|------|------|-----|-------|--------|
| Dec 09, 2022 | $2.96 | $2.96 | $2.96 | $2.96 | 0 |
| Dec 08, 2022 | $4.41 | $4.50 | $2.85 | $2.96 | 8 333 725 |
| Dec 07, 2022 | $9.88 | $9.90 | $7.07 | $7.90 | 3 714 213 |
| Dec 06, 2022 | $7.15 | $9.70 | $5.04 | $7.97 | 3 907 648 |
| Dec 05, 2022 | $8.25 | $9.00 | $7.55 | $7.60 | 1 467 521 |
| Dec 02, 2022 | $8.90 | $8.90 | $8.10 | $8.21 | 992 624 |
| Dec 01, 2022 | $8.25 | $9.05 | $7.75 | $8.17 | 1 678 750 |
| Nov 30, 2022 | $9.72 | $10.00 | $7.76 | $8.50 | 1 305 436 |
| Nov 29, 2022 | $9.70 | $9.75 | $9.65 | $9.72 | 393 564 |
| Nov 28, 2022 | $10.79 | $10.98 | $9.61 | $10.02 | 1 544 600 |
| Nov 25, 2022 | $10.87 | $10.99 | $9.88 | $10.03 | 1 673 741 |
| Nov 23, 2022 | $10.72 | $10.95 | $8.55 | $10.00 | 1 601 754 |
| Nov 22, 2022 | $11.85 | $12.50 | $10.85 | $12.00 | 3 045 999 |
| Nov 21, 2022 | $9.90 | $11.30 | $9.43 | $11.21 | 2 767 169 |

846

847

848

849

850

851

852

853    **EXHIBIT AB**

854    **Subject:** TradeZero's Correspondence to MMTLP Holders Pre-Halt

855    **Source:** https://x.com/RareDealsHere/status/1836136427815579911/photo/4

# Regarding MMTLP Share

## Distribution  Inbox



 **TradeZero America**  3:20 PM

to me ⌄

                                                    

TradeZero Clients, Symbol MMTLP, Meta Materials, Inc. Preferred Share, will undergo a share spinoff with the ex date listed as Monday, December 12th, 2022. Due to the circumstances and uncertain component of this corporate action, all options positions and short equity positions must be liquidated by 4:00 PM eastern time on Friday, December 9th, 2022  If you fail to liquidate your position, TradeZero's risk department will automatically liquidate your position. If you have any questions please contact us at support@tradezero.us or 718-709-4925.

856

857

858

859

860

861

862

863   **EXHIBIT AC**

864   **Subject:** Interactive Brokers Correspondence to MMTLP Holders

865   **Source:** https://x.com/bleedblue18/status/1785637472921153802/photo/1



# Meta Materials (MMTLP) Intends to Issue a Spin-off on a 1-for-1 Basis of Next Bridge Hydrocarbons, Inc. Shares

Dear Client,

Interactive Brokers was notified by Meta Materials (MMTLP) that they intend to issue a spin-off on a 1-for-1 basis of Next Bridge Hydrocarbons, Inc. shares.

The record date for this dividend is currently listed as **December 12, 2022**, and the shares are set to be distributed on **December 14, 2022**.

**PLEASE NOTE:**

- Meta Materials intends to cancel MMTLP shares immediately after the spin-off, and the Next Bridge Hydrocarbons, Inc. shares will be non-transferrable and non-tradable.
- **Shortholders:** Should account U****2640 be in a borrow position after the close of business on **December 8, 2022**, you will be short a security for which there is no market to cover. In addition, there is potentially no market to cover moving forward. At this time, the only way to avoid this is to cover your short position. For further information regarding the risks of short selling, please see the following link: https://ibkr.info/article/2880
- **Longholders:** Should account U****2640 be the owner of record past **December 8, 2022**, you will own shares of Next Bridge Hydrocarbons, Inc. shares that are non-transferrable and non-tradable. The only way to avoid this is to sell MMTLP any time prior to market close on **December 8, 2022**.
- If shares of Meta Materials are sold after **December 8, 2022** but prior to the cancellation date, sellers will be responsible for coordinating title ownership to new owner(s).

For additional information regarding this merger please read the company's press release.

