**EPG LAW GROUP**
Elias George, NV Bar No. 12379
elias@epglawgroup.com
5940 South Rainbow Blvd.
Las Vegas, NV 89118
Phone: 702-358-0933
*Attorneys for Defendant FINRA*

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| WILLIAM LEE KELLY, an individual, | CASE NO.:  2:25-cv-01195-APG-DJA |
| Plaintiff, | |
| vs. | **FINANCIAL INDUSTRY REGULATORY AUTHORITY, INC'S OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION** |
| FINANCIAL INDUSTRY REGULATORY AUTHORITY (FINRA), | |
| Defendant. | |

Defendant Financial Industry Regulatory Authority, Inc. ("FINRA"), a private self-regulatory organization ("SRO") registered with the Securities and Exchange Commission ("SEC") pursuant to 15 U.S.C. § 78o-3, submits this Opposition to *pro se* plaintiff William Lee Kelly's ("Kelly") Motion for Preliminary Injunction [ECF 16] (the "Motion").

## I.     INTRODUCTION

Kelly, a retail investor, is attempting to bypass clear procedural rules under the guise of a "Motion for Preliminary Injunction." But the relief he truly seeks—expedited discovery of highly sensitive, confidential regulatory data—is improper and baseless.

***Courts Have Soundly Rejected These Premature Demands***

The information Kelly demands includes, among other types of data, Blue Sheet data *and* internal communications related to FINRA's market oversight. Blue Sheet data contains non-public trading information, including personal and financial identifiers of third-party investors, maintained in proprietary systems used solely for regulatory enforcement. Access to the system is restricted within FINRA, and the data is treated by courts as confidential regulatory information. Compelling its production here—at the outset of litigation and without any showing

1

1  of relevance or necessity—would be not only inappropriate but also highly prejudicial and

2  disruptive to FINRA's core oversight functions.

3      Kelly's claims arise from FINRA's regulatory decision to halt trading in an equity

4  security that traded in the over-the-counter ("OTC") market under the symbol "MMTLP." The

5  MMTLP shares became the subject of intense retail investor speculation. FINRA's trading halt

6  of MMTLP in December 2022, taken to protect investors and market integrity, has triggered a

7  wave of meritless lawsuits filed by retail investors who misapprehend the nature of FINRA's

8  regulatory authority.

9      Other MMTLP retail investors—like Kelly—have aggressively filed similar actions

10  across the country, attempting to obtain pre-action discovery before courts can evaluate

11  jurisdiction or immunity. Courts have justifiably and consistently rejected these premature

12  efforts. *See, e.g., Khorassani v. FINRA,* Index No. 153819/2023, 2023 N.Y. Misc. LEXIS 2980

13  (N.Y. Sup.Ct. N.Y. Cty. June 15, 2023); *see also Steamroller, LLC v. OTC Mkts. Grp., Inc.*,

14  Index No. 160854/2023, 2024 N.Y. Misc. LEXIS 5183 (N.Y. Sup.Ct. N.Y. Cty. Aug. 15, 2024);

15  *Traudt v. Rubenstein*, Case No. 2:24-cv-782, 2025 U.S. Dist. LEXIS 123280, at *15 (D. Vt. June

16  30, 2025). In fact, the plaintiff in *Traudt*, another MMTLP investor, likewise made repeated but

17  unsuccessful attempts to obtain expedited discovery prior to the court's granting FINRA's

18  motion to dismiss.

19  ***Neither Grounded in Procedure Nor Law***

20      Even setting aside the broader pattern, the Motion is independently deficient—both

21  procedurally and substantively.

22      Procedurally, the Motion is improper because Kelly seeks expedited discovery without

23  meeting and conferring as required by Local Rules 26-6(c) and IA 1-3(f), and it improperly

24  combines multiple requests for relief in violation of Local Rule IC 2-2. These deficiencies—

25  standing alone—are grounds to strike the Motion.

26      Substantively, the Motion fails whether construed as a request for preliminary injunctive

27  relief or as a bid for expedited discovery.

28  / / /

2

1    As a motion for preliminary injunction, Kelly cannot establish any of the required

2 elements: he lacks a likelihood of success on the merits of the First Amended Complaint (the

3 "FAC"), he cannot show irreparable harm, and he fails to show that the equities or public interest

4 weigh in his favor. Specifically, there is no likelihood of success because: (i) this Court lacks

5 personal jurisdiction over FINRA[1]; (ii) FINRA's regulatory immunity bars the FAC; (iii) Kelly

6 lacks any private right of action against FINRA; and (iv) FINRA is not a state actor subject to

7 constitutional claims. Curiously, Kelly's claimed irreparable harm—rooted in unfounded fears of

8 evidence destruction and a desire to "fish" for facts to oppose a yet-to-be-filed motion to

9 dismiss—reveals rather than resolves the substantive defect in his request.

10    As a request for expedited discovery, the Motion also fails. No Rule 26(f) conference has

11 occurred or been scheduled, and FINRA has not yet responded to the FAC. Under Rule 26(f) and

12 Local Rule 26-1(a), such a conference is to be held within 30 days *after* FINRA answers or

13 otherwise appears. FINRA's Counsel appeared in this case for the first time today, ECF 19, and

14 its response to the FAC is not due until September 12, 2025.[2]

15    Nor can Kelly satisfy the good cause standard similarly required under Rule 26(d). The

16 discovery he seeks is not only voluminous and burdensome, but wholly irrelevant to any

17 threshold issue in this case. FINRA's forthcoming motion to dismiss will raise legal, not factual,

18 questions—rendering discovery premature and unnecessary. Forcing FINRA to produce

19 expansive regulatory materials at this stage would impose a substantial and unjustified burden,

20 disrupt its core enforcement functions, and risk compromising highly sensitive data entrusted to

21 it for regulatory purposes. The resulting prejudice to FINRA—as an SRO tasked with protecting

22 investors and safeguarding market integrity—would be profound. Under these circumstances,

23 judicial intervention would disserve, not advance, the public interest.

24    In sum, Kelly's Motion is procedurally and substantively deficient and should be denied.

25

26    _____

[1] By filing this Opposition, FINRA does not submit to this Court's jurisdiction over it in this matter.

27 [2] FINRA will be moving to dismiss the FAC on multiple grounds, including, but not limited to: (i) lack of personal jurisdiction over FINRA; (ii) FINRA's regulatory immunity; (iii) lack of any

28 private right of action against FINRA; and (iv) FINRA is not a state actor subject to constitutional claims.

## II.    FACTUAL BACKGROUND

### A.    Procedural History and First Amended Complaint.

On July 2, 2025, Kelly filed this lawsuit against FINRA. ECF 1. On July 9, 2025, Kelly filed his First Amended Complaint (the "FAC"). ECF 7. Kelly makes the following allegations in the FAC:

- Kelly is a retail investor and shareholder of MMTLP. FAC ¶ 7.
- FINRA published a revised corporate action regarding the security MMTLP on or around December 8, 2022. *Id.* ¶ 8.
- FINRA halted trading of MMTLP effective December 9, 2022. *Id.* ¶ 9.
- FINRA's publication of the corporate action and the trading halt constituted an abuse of discretion, violation of due process, and overreach beyond FINRA's statutory and delegated authority as an SRO. *Id.* ¶ 10.