Regards,

**Interactive Brokers**

866

867    **EXHIBIT AD**

868    **Subject:** FOIA Request Showing Sam Draddy's Correspondence With the SEC

869    **Source:** https://x.com/RareDealsHere/status/1909256130574057870/photo/3

From: Draddy, Sam <Sam.Draddy@finra.org>
Sent: Monday, December 5, 2022 9:07 AM
To: (b)(6); (b)(7)(C)                @SEC.GOV>
Cc: (b)(6); (b)(7)(C)                @SEC.GOV>; (b)(6); (b)(7)(C)                @SEC.GOV>; Boyle,
Richard <Richard.Boyle@finra.org>; Gibbon, Jay <Jay.Gibbon@finra.org>
Subject: RE: Inquiry

**CAUTION:** This email originated from outside of the organization. Do not click links or open
attachments unless you recognize the sender and know the content is safe.

(b)(6);
(b)(7)(C) –looks like this MMAT/MMTLP matter has now hit my Fraud team's radar screen (and
seemingly a lot of other radar screens as well). I know you have spoken to Patti Casimates and our
General Counsel's office—but was wondering if it made sense for my Fraud team to have a
conversation directly with you and your folks working on the matter so we are not duplicating
efforts. We are looking at the two issuers from a fraud/manipulation angle and, in fact, bluesheeting
both MMAT and MMTLP as we speak.

If you think a comparison of notes is worth a quick call—let me know a good day/time. I can set up a
zoom and feel free to let me know if (b)(6); or anyone else should be included.
(b)(7)(C)

Thanks (b)(6); (b)(7)(C)

870    Sam

871

872

873

874

875

876

877

878

879

880

881  **EXHIBIT AE**

882  **Subject:** Letter from Congresswoman Barbara Lee regarding MMTLP Resolution

883  **Source:** https://x.com/xMarketNews/status/1731863801522168131/photo/1

## Congress of the United States

### Washington, DC 20515

December 4, 2023

The Honorable Gary Gensler
Chairman
U.S. Securities and Exchange Commission
100 F St. NE Washington, D.C. 20549

Dear Chairman Gensler,

I am writing regarding an action taken by the Financial Industry Regulatory Authority (FINRA) on META Material's Series A Preferred Shares (MMTLP). This has been brought to my attention by a number of my constituents who have expressed concerns with the holding and status of their MMTLP shares. On December 8th, 2022, FINRA halted trading of MMTLP and announced deletion of the MMTLP symbol five days later. My constituents have expressed that as a result, they were left without clarify on the future of their investments.

The U.S. Securities and Exchange Commission (SEC) and FINRA have a responsibility to protect investors and safeguard the integrity of our public markets. Given the financial distress constituents have experienced because of these decisions, I want to ensure that market decisions are being made by regulators in an efficient and transparent manner.

I request that you fully investigate the events surrounding the trading halt of MMTLP and ensure no wrongdoing took place. Furthermore, I request that you make any findings publicly available and that you to provide clear guidance to my constituents about what they should expect to occur regarding their current MMTLP holdings and under what timeline they should expect a resolution to take place. I also ask that you identify any regulatory or legislative gaps that could be addressed to better protect investors and market integrity.

Thank you for your attention to this matter and I look forward to your response.

Sincerely,

Barbara Lee
Member of Congress

884

885

886

887　**EXHIBIT AF**

888　**Subject:** VP of OTC Markets on trader live discussing MMTLP Deletion prior to Revised C.A.

889　**Source:** https://x.com/LizHoff51005452/status/1725558915272733174



890

891

892

893

894

895

896

897

898

899

900

901

902

903    **EXHIBIT AG**

904    **Subject:** Ameritrade Correspondence to MMTLP Holders Pre-Halt

905    **Source:** https://x.com/JunkSavvy/status/1905727233414494981/photo/2



Wed Mar 8 2023 12:06:00 am ET

**Re: MMTLP Finra Corporate Action Notice**
From: Institutional Message Center | Date: 12/09/22 9:30 AM  Message available until 12/08/24.

Hello

Good Morning! Thank you for taking the time to respond to our message and I hope you are having a wonderful day so far! My name is Bob, and I am happy to continue helping you with your account today!

We did receive some information from MMTLP. These are the details and guidance they provided.