In the FAC, Kelly asserts three purported causes of action against FINRA: (1) Abuse of Regulatory Authority Resulting in Due Process Violations committed by FINRA; (2) Negligent Failure to Adhere to Mandated Regulatory Procedures committed by FINRA; and (3) Deprivation of Property Without Due Process of Law (Fifth Amendment Violation) committed by FINRA. *See* FAC ¶¶ 33-40, 41-46, 47-56.

On July 14, 2025, Kelly filed the Waiver of Service to FINRA. ECF 12. Pursuant to the waiver, FINRA has until September 12, 2025 to respond to the FAC.

On July 18, 2025, Kelly filed his Motion for Preliminary Injunction. ECF 16.

On August 1, 2025, FINRA's counsel filed his Notice of Appearance. ECF 19.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /



1
2

**B.      FINRA is a Private Company That Regulates its Broker-Dealer Members, Subject to SEC Oversight[3]**

3      FINRA is a private, not-for-profit Delaware corporation and self-regulatory organization

4  ("SRO") headquartered in the District of Columbia.[4] *See* FAC ¶ 6 (FINRA is headquartered in

5  Washington, D.C.); *see also Webb v. FINRA*, 889 F.3d 853, 856 (7th Cir. 2018). The government

6  does not appoint FINRA board members, officers, or employees. SEC Release No. 34-56145, 72

7  Fed. Reg. 42160, 42170-72 (July 26, 2007). FINRA does not receive any state or federal

8  funding; it is funded by registration, membership, and transaction fees charged to its members.

9  *See* FINRA By-Laws, Art. VI, § 1, *publicly available at* https://www.finra.org/rules-

10  guidance/rulebooks/corporate-organization/power-corporation-fix-and-levy-assessments.

11      In the Securities Exchange Act of 1934 ("Exchange Act"), Congress established "a

12  comprehensive system of federal regulation of the securities industry," an integral part of which

13  is the formation and oversight of private SROs, like FINRA, which are "responsible for the self-

14  regulation of member brokerage firms, exchange markets, and individuals associated with those

15  firms and markets." *Wiley v. SEC*, 663 Fed. App'x 353, 356 n.1 (5th Cir. 2016); *Sparta Surgical*

16  *Corp. v. NASD, Inc.,* 159 F.3d 1209, 1210-11, 1213 (9th Cir. 1998), *abrogated in part on other*

17  *grounds by Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 578 U.S. 374 (2016) (Congress

18  "established a system of 'cooperative regulation'" in which it imposed duties upon SROs to

19  conduct day-to-day regulation of the national securities markets). The Exchange Act generally

20  requires any broker or dealer transacting in securities to join an association of broker-dealers

21  registered as a national securities association, which is one type of SRO. *See* 15 U.S.C. §§

22  78o(a)(1), (b)(1). FINRA is a registered national securities association under the Exchange Act.

23  *See Sparta Surgical*, 159 F.3d at 1210; *see also Balabon v. Ketchum*, 785 Fed. App'x 263, 263

24

---

25  [3] In addition to the allegations in the FAC that describe FINRA, the information discussed in this Opposition regarding FINRA's role in the securities industry is publicly available, or in case law, or in other sources from which the Court may take judicial notice.

26

27  [4] FINRA was formed in 2007, when its predecessor, the National Association of Securities Dealers, Inc. ("NASD"), consolidated its member-firm regulation and enforcement functions with the regulatory and enforcement functions of the New York Stock Exchange. *See* Order Approving Proposed Rule Change to Amend the By-Laws of NASD, 72 Fed. Reg. 42,169 (Aug. 1, 2007).

28

1  (5th Cir. 2019); *Turbeville v. FINRA*, 874 F.3d 1268, 1270, n.2 (11th Cir. 2017). Under that

2  system, the SEC has "formidable oversight power to supervise, investigate, and discipline

3  [FINRA] for any possible wrongdoing or regulatory missteps." *NHBPA v. Black*, 107 F.4th 415,

4  435 (5th Cir. 2024) (citation omitted); *see also Sparta Surgical*, 159 F.3d at 1214.

5       The Exchange Act requires FINRA to establish rules "designed to prevent fraudulent and

6  manipulative acts and practices, to promote just and equitable principles of trade, to foster

7  cooperation and coordination with persons engaged in regulating, clearing, settling, processing

8  information with respect to, and facilitating transactions in securities, . . . and, in general, to

9  protect investors and the public interest . . . ." 15 U.S.C. § 78o-3(b)(6). FINRA's rules are "part

10  of the apparatus of federal securities regulation." *Kurz v. Fid. Mgmt. & Rsch. Co.*, 556 F.3d 639,

11  641 (7th Cir. 2009).

12       FINRA regulates the broker-dealer industry in accordance with the requirements of the

13  Exchange Act and under close supervision by the SEC. *Sparta Surgical*, 159 F.3d at 1210-11;

14  *see also NHBPA*, 53 F.4th at 876-77. The SEC has "broad supervisory responsibilities over

15  [SROs]" and correspondingly broad power to enforce their compliance with these obligations.

16  *See Austin Mun. Sec., Inc. v. NASD*, 757 F.2d 676, 680 (5th Cir. 1985). If FINRA violates the

17  Exchange Act, federal regulations, or its own rules, the SEC may suspend or revoke FINRA's

18  registration as an SRO, limit FINRA's activities, functions, and operations, or impose other

19  sanctions. *See* 15 U.S.C. §§ 78s(c), (h)(1)-(4). The SEC is also authorized to initiate judicial

20  proceedings against FINRA to enjoin activities that would violate the Exchange Act or FINRA's

21  rules and to seek civil penalties. *See* 15 U.S.C. §§ 78u(d)(1), (d)(3)(A). Thus, "Congress has

22  vested in the SEC the obligation of ensuring that FINRA performs its statutory responsibilities."

23  *Empire Fin. Grp., Inc. v. FINRA*, Case No. 08-80534-CIV, 2009 U.S. Dist. LEXIS 133643, at

24  *20 (S.D. Fla. Jan. 15, 2009).

25       **C.    FINRA Regulates the National Securities Markets**

26       The national securities markets are comprised of the national securities exchanges and the

27  over-the-counter ("OTC") market. FINRA does not operate a market, and it does not issue,

28  cancel, settle, or clear securities that are traded in the national securities markets. Instead, FINRA

1  performs oversight functions and regulates its members that trade and quote securities in the

2  national securities markets to ensure compliance with FINRA rules, the federal securities laws,

3  and the rules and regulations thereunder. 15 U.S.C. § 78o-3(b).