MMTLP shareholders with settled positions as of 12/12/22 (Record Date) will receive one share of Next Bridge Hydrocarbons, Inc for every one share of MMTLP. Scheduled Pay Date for this distribution is 12/14/22.

New long purchases (BUYS) of MMTLP executed after 12/08/22 will NOT receive Next Bridge Hydrocarbons, Inc shares. As such, after market close on 12/8/2022:
New long BUY orders of MMTLP placed after market close on 12/8/2022 will be routed for review and canceled.
New closing SELL orders of MMTLP should be routed normally, but there may be liquidity issues on 12/9/22 and 12/12/22.
Current open long BUY orders that are GTC will be canceled after market close on 12/8/22.
In addition, MMTLP shares will be canceled 12/13/22 and no trading will occur.
Clients should trade or hold this security at their own risk.

Hope this helps! Thank you so much for being a client here at TD Ameritrade, Tim! We truly appreciate it! I hope you have a fantastic day!

We greatly appreciate your business and know you have a choice where you invest. If there is anything else we can do for you, or could have done better, please let us know.

We look forward to serving your needs for years to come.

Respectfully,

Robert Mangan
Client Services

TD Ameritrade
1-800-669-3900

906
907
908
909
910
911
912
913

914    **EXHIBIT AH**

915    **Subject:** Next Bridge Hydrocarbons Prospectus referencing an MMTLP Short Squeeze

916    **Source:**
917    https://www.sec.gov/Archives/edgar/data/1936756/000119312522292114/d302576d424b
918    4.htm

*The price per share of Meta's Series A Preferred Stock traded on the over-the-counter ("OTC") market under the symbol MMTLP may not accurately reflect the value of a share of our Common Stock that you will receive in the Distribution.*

Before the Distribution, Meta's Series A Preferred Stock was traded on the OTC market under the trading symbol "MMTLP", although such shares of MMTLP were not eligible for broker-dealer quotations. The OTC

23

market does not constitute an established stock exchange, and as a result, the historical trading prices for the shares of MMTLP may not be a reliable benchmark on which to determine the value of the shares of our Common Stock you will receive in the Distribution.

Additionally, securities of certain companies have recently experienced significant and extreme volatility in stock price due to short sellers of shares of securities, known as a "short squeeze." These short squeezes have caused extreme volatility in both the stock prices of those companies and in the market and have led those companies' securities to trade at a significantly inflated price per share that is disconnected from the underlying value of the company. In particular, if any investors have sold shares of MMTLP short, then in connection with the Distribution such investors may feel compelled to buy shares of MMTLP to cover such sales before the Distribution. If this were to occur, given the potential high demand from buyers with a relatively low supply of MMTLP shares available for sale on the OTC market, the MMTLP price per share as shown on the OTC market may rise significantly but not be representative of the value of the underlying shares of our Common Stock that you will receive in the Distribution.

919

920

921

922

923

924

925    **EXHIBIT AI**

926    **Subject:** Next Bridge acknowledgement of Attempts  to Resolve the Share Imbalance

927    **Source:**
928    https://cdn.prod.websitefiles.com/6169e69d0075ec7c66221a8b/67b40af0d3fda89d9c9341ba_NB
929    H%20Hiring%20Wes%20Christian%20and%20Firm_vFINAL.pdf

**MIDLAND, TEXAS – February 18, 2025 – Next Bridge Hydrocarbons, Inc.** ("Next Bridge," "our," "we," or the "Company"), an oil and natural gas exploration and production company with interests in Texas, Louisiana, and Oklahoma announced today the following:

The Company is pleased to announce engaging the services of the Houston-based law firm Christian Attar. Christian Attar has been engaged to explore and investigate any and all potential claims related to harassment, business disparagement, libel, slander, tortious interference, conspiracy, obstruction of justice and violations of the Administrative Procedures Act. The Company will be working closely with founding partner James "Wes" Christian, whom we believe is the best candidate for investigating such potential claims given his expertise in this area of litigation.

As stated in prior press releases, the Company has become aware of shareholder ledger imbalances at several brokerage firms totaling amounts exceeding the aggregate 2.65 million share short interest position in MMTLP stated publicly by FINRA. The Company wishes to reiterate that after more than two years, we have yet to uncover the full magnitude of these imbalances. This is in spite of multiple attempts to recruit assistance from overseeing Regulators.