4       Specifically, FINRA performs multiple regulatory functions to oversee the OTC market

5  for equity securities, like MMTLP, that are not listed on a national securities exchange. For

6  example, FINRA: (1) maintains a symbol directory for OTC equity securities and can issue and

7  delete security symbols, *see* https://otce.finra.org/otce/symbol-directory; (2) adopts rules

8  regarding quoting and trading in OTC equity securities, *see* FINRA Rule 6400 Series;[5] (3)

9  reviews, processes, and announces information about corporate actions regarding OTC equity

10 securities, *see* SEC Rule 10b-17, 17 C.F.R. § 240.10b-17; *see also* FINRA Rule 6490;[6] and (4)

11 is authorized to halt trading and quoting of OTC equity securities if FINRA determines that

12 doing so is necessary to protect investors and the public interest, *see* FINRA Rule 6440.[7]

13 **III.    LEGAL ARGUMENT**

14     **A.    Kelly Failed to Comply with Local Rules 26-6(c), IA 1-3(f), and IC 2-2**

15      This case is in its infancy, and the Motion is procedurally deficient. FINRA has not

16 answered or otherwise responded to the FAC, as its response is not yet due and it is not required

17 to do so until September. As a result, a discovery conference required by the Federal and Local

18 Rules has not been scheduled. *See* Fed. R. Civ. P. 26(f); L.R. 26-1(a). Nonetheless, on July 18,

19 2025, Kelly filed the Motion seeking to compel expedited discovery from FINRA within 14

20 days. Mot. ¶¶ 31-32. In doing so, Kelly seeks six broad categories of discovery:

21     (1) Blue Sheet data for MMTLP trades on December 6-9, 2022;

22     (2) communications between FINRA and Meta Materials from December 5-9, 2022;

23 / / /

---

[5] The FINRA Rule 6400 Series is publicly available at https://www.finra.org/rules-guidance/rulebooks/finra-rules/6400.

[6] FINRA Rule 6490 is publicly available at https://www.finra.org/rules-guidance/rulebooks/finra-rules/6490.

[7] FINRA Rule 6440 is publicly available at https://www.finra.org/rules-guidance/rulebooks/finra-rules/6440-0.

1       (3) internal FINRA decision documents, emails or memoranda relating to the MMTLP halt

2 and the December 6 and 8, 2022 corporate action notices;

3       (4) communications with the SEC relating to the MMTLP corporate actions and trading

4 halt;

5       (5) communications between FINRA and DTCC regarding MMTLP; and

6       (6) records of short positions and fails-to-deliver ("FTDs") for MMTLP on December 6-9,

7 2022.

8 *Id.* ¶ 31.

9       Under Local Rule 26-6(c),

10     Discovery motions will not be considered unless the movant (1) has made a good
faith effort to meet and confer as defined in LR IA 1-3(f) before filing the motion,
11     and (2) includes a declaration setting forth the details and results of the meet-and-
confer conference about each disputed discovery request.
12

13     Local Rule IA 1-3(f), defines "Meet and Confer" as follows:

14     Whenever used in these rules, to "meet and confer" means to communicate directly
and discuss in good faith the issues required under the particular rule or court order.
15     This requirement is reciprocal and applies to all participants. Unless these rules or
a court order provide otherwise, this requirement may only be satisfied through
16     direct dialogue and discussion in a face-to-face meeting, telephone conference, or
video conference. The exchange of written, electronic, or voice-mail
17     communications does not satisfy this requirement.

18       Kelly did not make any efforts to meet and confer on the substance of his Motion with

19 FINRA. Prior to filing the Motion, Kelly was communicating via email with FINRA's counsel.

20 And, while an exchange of email would be insufficient to satisfy the Court's meet and confer

21 requirement, in none of Kelly's email communications did he mention his plan to file the Motion

22 or request a call or meeting with FINRA's counsel to discuss the contents of his Motion.[8]

23       Further, pursuant to Local Rule IC 2-2, "[f]or each type of relief requested . . . a separate

24 document must be filed and a separate event must be selected for that document." Failure to

25 follow this rule necessitates denial. *See Morgan Stanley Smith Barney LLC v. Takahaski*, Case

26 No. 2:24-cv-02127, 2025 U.S. Dist. LEXIS 1617, at \*14 (D. Nev. Jan 6, 2025) ("Because

27

28 
---
[8] Kelly also violated this Court's local rules by failing to include the required declaration regarding
any meet and confer conference or attempt at such with his Motion. *See* L.R. 26-6(c).

1  Morgan Stanley's request is procedurally deficient [for filing its request for expedited discovery

2  within its motions for TRO and preliminary injunction], its request for expedited discovery is

3  denied."); *Atrient, Inc. v. Perez*, Case No. 2:17-cv-2880, 2018 U.S. Dist. LEXIS 8037, at *1, n.1

4  (D. Nev. Jan. 18, 2018) ("Pursuant to Local Rule IC 2-2(b), a separate document must be filed on

5  the docket for each purpose. Atrient filed the instant motion as a motion for preliminary

6  injunction and the court will construe it as such. The court cannot consider Atrient's request for

7  expedited discovery unless it is filed separately.").

8      Here, Kelly titled the Motion, "Motion for Preliminary Injunction." Yet, the contents of

9  the entire document seek to compel expedited discovery from FINRA, which is a distinct relief

10  from the issuance of a preliminary injunction.

11      **B.    There are No Grounds for a Preliminary Injunction**

12      "A preliminary injunction seeks to preserve the status quo and prevent irreparable harm

13  from occurring before a judgment is issued." *Atrient*, 2018 U.S. Dist. LEXIS 8037, at *5; *Sierra*

14  *Forest Legacy v. Rey*, 577 F.3d 1015, 1023 (9th Cir. 2009) ("The **sole** purpose of a preliminary

15  injunction is to "preserve the status quo ante litem pending a determination of the action on the

16  merits.") (citations omitted) (emphasis added).

17      "A preliminary injunction is 'an extraordinary and drastic remedy, one that should not be

18  granted unless the movant, by a clear showing, carries the burden of persuasion.'" *Amistad*

19  *Christiana Church v. Life Is Beautiful, LLC*, 132 F. Supp. 3d 1246, 1254 (D. Nev. 2015);

20  *Branch-Noto v. Sisolak*, 576 F. Supp. 3d 790, 797 (D. Nev. 2021) ("'A preliminary injunction is

21  an 'extraordinary' remedy 'never awarded as of right.'") (*citing to Winter v. N.R.D.C.*, 555 U.S.

22  7, 24 (2008)).

23      The Ninth Circuit uses two alternative tests to determine whether a preliminary injunction

24  should issue. Under the traditional test articulated by the U.S. Supreme Court in *Winter v.*

25  *N.R.D.C*, a plaintiff seeking an injunction must prove four factors: "(1) likelihood of success on

26  the merits; (2) likelihood of irreparable injury if preliminary relief is not granted; (3) balance of

27  hardships; and (4) advancement of public interest." 555 U.S. at 20; *see also Mobilize the*

28  *Message, LLC v. Bonta*, 50 F.4th 928, 1002 (9th Cir. 2022); *Amistad*, 132 F. Supp. 3d at 1254.