Chairman and CEO Greg McCabe stated, "We are excited by these latest additions to our growing advisory team. Working with Wes Christian, a seasoned and highly successful litigator and an expert well-versed in our story from the beginning, marks the dawning of a new era for our legal campaign. We will not stand by as nefarious actors with hidden agendas spread misinformation regarding our Company, our business activities or our personnel. Our patient and loyal shareholders deserve us to protect the integrity of both Next Bridge and their investment in it, and I want to truly thank once again our online community, the MMTLP ARMY, for their long-standing support and steadfast dedication."

930

931

932

933

934

935

936    **EXHIBIT AJ**

937    **Subject:** NBH Disputes 2.65m Short Estimated Provided by FINRA in FAQ

938    **Source:**
939    https://cdn.prod.websitefiles.com/6169e69d0075ec7c66221a8b/65c66057134fd3d64ee87721_N
940    BH%20Statement%20vF%202-8-24.pdf

Second, we believe this information is necessary to help clarify potentially misleading information that has been disseminated to investors and the public. FINRA issued an "Investor Insights" FAQ on its website stating that "there was an aggregate short interest position in MMTLP in accounts held at broker-dealers as of December 12 of approximately 2.65 million shares out of 165.47 million total shares outstanding." FINRA went on to characterize this volume as "not significant." We infer no intent to mislead by FINRA, but we note that this statement was not qualified to make clear that the scope of the data available to FINRA under the investigatory powers it cited was limited, and thus it implied a categorical summation of the entire uncovered short interest position in Next Bridge. Subsequent to our most recent press release of January 19, 2024 calling for short interest data from all sources, foreign or domestic, whether registered with FINRA or not, we observed that FINRA clarified in its letter to Congressman Norman that the short interest figure it cited was only based on U.S. member data and not that of "domestic or foreign non-member entities that could act as custodians or agents holding securities for others, including foreign-registered broker-dealers." However, it repeated its assertion

1

that the short interest position it saw was "nominal." Unfortunately, we believe this is a consequential blind spot in FINRA's data, because foreign firms have approached Next Bridge about procuring more than 2.65 million shares.

941

942

943

944

945

946

947

948

949

950    **EXHIBIT AK**

951    **Subject:** Next Bridge Disputes FINRA's Role in The Corporate Actions

952    **Source:**

953    https://cdn.prod.websitefiles.com/6169e69d0075ec7c66221a8b/65c66057134fd3d64ee87721_N

954    BH%20Statement%20vF%202-8-24.pdf

Third, we believe there is an onus on FINRA to help resolve ongoing investor concerns due to the role it played in the events that led to the U3 halt, and the subsequent confusion resulting from the halt itself. FINRA stated that it determined the U3 halt was "necessary and appropriate to protect investors and ensure a fair and orderly marketplace." Unfortunately, many investors continue to communicate great frustration that the halt accomplished quite the opposite and could have been avoided. We do not intend to litigate FINRA's decision-making in this release, but we also would like to ensure that we clarify certain points on which we have a divergent view from FINRA in regards to the corporate action announcing the NBH spinoff and subsequent U3 halt, since the issues are actively being discussed in public releases to our investors and publicized letters to Congress. As an initial matter, we take issue with FINRA's repeated assertion that "FINRA's role is limited to reviewing and processing the (corporate action) submission and announcing the corporate action to market participants (unless the corporate action documentation is found to be deficient under Rule 6490, in which case FINRA may determine not to process the corporate action)." We do not believe this describes the role that FINRA played in the MMTLP corporate action submission process, nor does it offer a complete recitation of FINRA's authority under Rule 6490. First, FINRA drafted the initial and revised corporate action notices on December 6th and 8th of 2022, with an instruction that the issuer was not to edit or interpret it, and included language that we believe itself became the source of market confusion. For example, while FINRA describes the notice to Congressman Norman as "consistent with the information provided by Meta Materials," it is notable that the notice actually introduced a new instruction that MMTLP shares would be "deleted" on December 13th – a date never before contemplated or referenced by the issuers, and which many found difficult to reconcile with Meta's announcement that the distribution of Next Bridge shares would take place the next day- on December 14th. Indeed, it was never proposed to FINRA to add a December 13 cancellation date or deletion date, and adding such a date created an unnecessary restriction to the corporate action and shareholders of MMTLP. In addition, FINRA's Rule 6490 allows it to refrain from processing requested corporate actions altogether if it "determines not processing is necessary to protect investors and the public interest and to maintain fair and orderly markets." In other words, the justification FINRA ultimately used for issuing the U3 halt was available to it at the outset of the process,