"Alternatively, under the sliding scale approach, [a plaintiff] must demonstrate (1) serious questions on the merits, (2) a likelihood of irreparable harm, (3) the balance of hardships tips sharply in the its [sic.] favor, and (4) an injunction is in the public interest." *Amistad*, 132 F. Supp. 3d at 1254; *see also Atrient*, 2018 U.S. Dist. LEXIS 8037, at *5-6. "'Under this approach, the elements of the preliminary injunction test are balanced, so that a stronger showing of one element may offset a weaker showing of another.'" *Atrient*, 2018 U.S. Dist. LEXIS 8037, at *5-6 (*citing Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011)). For example, "'serious questions going to the merits' and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury, and that the injunction is in the public interest." *Takahaski*, 2025 U.S. Dist. LEXIS 1617, at *4 (citations omitted).

Under either the traditional test or the sliding scale approach, "the starting point is a merits analysis." *Branch-Noto*, 576 F. Supp. 3d at 797. "On the merits-success prong, 'the burdens at the preliminary injunction stage track the burdens at trial.'" *Paher v. Cegavske*, 457 F. Supp. 3d 919, 924 (D. Nev. 2020).

1.    Kelly Has No Likelihood of Success on the Merits

There is no likelihood that Kelly will prevail on the FAC, and thus, an injunction would serve no valid purpose and would only cause needless harm and prejudice to FINRA. As demonstrated below, there are multiple, independent grounds that establish Kelly has no likelihood of success on the merits of his purported claims.[9]

***a.    The Court Lacks Personal Jurisdiction Over FINRA***

There is a dearth of jurisdictional allegations in the FAC. The FAC concedes that FINRA's principal place of business and headquarters are in Washington, D.C. FAC ¶¶ 3, 6. Kelly's sole allegation concerning personal jurisdiction is that FINRA's "conduct had direct and harmful effects on investors nationwide, including the Plaintiff in this District." FAC ¶ 3. Kelly's

---

[9] FINRA is preparing additional arguments to include in its forthcoming motion to dismiss to be filed on September 12, 2025. However, the defenses raised herein would provide FINRA with full relief, i.e. dismissal from suit.

1  claims arise from allegations regarding FINRA's broad regulatory conduct: namely the

2  publication of corporate action notices and issuing a trading halt. *See, e.g.,* FAC ¶¶ 8-10. The

3  FAC does not allege that these regulatory activities occurred in Nevada. *See generally* FAC.

4       A court must have jurisdiction over both the parties and the claims asserted in a

5  plaintiff's complaint to decide the case. "Federal courts may exercise either general or specific

6  personal jurisdiction over a defendant." *Kehoe v. Walker*, Case No. 2:25-cv-01146, 2025 U.S.

7  Dist. LEXIS 137446, *4 (D. Nev. June 30, 2025) (internal citations omitted). Because FINRA is

8  neither subject to general nor specific personal jurisdiction in this Court, the FAC must be

9  dismissed.

10           **b.     FINRA is Not Subject to General Personal Jurisdiction in Nevada**

11      Corporations are subject to general personal jurisdiction solely where "their affiliations

12  with the state are so 'continuous and systematic' as to render them essentially at home in the

13  forum State." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011); *see*

14  *also Gerwaski v. Nevada ex rel. Bd. of Regents of the NV Sys. Higher Educ.*, Case No. 2:24-cv-

15  00985, 2025 U.S. Dist. LEXIS 84645, at *9 (D. Nev. May 5, 2025); *Kehoe*, 2025 U.S. Dist.

16  LEXIS 137446, at *4. A corporation is considered "essentially at home" in two places: (1) its

17  state of incorporation, and (2) the state in which its principal place of business is located. *See*

18  *Daimler AG v. Bauman,* 571 U.S. 117, 137 (2014).

19      FINRA is not incorporated in Nevada, and it does not maintain its principal place of

20  business in Nevada. FINRA is incorporated in Delaware and its principal place of business is in

21  Washington, D.C. FAC ¶ 6; *see also Webb*, 889 F.3d at 856. Accordingly, because FINRA is not

22  "essentially at home" in Nevada, the Court lacks general personal jurisdiction over FINRA.

23           **c.     FINRA is Not Subject to Specific Jurisdiction in Nevada**

24      Likewise, FINRA is not subject to specific personal jurisdiction in Nevada because there

25  is no connection (nor has Kelly alleged one) between FINRA's alleged conduct and Nevada. A

26  forum may exercise specific personal jurisdiction over an out-of-state defendant not otherwise

27  subject to personal jurisdiction in the forum where the defendant has "certain minimum contacts

28  with [the State] such that the maintenance of the suit does not offend 'traditional notions of fair

1   play and substantial justice.'" *Goodyear*, 564 U.S. at 923 (*citing Int'l Shoe Co. v. Washington*,

2   326 U.S. 310, 316 (1945)). In other words, there must be "some act by which the defendant

3   purposefully avail[ed] itself of the privilege of conducting activities within the forum State, thus

4   invoking the benefits and protections of its laws." *Id.* at 924 (*citing Hanson v. Denckla*, 357 U.S.

5   235, 253 (1958)). It is not enough that an act was allegedly directed at the plaintiff. Instead, to be

6   consistent with due process, the defendant's actions must be "purposefully directed toward the

7   forum State." *Asahi Metal Ind. Co., v. Sup. Court of Cal.*, 480 U.S. 102, 112 (1987).

8           "Determining whether specific jurisdiction exists over an out-of-state defendant involves

9   two inquiries: (1) whether a forum state's long-arm statute permits service of process, and (2)

10  whether the assertion of personal jurisdiction would violate due process." *Kehoe*, 2025 U.S. Dist.

11  LEXIS 137446, at *4 (*citing to Action Embroidery Corp. v. Atl. Embroidery, Inc.*, 368 F.3d

12  1174, 1177, 1180 (9th Cir. 2004)). "Where…there is no applicable federal statute governing

13  personal jurisdiction, the district court applies the law of the state in which the district court sits."

14  *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 800 (9th Cir. 2011). "Nevada's

15  longarm statute is co-extensive with federal standards, so [the court] may exercise personal

16  jurisdiction if doing so comports with federal constitutional due process." *Gerwaski*, 2025 U.S.

17  Dist. LEXIS 84645, at *8-9 (*citing, in part, to* NEV. REV. STAT. § 14.065(1)); *Kehoe*, 2025 U.S.

18  Dist. LEXIS 137446, at *4.

19          The Ninth Circuit has a three-prong test for analyzing specific personal jurisdiction:

20      (1) The non-resident defendant must purposefully direct his activities or
            consummate some transaction with the forum or resident thereof; or perform
21          some act by which he purposefully avails himself of the privilege of
            conducting activities in the forum, thereby invoking the benefits and
22          protections of its laws;

23      (2) the claim must be one which arises out of or relates to the defendant's forum-
24          related activities; and

25      (3) the exercise of jurisdiction must comport with fair play and substantial justice, i.e. it
            must be reasonable.

26
27      *Schwarzenegger,* 374 F.3d at 802; *see also Gerwaski,* 2025 U.S. Dist. LEXIS 84645, at

28  *10; *Kehoe*, 2025 U.S. Dist. LEXIS 137446, at *5.

1    Kelly does not allege any facts that establish FINRA's regulatory activities at issue in this

2  case were "purposefully directed" to Nevada. *See generally* FAC. Nor does Kelly allege any

3  contacts with Nevada that show purposeful availment in Nevada to support specific jurisdiction.