955

956

957

958

959

960

961    **EXHIBIT AL**

962    **Subject:** Historical Short Volume Data for TRCH Final days Before Reverse Merger

963    **Source:** https://x.com/wdmorgan2/status/1935727622496891284/photo/2

| Historical Short Volume Data for TRCH | | | | | | |
|---|---|---|---|---|---|---|
| Date | Close | High | Low | Volume | Short Volume | % of Vol Shorted |
| Jun 25 | NA | NA | NA | 34,012,888 | 20,775,892 | 61.08 |
| Jun 24 | NA | NA | NA | 43,613,656 | 26,945,148 | 61.78 |
| Jun 23 | NA | NA | NA | 50,195,107 | 26,729,319 | 53.25 |
| Jun 22 | NA | NA | NA | 76,352,054 | 42,249,501 | 55.34 |
| Jun 21 | NA | NA | NA | 150,035,489 | 82,496,774 | 54.98 |
| Jun 18 | NA | NA | NA | 28,608,216 | 13,557,742 | 47.39 |
| Jun 17 | NA | NA | NA | 21,996,332 | 9,066,068 | 41.22 |
| Jun 16 | NA | NA | NA | 74,217,339 | 41,707,265 | 56.20 |
| Jun 15 | NA | NA | NA | 109,951,610 | 54,999,009 | 50.02 |
| Jun 14 | NA | NA | NA | 5,674,578 | 1,912,649 | 33.71 |

964

965

966

967

968

969

970

971

972

973

974

975    **EXHIBIT AM**

976    **Subject:** Outstanding Share count of the Series A Preferred Share (MMTLP)

977    **Source:**
978    https://metamaterial.com/files/603fd35021a8272338f06fac/641c4de2e50576e0b3712881_mmat
979    %20(meta%20materials%20inc.)%20annual%20report%20pursuant%20to%20section%2013%2
980    0or%2015(d)%20(10-k)%202023-03-23.pdf_.pdf

On December 14, 2022, we distributed all of the 165,472,241 outstanding shares of Common Stock of Next Bridge Hydrocarbons Inc. ("Next Bridge"), incorporated in Nevada on August 31, 2021, as OilCo. Holdings, Inc., as a wholly owned subsidiary of META, (and changed its name to Next Bridge Hydrocarbons, Inc. pursuant to its Amended and Restated Articles of Incorporation filed on June 30, 2022), on a pro rata basis to holders of our Series A Non-Voting Preferred Stock. Immediately after the distribution, Next Bridge became an independent company, and as a result, we have deconsolidated the financial results of Next Bridge from our consolidated financial results from December 14, 2022 onwards. See note 5 for additional information on this transaction.

98
982
983
984
985
986
987
988
989
990
991
992
993
994
995
996
997
998

999    **EXHIBIT AN**

1000    **Subject:** Former CEO of Torchlight Energy Discussing Trading of the Series A preferred Share
1001    (MMTLP)

1002    **Source:** https://x.com/bleedblue18/status/1622172637240647682



1003
1004
1005
1006
1007
1008
1009
1010
1011
1012
1013
1014
1015
1016
1017

1018    **EXHIBIT AO**

1019    **Subject:** Legal Statements by George Palikaras regarding FINRA Corporate Actions

1020    **Source:** https://www.dropbox.com/scl/fi/tbp2nwed5ldbopmjfclwb/Inter-Coastal-v.-TradeStation-
1021    Decl.-ISO-Georgios-Pallikaras-
1022    Signed_GP.pdf?rlkey=2wgw6dvot12b0km16szm4zrpn&e=1&st=z6nvgdol&dl=0



Case 0:24-cv-60891-AHS    Document 39-1    Entered on FLSD Docket 08/16/2024    Page 9 of :

31.    Further, on or about December 8, 2022, FINRA notified the Company that it had unilaterally revised the language of the Company's December 6, 2022 corporate action and required the revised notice to be published on the Daily List. This revision was made without the input or authorization of the Company and took place on or about December 7, 2022, *after* FINRA had a call discussion with DTCC. I was informed that META II and Next Bridge's counsel were not invited to participate in the call between FINRA and DTCC.[14]