4  Rather, Kelly challenges the propriety of FINRA's broad regulatory decisions related to MMTLP,

5  namely the publication of corporate action notices and the issuance of a trading halt. *See e.g.,* FAC

6  ¶¶ 8-10. Kelly does not describe any activity or transaction occurring in Nevada. Finally, the

7  exercise of jurisdiction over FINRA does not comport with justice or fair play, and an exercise of

8  jurisdiction by the federal court in Nevada would not be reasonable.

9    In sum, none of the allegations contained in the FAC establishes general or specific

10  personal jurisdiction over FINRA in Nevada. As such, the FAC has no likelihood of success on

11  the merits, and the Motion must be denied. *See Proteinhouse Franchising, LLC v. Gutman*, Case

12  No. 2:17-cv-02816, 2017 U.S. Dist. LEXIS 185468, at *11 (D. Nev. Nov. 8, 2017) (finding that

13  plaintiffs had failed to allege personal jurisdiction over one of the defendants, and thus the court

14  could not issue a TRO enjoining that defendant).

15                    *d.    FINRA's Regulatory Immunity Is Absolute and Bars All Claims*

16    An SRO such as FINRA is absolutely "immune from liability based on the discharge of

17  its duties under the Exchange Act." *Sparta Surgical*, 159 F.3d at 1213[10]; *see also SCAP 9, LLC v.*

18  *Fin. Indus. Regulatory Auth.,* No. 23-15627, 2024 U.S. App. LEXIS 8731 (9th Cir. 2024); *Hurry*

19  *v. Fin. Indus. Regulatory Auth.*, 782 F. Appx. 600 (9th Cir. 2019); *Cent. Registration Depository*

20  *# 1346377 (Christiansen) v. FINRA*, 459 Fed. Appx. 662, 663 (9th Cir. 2011); *P'ship Exch. Sec.*

21  *Co. v. NASD*, 169 F.3d 606, 608 (9th Cir. 1999).

22    Every circuit court that has considered the issue has held that SROs are absolutely

23  immune "from suit for conduct falling within the scope of [their] regulatory and general

24  oversight functions." *See, e.g., D'Alessio v. NYSE*, 258 F.3d 93, 105 (2d Cir. 2001), *cert. denied*,

25  534 U.S. 1066 (2001); *see also Austin Mun.*, 757 F.2d at 679. Such protection is crucial to an

26

27

28

---

[10] Kelly's citation to *Sparta Surgical* for the proposition that "ultra vires" conduct of FINRA is unprotected by immunity is incorrect. FAC ¶¶ 21, 23. There is no mention of "ultra vires" conduct, or any synonym thereof in *Sparta Surgical*. Instead, the opinion holds that there is no bad faith exception to regulatory immunity under the Exchange Act. *Sparta Surgical*, 159 F.3d at 1215.

1   SRO's ability to perform its regulatory tasks and is consistent with the system of cooperative

2   regulation contemplated by Congress "under which [SROs] . . . exercise a primary supervisory

3   role subject to ultimate SEC control." *Sparta Surgical*, 159 F.3d at 1213-14.

4          Courts across the country considering claims related to MMTLP have consistently

5   dismissed pro se litigants' cases on the basis of regulatory immunity. *See, e.g., Traudt v.*

6   *Rubenstein*, Case No. 2:24-cv-782, 2025 U.S. Dist. LEXIS 123280, at *15 (D. Vt. June 30,

7   2025); *Park v. FINRA*, Case No. 2:23-cv-69, 2023 U.S. Dist. LEXIS 238130, *7-18 (N.D. Ga.

8   Sept. 25, 2023); *Hofman v. Fid. Brokerage Servs., LLC*, Case No. 2:23-cv-00881, 2023 U.S.

9   Dist. LEXIS 81166, *13-17 (C.D. Cal. May 8, 2023); *Tawil v. FINRA*, Case No. 4:22-cv-440,

10  2023 U.S. Dist. LEXIS 117247, *2-3 (N.D. Fla. May 24, 2023).

11         The immunity afforded to FINRA is absolute, and it applies to all of FINRA's regulatory

12  activities regardless of any purported motive. *See, e.g., Sparta Surgical*, 159 F.3d at 1215

13  (holding that even if the NASD had suspended trading of a security in a capricious bad-faith

14  manner, the NASD's conduct was still regulatory in nature and protected from liability); *see also*

15  *Gallagher v. FINRA*, No. 21-13605, 2022 WL 1815594, at *2 (11th Cir. June 3, 2022) ("The test

16  [for whether SRO conduct is protected by regulatory immunity] does not turn on 'an SROs

17  subjective intent or motivation,' but rather the 'function being performed'"). When determining

18  an SRO's entitlement to regulatory immunity, courts examine the nature of the function

19  performed and not "an SRO's subjective intent or motivation." *Weissman v. NASD*, 500 F.3d

20  1293, 1297 (11th Cir. 2007); *see also Austin Mun.*, 757 F.2d at 688 (examining whether

21  challenged action falls within scope of permissible discretion).

22         Here, all of Kelly's claims against FINRA arise from its regulatory activities. See, e.g.,

23  FAC ¶¶ 8, 9, 13, 15, 16, 17, 18, 19, 20, 22, 23, 24, 27, 28, 29, 32. Moreover, FINRA's decision

24  to halt trading of MMTLP is a "quintessentially regulatory function." *See, e.g., In re Facebook,*

25  *Inc., IPO Sec. & Derivative Litig.*, 986 F. Supp. 2d 428, 454 (S.D.N.Y. 2013) (dismissing claim

26  against an SRO alleging its decision not to halt trading of a security was negligent on regulatory

27  immunity grounds because "[t]he capacity to suspend trading . . . is a quintessentially regulatory

28  function."); *see also Tawil*, 2023 U.S. Dist. LEXIS 117247, at *2-3 ("Suspending trading—when

1  warranted—is precisely the kind of activity FINRA can undertake in its quasi-regulatory

2  capacity."); *Opulent Fund, L.P. v, Nasdaq Stock Mkt., Inc.*, 2007 U.S. Dist. LEXIS 79260, *13

3  (N.D. Cal. Oct. 12, 2007) (identifying suspension of trading as regulatory in nature).

4  Accordingly, all claims against FINRA in the FAC are barred by regulatory immunity, and Kelly

5  has no likelihood of success on the merits of the FAC.

6           **e.    *Kelly Has No Private Right of Action Against FINRA***

7           Courts have consistently held that no private right of action exists against an SRO, like

8  FINRA, for its regulatory acts, omissions, or alleged violations of its own rules. *See Jablon v.*

9  *Dean Witter & Co.* (9th Cir. 1980) 614 F.2d 677, 681 (finding no private right of action for

10 violations of stock association rules); *see also, e.g., MM&S Fin., Inc. v. NASD*, 364 F.3d 908,

11 911-12 (8th Cir. 2004) ("[T]he Exchange Act does not create a private right of action against

12 NASD defendants for violating their own rules" and a party's attempt to bypass the absence of a

13 private right of action by asserting a claim under state contract law is "fruitless."); *Desiderio v.*

14 *NASD*, 191 F.3d 198, 208 (2d Cir. 1999) ("[T]here is no private right of action available under

15 the Securities Exchange Act . . . to challenge an exchange's failure to follow its own rules.") cert.