1023
1024
1025
1026
1027
1028
1029
1030
1031
1032
1033
1034

1035    **EXHIBIT AP**

1036    **Subject:** FINRA letter to Next Bridge Reference to Rule 6490 – May 19, 2023

1037    **Source:** https://www.finra.org/sites/default/files/2023-07/nbh-finra-letter-5-19-
1038    23.pdf?utm_source=chatgpt.com

FINRA Rule 6440. This rule requires broker-dealer firms to halt quoting and trading
activities when FINRA determines, in accordance with the rule, that doing so is necessary
to protect investors and the public interest. As described publicly, pursuant to Rule 6440,
FINRA halted trading in MMTLP due to concerns regarding the clearance and settlement
process for transactions occurring after December 8th in light of the timing and structure
of the Next Bridge / MMTLP corporate action.

FINRA Rule 6490. SEC Rule 10b-17 generally requires issuers of publicly traded
securities to give notice of corporate actions to a self-regulatory organization, which is
the securities exchange for actions involving a listed security. For unlisted securities,
SEC Rule 10b-17 requires issuers to provide FINRA with notice of corporate actions. In
relevant part, the rule generally provides that it shall constitute a "manipulative or
deceptive device or contrivance" as used in Section 10(b) of the Exchange Act for any
issuer of a class of publicly traded securities to fail to give notice relating to such
securities of a dividend or other distribution in cash or in kind, including a dividend
or distribution of any security of the same or another issuer. Thus, though FINRA does
not have jurisdiction over the issuer of a class of unlisted securities, the issuer is obligated
by the SEC to provide notice to FINRA, in accordance with Rule 10b-17, of specified
planned corporate actions, including the distribution of a security.

FINRA Rule 6490 sets forth FINRA's process for reviewing corporate action
submissions, including those required under SEC Rule 10b-17. FINRA does not initiate,
approve, or conduct the underlying corporate action that the issuer is taking. Rather, the
company itself is responsible for making sure the corporate action complies with all
applicable laws and regulations. FINRA's role in the process is thus limited to reviewing
and processing the submission and announcing the corporate action to market participants
(unless the corporate action documentation is found to be deficient under the rule, in
which case FINRA may determine not to process the corporate action).

FINRA Rule 6432. Like Rule 6490, Rule 6432 addresses compliance with an SEC
obligation. Rule 6432 is designed to address FINRA member broker-dealer compliance
with SEC Rule 15c2-11, which sets forth requirements for broker-dealers that publish

1039

1040

1041

1042

1043

1044

1045    **EXHIBIT AQ**

1046    **Subject:** FINRA Does Not Determine When a Security Stops Trading – May 19, 2023

1047    **Source:** https://www.finra.org/sites/default/files/2023-07/nbh-finra-letter-5-19-

1048    23.pdf?utm_source=chatgpt.com

**NBH Proposals**

NBH has indicated in its letter that it is interested in facilitating the trading of its common stock, but only subject to a number of limitations, including trading for a pre-determined, limited period of time. Because an offering of NBH common stock was registered with the Commission, these shares are freely tradeable as a legal matter; however, trading is difficult because NBH has not requested a CUSIP from CUSIP Global Services. If NBH obtains a CUSIP for NBH common stock, NBH can apply to DTC for DTC eligibility for the NBH common stock, which facilitates the central clearance and settlement of securities transactions. In addition, if NBH obtains a CUSIP for the NBH common stock, a member firm can apply to FINRA for a trading symbol for that stock. However, FINRA does not operate a market and does not determine when a security may begin to trade or stop trading in the ordinary course.[3]

---

[3]    One of FINRA's roles in the market for OTC equity securities is to assign security symbols in connection with quoting and trade reporting by FINRA member firms. Through published guidance and FAQs, FINRA's members are familiar with the circumstances under which a symbol may be assigned as well as the process for obtaining a symbol. In accordance with regulatory obligations for OTC equity securities, symbols are assigned by FINRA at the request of a FINRA member to allow members to:

-    Report an executed transaction in an OTC equity security, or

1049

1050    -    Initiate quotations (consistent with the review requirements of Rule 15c2-11).