16 denied, 531 U.S. 1069 (2001); Spicer v. Chicago Bd. of Options Exch., Inc., 977 F.2d 255, 259-

17 60 (7th Cir. 1992) (holding no private right of action exists under the Exchange Act against an

18 SRO for failing to enforce its rules).

19          All of the causes of action against FINRA in the FAC arise out of FINRA's regulatory

20 functions under the Exchange Act. FAC ¶¶ 13, 15, 16, 22, 23, 26, 27, 28, 29, 32. Thus, in

21 addition to being barred by regulatory immunity, Kelly's claims against FINRA fail for the

22 independent reason that he has no private right of action against FINRA arising under the

23 Exchange Act, or any other federal or state law. Accordingly, the Motion should be denied

24 because Kelly has no likelihood of success on the merits of the FAC.

25          **f.    *Kelly's Constitutional Claims Fail Because FINRA is***

26                  ***Not a State Actor***

27          The three causes of action asserted against FINRA all stem from purported

28 constitutional violations. *See, e.g.*, FAC ¶¶ 34, 46, 55.

1    Kelly's constitutional claims are futile because as "a general matter the protections of the

2    [U.S. Constitution] do not extend to private conduct abridging individual rights." *NCAA v.*

3    *Tarkanian*, 488 U.S. 179, 191 (1988). Constitutional claims—like due process and takings clause

4    claims under the Fifth Amendment—require "state action." *Duffield v. Robertson Stephens &*

5    *Co.*, 144 F.3d 1182, 1200 (9th Cir. 1998), *overruled on other grounds by EEOC v. Luce,*

6    *Forward, Hamilton & Scripps*, 345 F.3d 742 (9th Cir. 2003) ("A threshold requirement of any

7    constitutional claim is the presence of state action."); *Rank v. Nimmo*, 677 F.2d 692, 701 (9th

8    Cir. 1982) ("The Due Process Clause of the Fifth Amendment applies to actions of the federal

9    government and not to individual activities of private actors … [unless] the action of the latter

10   may be fairly treated as that of the [government] itself." (cleaned up)). To establish a

11   constitutional violation, a plaintiff must first "demonstrate 'that in denying plaintiff's

12   constitutional rights, the defendant's conduct constituted state action.'" *D.L. Cromwell Invs., Inc.*

13   *v. NASD Reg., Inc.*, 279 F.3d 155, 161 (2d Cir. 2002) (*quoting Desiderio*, 191 F.3d at 206);

14   *Sybalski v. Indep. Grp. Home Living Program, Inc.*, 546 F.3d 255, 256-57 (2d Cir. 2008)

15   (dismissing First Amendment claims and other claims where plaintiff failed to plead state

16   action); *Desiderio*, 191 F.3d at 206-07 (affirming dismissal of plaintiff's Fifth Amendment claim

17   because plaintiff failed to show NASD's actions constituted state action).

18       Courts considering the issue have held, without exception, that FINRA is not a state

19   actor. *See, e.g., Kim v. FINRA*, 698 F. Supp. 3d 147, 153 (D.D.C. 2023) ("[N]o court has ever

20   held that FINRA or its relationship with the SEC is unconstitutional."); *Mohlman v. FINRA*,

21   Case No. 3:19-cv-154, 2020 U.S. Dist. LEXIS 31781, at *14 (S.D. Ohio Feb. 25, 2020), aff'd,

22   977 F.3d 556 (6th Cir. 2020)) ("Courts have held without exception that FINRA is a private

23   entity and not a state actor.") (collecting cases); *First Jersey Sec., Inc. v. Bergen*, 605 F.2d 690,

24   698 (3d Cir. 1979), *cert. denied*, 444 U.S. 1074 (1980) ("Congress preferred self-regulation by a

25   private body over direct involvement of a governmental agency."); *Perpetual Secs., Inc. v. Tang*,

26   290 F.3d 132, 138 (2d Cir. 2002) ("It is clear that NASD is not a state actor.").

27       Rather, FINRA is a private entity organized as a not-for-profit corporation under Delaware

28   law that does not receive state or federal funding. *See Kim*, 698 F. Supp. 3d at 158; *see also,*

16

1   *Desiderio*, 191 F.3d at 206. Moreover, no government official serves as a FINRA employee, and

2   the government does not appoint any FINRA employees or officers. *Desiderio*, 191 F.3d at 206.

3   Because FINRA is not a state actor, Kelly would be unable to sustain any constitutional claims

4   against FINRA, and as such, Kelly has no likelihood of success on the merits of the FAC.

5               2.    <u>Kelly Cannot Establish Irreparable Harm</u>

6           "Irreparable harm is traditionally defined as harm for which there is no adequate legal

7   remedy." *Atrient*, 2018 U.S. Dist. LEXIS 8037 at *7 (*citing Arizona Dream Act Coal. v. Brewer*,

8   757 F.3d 1053, 1068 (9th Cir. 2014)). The "possibility" of irreparable harm is not enough to

9   justify a preliminary injunction; the harm must be "immediate." *Id.* (*citing Winter*, 555 U.S. at

10  22; *Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988)).

11          Kelly asserts that, absent the requested discovery, he "will be unable to fully establish the

12  basis for his constitutional claims… resulting in irreparable harm through the likely dismissal of

13  the case on the grounds of FINRA's regulatory immunity…." Mot. ¶ 24; *see also id.* ¶ 25

14  ("[I]rreparable harm by permanently foreclosing Plaintiff's ability to substantiate these ultra

15  vires and due process claims before potential dismissal on immunity grounds.").[11]

16          The FAC, therefore, fails to establish that Kelly suffered any concrete harm to date or

17  that he will suffer any immediate harm. Having one's case dismissed because of an anticipated

18  dispositive defense is not harm, let alone irreparable harm. If that were the case, every failed

19  litigant would claim to be irreparably harmed in every lawsuit. While FINRA believes Kelly's

20  lawsuit will be dismissed (as does Kelly apparently), such a dismissal does not amount to harm.