1051

1052

1053

1054

1055

1056

1057

1058

1059

1060

1061   **EXHIBIT AR**

1062   **Subject:** Clarification on FINRA's Role on Restricting Trades – May 19, 2023

1063   **Source:** https://www.finra.org/sites/default/files/2023-07/nbh-finra-letter-5-19-
1064   23.pdf?utm_source=chatgpt.com

1065

1066   In your letter, NBH states that, if its common stock is traded, NBH would like to restrict market
activity in the stock to a limited period of time.  NBH asks that FINRA take action to effectuate
these time restrictions; however, it is unclear on what grounds and under what authority FINRA
would mandate that trading must cease within a relatively short, predetermined time after the
security has been assigned a CUSIP, FINRA has assigned a symbol, and trading has commenced.
FINRA assigns a symbol to a security to enable its member firms to comply with regulatory
requirements or in connection with quoting of the security once certain regulatory requirements
are met; this limited function does not authorize FINRA to subsequently restrict trading in that
security by immediately deleting the symbol pursuant to an issuer's request.  For this reason,
FINRA deletes symbols only in limited circumstances, for example when the CUSIP has been
suspended as determined by CUSIP Global Services (including where the subject security has
been cancelled), or where there has been a period of extended inactivity in the security.  Thus, if
NBH obtains a CUSIP for its common stock and a member obtains a symbol for those shares,
that symbol would continue to be available for ongoing quoting and trade reporting purposes
unless conditions were to significantly change (with or without the agreement of the issuer).

1067

1068

1069

1070

1071

1072

1073

1074

1075

1076

1077

1078

1079

1080   **EXHIBIT AS**

1081   **Subject:** Legal Declaration from Georgios Palikaras - Aug. 15 2024

1082   **Source:** https://www.dropbox.com/scl/fi/tbp2nwed5ldbopmjfclwb/Inter-Coastal-v.-TradeStation-
1083   Decl.-ISO-Georgios-Pallikaras-
1084   Signed_GP.pdf?rlkey=2wgw6dvot12b0km16szm4zrpn&e=1&st=z6nvgdol&dl=0

36.     During my own inquiries for several weeks after the halt, as well as through counsel

including multiple calls with the Ms. Gill at the Office of the Ombudsman, we never received any

---

[14] *See* https://metamaterial.com/meta-materials-announces-finra-has-revised-corporate-action-for-exchange-of-series-a-preferred/ (last accessed August 15, 2024).

9

answers for exactly what the "extraordinary event" or reasons were that FINRA relied on to enact

the halt.[15] If FINRA had planned the halt all along, it is my opinion that they should have put such

information into the announcement in order to fully inform and protect shareholders and avoid

shareholder confusion.

37.     On December 13, 2022, FINRA deleted the MMTLP ticker.

1085

1086

1087

1088

1089

1090

1091

1092

1093   **EXHIBIT AT**

1094   **Subject:** Palikaras Declaration Whether The Corporate Action was Deficient

1095   **Source:** https://www.dropbox.com/scl/fi/tbp2nwed5ldbopmjfclwb/Inter-Coastal-v.-TradeStation-
1096   Decl.-ISO-Georgios-Pallikaras-
1097   Signed_GP.pdf?rlkey=2wgw6dvot12b0km16szm4zrpn&e=1&st=z6nvgdol&dl=0

      27.    On December 5, 2022, the Company's counsel, together with Next Bridge's counsel drafted and sent a new email requesting escalation of its concerns to FINRA's executive team. This escalation reminded FINRA that through no actions taken by META II, the Company's Series A Preferred Stock began trading in 2021 and was still trading on the OTC Market under the symbol MMTLP. The Company's counsel stated that META II management had notified FINRA of a corporate action (stock dividend) to be taken (FINRA Rule 6490) approximately 3 months prior and, as of that date, we still did not have an answer regarding whether or not FINRA found the request to be deficient. Counsel also noted to FINRA it had become extremely difficult for META II to make plans and, more importantly, could and may be causing confusion in the OTC market of MMTLP to the detriment of META II's investors. Counsel further noted to FINRA that

1098

1099

1100

1101

1102

1103

1104

1105

1106

1107

1108

1109

1110    **EXHIBIT AU**

1111    **Subject:** MMTLP On Theshold List for over 30 Days (FINRA Deleted Data)