21  *Cf. Rodriguez v. Salem Police Dep't*, Case No. 6:23-cv-01863, 2024 U.S. Dist. LEXIS 127682,

---

[11] Kelly's citations to "*Alpine Securities Corp. v. FINRA*, 102 F.4th 55, 74 (D.C. Cir. 2024)" contains both typographical errors and mischaracterizations of the holding. FAC at ¶¶ 26-27. The correct citation is *Alpine Secs. Corp. v. FINRA,* 121 F.4th 1314 (D.C. Cir. 2024). Because of this typographical error, Kelly's pin-cite to page 74 of the decision is indecipherable. Regardless, Kelly asserts that the *Alpine* opinion holds that "denial of access to relevant records – especially those held by the opposing party – can constitute irreparable harm where such denial prevents vindication of a constitutional right." FAC ¶ 26. However, *Alpine* does not mention records, much less hold that denial of records can constitute irreparable harm for purposes of a preliminary injunction. Instead, it holds that the expedited expulsion of a firm from FINRA membership without adequate SEC review constitutes an irreparable harm to that firm. *Alpine,* 102 F.4th at 1329. Further, the court in *Alpine* specifically noted that its holding is "narrow and limited to expedited expulsion proceedings." *Id.* at 1330.

epg
LAW GROUP

1    *9 (D. Or. July 19, 2024) ("Plaintiffs cannot be irreparably harmed by the [sic] being denied

2    possession of a property that was never theirs in the first place."); *Global Commodities Trading*

3    *Grp., Inc. v. Beneficio de Arroz Choloma, S.A.*, Case No. 2:16-cv-01045, 2016 U.S. Dist. LEXIS

4    98989, *11 (E.D. Cal. July 28, 2019) ("[T]he Court is not aware of any case law indicating that

5    requiring a party to prepare a responsive pleading in a separate litigation constitutes an

6    irreparable injury. To conclude that preparing filings constitutes irreparable injury stretches the

7    doctrine of injunctions to absurd conclusions…."); *Rose v. Swanson*, Cause No. CV 10-48-H,

8    2011 U.S. Dist. LEXIS 119334, *9 (D. Mon. Oct. 17, 2011) ("[Plaintiff] has failed to

9    demonstrate any actual harm or that he will suffer irreparable harm in the absence of an

10   injunction. His general assertion that he is unable to prosecute this and other actions is too

11   speculative to support an injunction.").

12       "Where a plaintiff's showing of irreparable harm is so inadequate, even a stronger

13   showing as to one of the other elements of the Winter test will be insufficient to salvage the

14   plaintiff's motion for preliminary injunction." *Atrient*, 2018 U.S. Dist. LEXIS 8037, at *6, n.2.

15   As such, the failure to establish irreparable harms weighs in favor of denying the Motion.

16              3.    The Balance of Equities Does Not Tip in Kelly's Favor

17       "'To determine which way the balance of the hardships tips, a court must identify the

18   possible harm caused by the preliminary injunction against the possibility of the harm caused by

19   not issuing it.'" *Paher*, 457 F. Supp. 3d at 924 (*citing Univ. of Haw. Prof'l Assembly v.*

20   *Cayetano*, 183 F.3d 1096, 1108 (9th Cir. 1999)). That is, a court must weigh "'the hardships of

21   each party against one another.'" *Id.*

22       Here, there is no hardship to Kelly to waiting to proceed with discovery in the normal

23   course of litigation, especially where there is no legitimate threat of document destruction or

24   spoliation. On the other hand, FINRA has several dispositive defenses which it will brief in its

25   forthcoming motion to dismiss (and which have been previewed here), that should dispose of this

26   entire case before any discovery is taken. Therefore, requiring FINRA to now produce the

27   burdensome and broad discovery that Kelly seeks would inflict great hardship on FINRA. Thus,

28   this factor weighs in FINRA's favor.

18

1           4.     <u>The Public Interest is Not Served by an Injunction</u>

2       Kelly claims that the public interest is served by an injunction to ensure transparency and

3  accountability of FINRA. Mot. ¶ 29. He further alleges that because there are approximately

4  65,000 shareholders who suffered during the MMTLP trading halt, and the injunction would

5  contribute to "informed public disclosures, responsible oversight, and broader market fairness."

6  *Id.* ¶ 30. But this is an individual action not a class action, and any discovery exchanged in this

7  case could only be used in this case. As such, this factor weighs in favor of denying the Motion.

8      **C.**    **There is No Basis for Expedited Discovery Under Fed. R. Civ. P. 26**

9       Kelly's Motion seeking expedited discovery is also premature because "[a] party may not

10 seek discovery from any source before the parties have conferred as required by Rule 26(f),

11 except in a proceeding exempted from initial disclosure under Rule 26(a)(1)(B), or when

12 authorized by these rules, by stipulation, or by court order." FED. R. CIV. P. 26(d)(1).

13      A party seeking expedited discovery before a Rule 26(f) conference must establish "good

14 cause" for the discovery sought. *See, e.g., Yenovkian v. JP Morgan Chase & Co.*, Case No. 2:24-

15 cv-00170, 2024 U.S. Dist. LEXIS 98592, *2-3 (D. Nev. June 3, 2024) (Report &

16 Recommendation of Magistrate Judge); *Aristocrat Techs., Inc. v. Light & Wonder, Inc.*, 2:24-cv-

17 00382, 2024 U.S. Dist. LEXIS 140513, at *3 (D. Nev. Mar. 26, 2024); *Proteinhouse*

18 *Franchising*, 2017 U.S. Dist. LEXIS 185468, at *10. To determine whether good cause exists,

19 courts must consider the following factors: "(1) whether a preliminary injunction is pending; (2)

20 the breadth of the requested discovery; (3) the purpose for requesting the expedited discovery;

21 (4) the burden on the defendant to comply with the requests; and (5) how far in advance of the

22 typical discovery process the request was made." *Aristocrat*, 2024 U.S. Dist. LEXIS 140513, at

23 *3; *Takahaski*, 2025 U.S. Dist. LEXIS 1617, at *11.

24      Kelly has not established good cause. First, there is no preliminary injunction pending for

25 which discovery is necessary. Second, Kelly seeks a vast breadth of discovery—encompassing

26 six broad categories of documents. Mot. ¶ 31; *see also, supra,* at p. 7:21 – 8:7 (outlining the

27 categories).

28 / / /



1    As to the third factor – the purpose for the expedited discovery – Kelly's asserted purpose

2    is deficient as a matter of law. Kelly argues that the Motion is necessary to "preserve critical

3    evidence." Mot. ¶¶ 2, 26. However, Kelly cites no factual basis for his unfounded concern of

4    potential evidence destruction.[12] Moreover, FINRA is already legally obligated by the federal

5    securities laws to retain all the trading data that Kelly seeks in his Motion. SEC rules and

6    regulations explicitly provides the following "[r]ecordkeeping rule" for, among other entities,

7    national securities associations like FINRA:

8            Every national securities exchange, national securities association,
             registered clearing agency and the Municipal Securities Rulemaking Board
9            shall keep and preserve at least one copy of all documents, including all
             correspondence, memoranda, papers, books, notices, accounts, and other
10           such records as shall be made or received by it in the course of its business
             as such and in the conduct of its self-regulatory activity.

11

12    17 CFR 240.17a-1(a). The rules further provide that:

13           Every national securities exchange, national securities association,
             registered clearing agency and the Municipal Securities Rulemaking Board
14           shall keep all such documents for a period of not less than five years. . . .

15    17 CFR 240.17a-1(b). Thus, spoliation is not a legitimate concern or basis to seek expedited

16    discovery.