1112    **Source:** https://x.com/tonys_twits/status/1601504909093806080/photo/1



1113

1114

1115

1116

1117

1118

1119

1120

1121

1122

1123

1124

1125

1126

1127    **EXHIBIT AV**

1128    **Subject:** Johnny Tabacco confirms 15 million Shares on Loan in MMTLP Dec. 8, 2022 (The last
1129    day MMTLP Traded)

1130    **Source:** https://x.com/JohnnyTabacco/status/1742634895950618744/photo/1



| 2022-12-08 | 59134N203 | (Null) | 322 | 15402238 | 118334822.3 |
| 2022-12-07 | 59134N203 | (Null) | 329 | 15444646 | 135181556.3 |
| 2022-12-06 | 59134N203 | (Null) | 321 | 15339346 | 118429972.9 |

⬆ CHECK OUT 12/08 ⬆⬆⬆          15,402,238 MMTLP
on Loan
Any shares on loan 12/8 are NAKED SHORT FTR the NBH Div

1131

1132

1133

1134

1135

1136

1137

1138

1139

1140

1141

1142

1143

1144

1145

1146

1147

1148

1149    **EXHIBIT AW**

1150    **Subject:** Legal Declaration from George Palikaras Regarding MMTLP Trading

1151    **Source:** https://www.dropbox.com/scl/fi/tbp2nwed5ldbopmjfclwb/Inter-Coastal-v.-TradeStation-
1152    Decl.-ISO-Georgios-Pallikaras-
1153    Signed_GP.pdf?rlkey=2wgw6dvot12b0km16szm4zrpn&e=2&st=z6nvgdol&dl=0

7.      The Dividend shares were never intended or authorized to be listed or traded on

any exchange, and were created merely to be a dividend placeholder representing the assets of

Torchlight Energy that the Company would continue to own as a part of the merger.[5]

1154

1155

1156

1157

1158

1159

1160

1161

1162

1163

1164

1165

1166

1167

1168

1169

1170

1171

1172

1173

1174    **EXHIBIT AX**

1175    **Subject:** Legal Declaration from George Palikaras Regarding False & Outdated Information

1176    **Source:** https://www.dropbox.com/scl/fi/tbp2nwed5ldbopmjfclwb/Inter-Coastal-v.-TradeStation-
1177    Decl.-ISO-Georgios-Pallikaras-
1178    Signed_GP.pdf?rlkey=2wgw6dvot12b0km16szm4zrpn&e=2&st=z6nvgdol&dl=0

      16.    On October 7, 2021, the MMTLP shares began trading on the OTC Market without the authorization of the Company. FINRA did not send its notice to the Company until less than 24 hours before the MMTLP Shares began trading on the OTC Market.

      17.    FINRA did not halt the trading of MMTLP even after META II's management communicated to Mr. West that the listing included false and outdated information. META II management indicated that the Company did not request for FINRA to assign a ticker symbol to the Series A Shares because the Series A Shares were intended by the Company to be a placeholder dividend representing the assets of Torchlight Energy prior to the asset sale or spin-out.

1179

1180

1181

1182

1183

1184

1185

1186

1187

1188

1189

1190

1191

1192

1193    **EXHIBIT AY**

1194    **Subject:** Gary Gensler Questioned by Congress on MMTLP Sept. 12, 2023

1195    **Source:** https://x.com/busybrands/status/1701609541052576033



1196

1197

1198

1199

1200

1201

1202

1203

1204

1205

1206

1207

1208

1209

1210

1211    **Exhibit AZ**

1212    **Subject:** TradeStation Confirming They Don't Have Shares Available for Investors

1213    **Source:** https://ecf.flsd.uscourts.gov/doc1/051127252128

1214    Upon the initial distribution of NBH common stock, broker-dealers, like TradeStation, were granted physical certificates based on their customers' former holdings of Meta Materials ("MMTLP"). The NBH certificate that TradeStation received excluded a large number of NBH shares that had been lent to other broker-dealers as part of TradeStation's Fully Paid Lending program. Despite TradeStation's best efforts, we have been unable to recall a portion of the lent-out shares because there is currently no market for the security. This means that we will not be able to honor some of our customers' requests to register and record their ownership in book entry form with AST because the shares are not backed by a physical certificate. If the