17    Instead, the Motion is an impermissible fishing expedition to identify evidence that might

18    support Kelly's claims and to prevent "the likely dismissal of the case on grounds of FINRA's

19    regulatory immunity." Mot. ¶ 24; *see also id.* ¶¶ 18, 20, 24, 26. This not good cause. *See*

20    *Aristocrat*, 2024 U.S. Dist. LEXIS 140513, at *6 ("[E]xpedited discovery may be denied when it

21    ultimately goes to the merits of a party's claim."); *Yenovkian*, 2024 U.S. Dist. LEXIS 98592, at

22    *3 (recommending denial of plaintiff's motion to conduct early discovery where plaintiff

23

24    ---
      [12] Moreover, Kelly's reliance on *De Beers Consol. Mines v. United States*, 325 U.S. 212 (1945)
25    for the proposition that preliminary injunctions may be granted "to preserve evidence and prevent
      procedural prejudice, particularly in cases involving potential spoliation or where limited
26    discovery is necessary to evaluate a constitutional claim" is incorrect and misplaced. FAC ¶ 10.
      The *De Beers* opinion does not mention anything regarding preservation of evidence or potential
27    spoliation, nor does it involve a constitutional claim. *See generally id.* The opinion focuses solely
      on whether a district court had the power to issue a preliminary injunction restraining defendants
28    from disposing of property in the U.S. until the court determined the merits of an antitrust case
      brought by the U.S. government. *Id.*

20

1  requested early discovery in order to combat defendant's motion to dismiss); *see also Ashcroft v.*

2  *Iqbal*, 556 U.S. 662, 678-79 (2009) ("Rule 8 marks a notable and generous departure from the

3  hyper-technical, code-pleading regime of a prior era, but it does not unlock the doors of

4  discovery for a plaintiff armed with nothing more than conclusions.").[13]

5      Kelly has not and cannot establish any alleged need for discovery given that FINRA's

6  forthcoming motion to dismiss will assert legal, rather than factual, arguments.[14] For example,

7  FINRA's decision to halt trading of the MMTLP security is "quintessentially regulatory" activity

8  for which it is entitled to absolute immunity, and the discovery Kelly seeks is irrelevant and

9  unnecessary to assess FINRA's immunity defense. *See Sparta Surgical*, 159 F.3d at 1214-15.

10  Indeed, when determining an SRO's entitlement to immunity, courts examine only the nature of

11  the function performed and not "an SRO's subjective intent or motivation." *Weissman*, 500 F.3d

12  at 1297; *see also Sparta Surgical*, 159 F.3d at 1214; *Gallagher*, 2022 U.S. App. LEXIS 15309, at

13  *4; *In re NYSE Specialists Sec. Litig.,* 503 F.3d 89, 96 (2nd Cir. 2007); *Empire*, 2009 U.S. Dist.

14  LEXIS 133643, at *19 ("[Regulatory] immunity applies regardless of FINRA's alleged motives,

15  and despite [plaintiff's] disagreement with how FINRA carried out this function.").

16      The fourth factor related to the burden of compliance also disfavors Kelly's request

17  because the burden on FINRA to collect, review, redact, and produce the documents sought

18  would be significant and not "proportional to the needs of the case." FED. R. CIV. P. 26(b)(1). For

19  example, Blue Sheet data is an investigative tool available to FINRA's examination and

---

[13] Courts have justifiably rejected other MMTLP retail investors' attempts to obtain pre-action discovery. *See Khorassani v. FINRA,* Index No. 153819/2023, 2023 N.Y. Misc. LEXIS 2980 (N.Y. Sup.Ct. N.Y. Cty. June 15, 2023); *see also Steamroller, LLC v. OTC Mkts. Grp., Inc.*, Index No. 160854/2023, 2024 N.Y. Misc. LEXIS 5183 (N.Y. Sup.Ct. N.Y. Cty. Aug. 15, 2024). Additionally, the plaintiff in *Traudt*, 2025 U.S. Dist. LEXIS 123280, a case brought by another MMTLP investor, also made numerous unsuccessful attempts at obtaining expedited discovery prior to the court's adjudication of FINRA's motion to dismiss.

[14] Given that FINRA will be asserting an immunity defense, FINRA's motion to dismiss should also be decided expeditiously, and prior to any discovery. *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (the Court "repeatedly ha[s] stressed the importance of resolving immunity questions at the earliest possible stage in litigation") (citations omitted). Immunity provides protection "not merely to avoid standing trial, but also to avoid the burdens of such pretrial matters as discovery." *Behrens v. Pelletier*, 516 U.S. 299, 308 (1996) (cleaned up). Under the circumstances, FINRA reserves the right to move to stay all discovery or other case proceedings until after this Court decides its motion to dismiss.

1   investigation teams for the purpose of conducting regulatory investigations under FINRA Rules.

2   *See* FINRA Rules 8211, 8213. In prior unsuccessful litigations seeking to obtain some of the

3   same Blue Sheet data, FINRA established that Blue Sheet data is collected in a proprietary

4   system, and the data contains highly sensitive and confidential data, including the personal,

5   financial, and identifying information of other, third-party investors. *See* Affidavit of Sam

6   Draddy ("Draddy Aff.") ¶¶ 8-16, attached as **Exhibit A**. FINRA itself limits internal access to

7   this proprietary system. *Id.* ¶ 9. In addition, Blue Sheet data is not made publicly available, and it

8   is difficult to understand without significant knowledge, training, and experience. *Id.* ¶¶ 15-17.

9       As a result, production of Blue Sheet data would also impose a significant burden on

10  FINRA in terms of both the volume and the nature of the information. *Id.* ¶¶ 21-22. Kelly

11  additionally seeks five other categories of documents that would also need to be collected,

12  reviewed, and potentially redacted. The immense burden on FINRA to provide all of this

13  discovery at this juncture, prior to the filing of its dispositive motion to dismiss, would be highly

14  prejudicial to FINRA.

15      Lastly, regarding the fifth factor, Kelly's request for expedited discovery is being made

16  well in advance of the typical discovery process. Specifically, FINRA has not responded to the

17  FAC, and a Rule 26(f) conference has not been scheduled or held.

18      Accordingly, expedited discovery is not warranted. And like other MMTLP investors

19  who have prematurely and unsuccessfully sought discovery to support their conclusory claims

20  against FINRA, the Motion should be denied.

21  / / /

22  / / /

23  / / /

24  / / /

25  / / /

26  / / /

27  / / /

28  / / /



1    **IV.    CONCLUSION**

2          For all of the reasons included herein, Kelly's Motion for Preliminary Injunction fails and

3    must be denied.

4

5          DATED: August 1, 2025

6                                                      **EPG LAW GROUP**

7

8                                                      _____
                                                      Elias George, NV Bar No. 12379
9                                                      elias@epglawgroup.com
                                                      5940 South Rainbow Blvd.
10                                                     Las Vegas, NV 89118
                                                      Phone: 702-358-0933
11                                                     *Attorneys for Defendant FINRA*

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Image-only.

<b><u>CERTIFICATE OF SERVICE</u></b>

I hereby certify that on August 1, 2025, I served a true and correct copy of the foregoing **FINANCIAL INDUSTRY REGULATORY AUTHORITY, INC'S OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION** through the CM/ECF system of the United States District Court for the District of Nevada (or, if necessary, by United States Mail at Las Vegas, Nevada, postage fully prepaid) upon the following:

William Lee Kelly
6126 Leaning Rock Ct.
North Las Vegas, NV 89031
William.Lee.Kelly@gmail.com
Phone: (702) 427-2763
*Plaintiff, Pro Se*

_____
Kimberly Rupe, EPG Law Group

