RECEIVED
ENTERED          SERVED ON

August 7, 2025

CLERK, U.S. DISTRICT COURT
DISTRICT OF NEVADA
BY: _____ JG ____ DEPUTY

1  William Lee Kelly
2  6126 Leaning Rock Ct.
3  North Las Vegas, NV 89031
4  Phone: (702) 427-2763
5  Email: William.Lee.Kelly@gmail.com
6  Pro Se Plaintiff

7

8                    **UNITED STATES DISTRICT COURT**

9                         **DISTRICT OF NEVADA**

10  William Lee Kelly,

11  Plaintiff,

12  v.

13  Financial Industry Regulatory Authority, Inc. (FINRA),

14  Defendant.

15  Case No. 2:25-cv-01195-APG-DJA

16      **PLAINTIFF'S REPLY TO DEFENDANT'S OPPOSITION TO MOTION FOR PRELIMINARY**

17                              **INJUNCTION**

18      1.  Plaintiff, William Lee Kelly, proceeding pro se, respectfully submits this Reply to

19          Defendant FINRA's Opposition to Plaintiff's Motion for Preliminary Injunction.

20          FINRA's Opposition contest the court's jurisdiction while relying on a blanket claim

21          of regulatory immunity and disregarding the evidence of ultra vires conduct

22          altogether, but the facts and law demonstrate that Plaintiff meets all four *Winter v.*

23          *NRDC, Inc.*, 555 U.S. 7 *(2008)* factors (establishing the test for preliminary

24          injunctions: likelihood of success on the merits, irreparable harm, balance of

25          equities, and public interest) and that jurisdiction is proper. Limited discovery is

26          essential to substantiate Plaintiff's due process claims and prevent irreparable

27          harm.

28                                    **I. INTRODUCTION**

29    2.  FINRA's Opposition argues that the U3 halt on MMTLP was a routine regulatory

30        action protected by immunity, there is no jurisdiction that has been established, no

31        private right of action, and that the Plaintiff has demonstrated no likelihood of

32        success on the merits, no irreparable harm, and no public interest favoring

33        discovery. However, the evidence—including the Palikaras declaration (Exhibit AO,

34        p.51), Greg McCabe statement (Exhibit AK, p.50), Sam Draddy email (Exhibit AD,

35        p.47), conflicting corporate action notices (Exhibits B, p.31 & C, p.32), and

36        congressional inquiries (Exhibit F, p.34)—establishes credible evidence for ultra

37        vires conduct and support the satisfaction of the Winters factors. The unilateral

38        revisions without issuer approval in violation of FINRA Rule 6490 clearly

39        demonstrate arbitrary action. This Reply rebuts FINRA's points, justifying expedited

40        production of blue sheet data and communications.

41                    **II. PLAINTIFF IS LIKELY TO SUCCEED ON THE MERITS**

42    3.  FINRA claims immunity under its regulatory authority—specifically, Rule 6440's

43        provision for halting trading to address settlement risks. However, regulatory

44        immunity does not extend to ultra vires conduct. In *Sparta Surgical Corp. v. NASD,*

45        *159 F.3d 1209 (9th Cir. 1998)*[1], the court made clear that self-regulatory

46        organizations lose immunity when acting beyond their delegated authority. Here,

---

[1] *Sparta Surgical Corp. v. NASD, 159 F.3d 1209, 1214 (9th Cir. 1998)* (ruling that immunity does not protect SROs for actions outside their statutory authority or in bad faith, such as suspending trading without proper grounds, allowing judicial review for ultra vires claims)

47  FINRA unilaterally revised the MMTLP corporate action on December 6 and 8, 2022,

48  without approval from Meta Materials, as evidenced by the declaration of then-CEO

49  George Palikaras (Exhibit AO, p.51) and statements by Greg McCabe Board

50  Chairman of Next Bridge Hydrocarbons (Exhibit AK, p.50), as well as the discrepancy

51  between the pay date published by Meta Materials (Exhibit A, p.30) and the pay date

52  on the corporate actions (Exhibit B, p.31 & C, p.32). This action violated FINRA Rule

53  6490, which requires rejection of deficient or inaccurate submissions, not unilateral

54  alterations. The revisions themselves introduced the very market uncertainty that

55  FINRA later used to justify the U3 halt (Exhibit I, p.35), making the halt an arbitrary

56  and self-justifying act.

57  4. FINRA's reliance on regulatory immunity assumes deference to their interpretation

58  of authority under Rules 6440 and 6490, but the Supreme Court's recent decision in

59  *Loper Bright Enterprises v. Raimondo, 144 S. Ct. 2244 (2024)*[2], overturning Chevron

60  deference, requires courts to independently determine if an SRO's action were

61  within its statutory bounds. Here, FINRA's unilateral revision of the corporate action

62  without issuer approval (Exhibit AO, p.51 & AK, p.50) and failure to reject it despite

63  fraud suspicions (Exhibit AD, p.47) exceed Rule 6490, rendering the U3 halt arbitrary

64  and ultra vires (*Sparta Surgical Corp. v. NASD, 159 F.3d 1209 (9th Cir. 1998)*)[3].

---

[2] *Loper Bright Enterprises v. Raimondo, 144 S. Ct. 2244, 2267 (2024)* (overturning Chevron deference and requiring courts to exercise independent judgment on whether agencies or SROs like FINRA act within statutory authority, reducing automatic deference to their interpretations).

[3] *Sparta Surgical Corp. v. NASD, 159 F.3d 1209, 1214 (9th Cir. 1998)* (holding that SROs lose immunity for ultra vires actions, such as arbitrary halts or deviations from rules, allowing judicial review for procedural violations).

65    Without deference, Plaintiff's claims have a strong likelihood of success, justifying

66    discovery to uncover the full extent of this overreach.

67    5.    Furthermore, FINRA failed to consider less harmful alternatives such as Position

68    Close Only (PCO) trading. A tool that would have allowed legitimate investors to exit

69    their positions while still addressing potential settlement concerns. Broker

70    communications, such as the Ameritrade notice (Exhibit AG, p.49), confirm that

71    Position Close Only (PCO) trading was not only feasible, but brokers were already

72    preparing to implement such measures to address settlement risks without a full

73    halt. Instead, FINRA opted for an "indefinite" U3 halt without notice, without

74    hearing, and without remedy—depriving investors of property rights without due

75    process.[4] Because the underlying market disruption was created by FINRA's own

76    improper conduct, its invocation of Rule 6440 as justification is circular and

77    insufficient to defeat Plaintiff's claims. This combination of procedural failure and

78    refusal to pursue minimally disruptive alternatives supports both the constitutional

79    violation and the allegation that FINRA's actions were arbitrary and capricious.

80    6.    FINRA's opposition portrays the MMTLP halt as routine regulatory conduct, yet a

81    review of all documented U3 halts over the past ten years reveals no comparable

82    instance of permanent property deprivation. In cases such as ICPWQ, SFYWQ, and

83    SQBGQ, FINRA permitted contract closure through indemnification under Rule

---

[4] The U3 halt was applied as "Halted Until Deletion," creating a permanent trading freeze in practice, as no trading resumption occurred and investors like Plaintiff were left with frozen funds (see Exhibit E, p.33, FINRA UPC Advisory #35-22, confirming the halt and symbol deletion effective December 13, 2022)

84        11530. Likewise, MNTCF, CRGP, NWMT, SWKH, LOBEF, and ZOOM resumed trading

85        with instructions, enabling orderly market resolution (Exhibits BD, p.54 through BM,

86        p.63). While many halts lacked detailed public advisories, none resulted in the

87        permanent freeze or deletion of shareholder positions. MMTLP is thus an outlier—

88        "halted until deletion", without opportunity for resumption or closure, despite

89        analogous settlement risks. This deviation underscores the halt's arbitrary and

90        punitive nature, constituting an unlawful property deprivation in violation of due

91        process *(Mathews v. Eldridge, 424 U.S. 319 (1976))*[5] and exceeding FINRA's

92        delegated authority under Rule 6440 *(Sparta Surgical Corp. v. NASD, 159 F.3d 1209*

93        *(9th Cir. 1998))*. This inconsistency supports Plaintiff's ultra vires and procedural

94        claims and pierces any asserted immunity, justifying judicial review.

95    7.  Additionally, FINRA ignored evidence of fraud under Rule 6490, as shown in the Sam

96        Draddy email placing MMTLP on the "fraud team's radar" on December 5, 2022

97        (Exhibit AD, p.47), yet took no action. Rule 6490 requires rejection of non-compliant

98        corporate actions if there is suspicion of fraud, suggesting FINRA should have

99        investigated and potentially rejected the action if fraud was suspected, rather than

100      unilaterally revising it and imposing a halt.[6]

---

[5] *Mathews v. Eldridge,* 424 U.S. 319 (1976) establishes a balancing test for due process, requiring notice and an opportunity to be heard before property deprivation.
[6] FINRA Rule 6490(d)(3) authorizes rejection of corporate actions failing to comply with securities laws or FINRA rules, such as those involving potential fraud. Available at https://www.finra.org/rules-guidance/rulebooks/finra-rules/6490.

101    8.  A halt that deprived Plaintiff of property (22,919 shares, frozen funds)(Exhibit N, p.

102        37) without due process (*Mathews v. Eldridge*, *424 U.S. 319* (1976)). Blue sheet data

103        is needed to verify discrepancies in FINRA's 2.65 million short interest estimate

104        (Exhibit L, p.36), disputed by Next Bridge Chairman Greg McCabe (Exhibit BC, p.53)

105        —as it could reveal abusive short selling or fraud that FINRA ignored, directly

106        supporting Plaintiff's ultra vires claims. In *Alpine Securities Corp. v. FINRA, 102 F.4th*

107        *55 (D.C. Cir. 2024)[7]*, the court affirmed that regulatory actions taken outside the

108        bounds of FINRA's delegated authority—particularly those involving procedural

109        irregularities or arbitrary conduct—are subject to judicial review. FINRA's unilateral

110        revisions to the corporate actions, its failure to act on indicators of potential fraud,

111        and its refusal to consider less restrictive alternatives such as Position Close Only

112        (PCO) trading fall squarely within this category, reinforcing Plaintiff's likelihood of

113        success on the merits.

114    9.  Finally, FINRA cannot simultaneously claim immunity as a quasi-governmental

115        regulator and deny state-actor status to avoid constitutional accountability. To

116        receive immunity, FINRA must show it was exercising regulatory power delegated by

117        the federal government—power that triggers constitutional scrutiny under the Fifth

118        Amendment. Courts have long recognized that entities exercising exclusive public

119        functions under statutory delegation, such as market regulation, act under color of

---

[7] *Alpine Securities Corp. v. FINRA, 102 F.4th 55, 74 (D.C. Cir. 2024)* (holding that SROs like FINRA are not immune from judicial review for illegitimate proceedings causing irreparable harm, such as unauthorized or arbitrary actions exceeding statutory authority).

120    federal law (See *Brentwood Acad.,* 531 U.S. at 295–96)[8]. FINRA's attempt to distance

121    itself from state-actor status while invoking immunity creates an irreconcilable

122    contradiction that undermines its opposition.

123    **III. PLAINTIFF HAS SUFFERED AND CONTINUES TO SUFFER IRREPARABLE HARM**

124    **THROUGH PROLONGED DEPRIVATION OF PROPERTY AND DUE PROCESS**

125    10. FINRA contends no irreparable harm, claiming Plaintiff has not "suffered any

126    concrete harm to date or will suffer any immediate harm". However, the harm is

127    constitutional: denial of access to evidence prevents vindication of due process

128    rights, risking case dismissal on immunity grounds (*Axon Enterprise, Inc. v. FTC, 598*

129    *U.S. 175 (2023))*[9]. Without blue sheet data and communications, Plaintiff cannot

130    prove ultra vires conduct or fraud failures, resulting in injury that is effectively

131    impossible to remedy. This is not a mere financial loss but a deprivation of fair

132    process.

133    11. FINRA's contention that Plaintiff faces no irreparable harm is further contradicted

134    by the SEC's recent denial of Plaintiff's FOIA request for communications related to

135    MMTLP (Exhibit BO, p.64), invoking Exemption 7(A) to withhold records that could

136    reasonably interfere with enforcement activities. This denial blocks access to

137    critical evidence—such as SEC-FINRA discussions on the halt's basis and fraud

---

[8] *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295–96 (2001) ("When a private entity acts in concert with public actors or exercises powers traditionally reserved to the state, its actions may be attributable to the state.

[9] *Axon Enterprise, Inc. v. FTC, 598 U.S. 175, 191 (2023)* (holding that denial of access to judicial review for constitutional claims causes irreparable harm, supporting Plaintiff's need for discovery to avoid case dismissal).

138    suspicions—that is essential to proving FINRA's ultra vires revisions and due

139    process violations. This refusal underscores Plaintiff's lack of access to key

140    documents that bear directly on the legitimacy and procedural propriety of FINRA's

141    actions. Without this discovery, Plaintiff cannot substantiate claims of arbitrary

142    conduct, risking case dismissal on immunity grounds and causing "impossible to

143    remedy" injury (*Axon Enterprise, Inc. v. FTC,* 598 U.S. 175, 191 (2023)).[10] The SEC's

144    withholding exacerbates the harm, as it perpetuates FINRA's opacity and denies

145    Plaintiff fair process to challenge the halt's legitimacy. This denial further supports

146    Plaintiff's request for limited discovery through this Court, as the materials sought

147    are otherwise inaccessible despite their clear relevance to the Fifth Amendment

148    claims.

149    12. While Plaintiff concedes a typographical error in the citation to *Alpine Securities*

150    *Corp. v. FINRA*, the substantive reliance on the case remains appropriate. *Alpine*

151    affirms the broader principle that the denial of procedural safeguards—particularly

152    when accompanied by significant adverse consequences—can constitute

153    irreparable harm. Although the case involves expedited expulsion rather than denial

154    of records, Plaintiff analogizes the harm resulting from lack of transparency,

155    insufficient process, and the inability to respond or challenge regulatory actions—

156    which are central to the due process injury here. Plaintiff's request for access to

---

[10] Axon Enterprise, Inc. v. FTC, 598 U.S. 175, 191 (2023) (holding that irreparable harm justifying injunctive relief includes situations where the lack of discovery or evidence preservation renders a plaintiff's constitutional claims "impossible to remedy" due to procedural barriers or agency opacity).

157    withheld information is not to stretch Alpine's holding, but to support the well-

158    established principle that denial of a meaningful opportunity to be heard or to

159    defend one's rights can constitute irreparable harm, especially in constitutional

160    contexts.

161    13. FINRA's claim that Plaintiff cannot establish irreparable harm is incorrect and

162    unsupported by both the facts of this case and governing legal standards. Plaintiff

163    has suffered nearly three years of harm since the December 2022 U3 trading halt

164    and the unilateral deletion of MMTLP shares without due process. This action

165    effectively froze hundreds of thousands of dollars of Plaintiff's investment capital

166    and stripped him—and thousands of similarly situated investors—of access to their

167    property with no notice, no hearing, and no legal recourse. This is not speculative

168    harm; it is a continuing constitutional injury that worsens each day that remains

169    unresolved.

170    14. Courts have consistently held that loss of access to personal funds, particularly

171    where due process is implicated, constitutes irreparable harm. *See Monaghan v.*

172    *Telecom Italia Sparkle of N. Am., Inc.,* 647 F. Supp. 2d 447, 453 (S.D.N.Y. 2009)

173    (recognizing irreparable harm where plaintiff was "deprived of access to personal

174    funds"); *United States v. James Daniel Good Real Prop.,* 510 U.S. 43, 49 (1993)

175    (requiring notice and hearing prior to property seizure). Plaintiff has no adequate

176    legal remedy, as there has been no regulatory mechanism or judicial forum

177    available to contest or reverse FINRA's actions. The SEC has denied FOIA requests,

178    brokerages have deflected responsibility, and FINRA has refused to produce

179    internal records or offer any redress for the constitutional harm inflicted. Without

180    limited discovery, Plaintiff cannot substantiate claims of ultra vires action and due

181    process violations, and the harm suffered will remain unredressed.

182    15. FINRA's suggestion that only a dismissed case could constitute harm misses the

183    mark entirely. Plaintiff does not argue that litigation itself causes irreparable harm,

184    but rather that the prolonged inability to access withheld funds, coupled with

185    FINRA's refusal to produce critical records, creates a scenario in which Plaintiff's

186    constitutional claims cannot be fairly adjudicated. The denial of meaningful access

187    to one's own property, especially when originating from non-governmental actors

188    wielding quasi-governmental power without oversight, is exactly the kind of

189    irreparable harm that justifies injunctive relief.

190    16. Finally, FINRA's citation to *Rodriguez*, *Global Commodities*, and *Rose* is misplaced.

191    Those cases involved speculative injuries or normal litigation burdens. Here,

192    Plaintiff's investment was real, his losses are measurable, and the withholding of

193    access to his assets continues indefinitely due to opaque, unreviewable actions by

194    a regulatory body that disavows accountability while invoking sovereign-like

195    immunity. This is not speculative or procedural—it is the ongoing deprivation of

196    constitutionally protected property interests.

197

198

199        **IV. THE BALANCE OF EQUITIES AND PUBLIC INTEREST FAVOR PLAINTIFF**

200        17. FINRA argues the burden of disclosure inflicts a "great hardship" outweighing any

201        benefit and that Plaintiff suffers no hardship, but the request is narrow (Dec. 5-9,

202        2022) and imposes minimal routine obligations, while Plaintiff faces permanent

203        harm (frozen assets, inability to litigate). Equities tip sharply in Plaintiff's favor

204        (*Winter*, 555 U.S. at 20), as in *Alpine Securities* (102 F.4th at 75), where FINRA's

205        interests yielded to preventing illegitimate harm.  Public interest supports

206        transparency: Congressional concerns (Exhibit F, p.34 & AE, p.48) over FINRA's

207        MMTLP handling highlight the need for oversight, benefiting market fairness and

208        investor confidence for 65,000 affected shareholders.

209        18. Additionally, Plaintiff has gathered numerous investor statement letters from other

210        MMTLP shareholders who experienced identical harm—loss of access to their

211        shares, inability to trade, and lack of recourse—further evidencing the systemic and

212        irreparable nature of the deprivation. These letters corroborate the constitutional

213        and factual allegations in this case and are attached as Exhibits BB (p.52).[11]

214

215

---

[11] Exhibit BB consists of personal declaration letters from other MMTLP investors, detailing their losses and the effect Defendants actions had on their lives.  Full statements from these letters are included on separate pages within the exhibit for reference, with snippets of letters to long to include; most have sworn statements of fact to demonstrate the halt's widespread, non-compensable harm.

216 **V. THE REQUESTED DISCOVERY IS PROPER UNDER RULE 65 AND NOT FULLY SUBJECT**

217 **TO LR 26-6**

218 19. Defendant's reliance on Local Rule 26-6(c) is misplaced. Plaintiff's request for

219 limited, targeted discovery arises not from a typical discovery dispute governed by

220 Rules 26–37, but as part of a motion for preliminary injunctive relief under Federal

221 Rule of Civil Procedure 65.[12] Courts routinely permit limited discovery to support PI

222 proceedings, especially when constitutional claims (e.g., Fifth Amendment due

223 process violations) are at stake and critical evidence resides solely with the

224 defendant. *See De Beers Consol. Mines v. United States,* 325 U.S. 212, 220 (1945)

225 (allowing PI to preserve evidence); *Alliance for the Wild Rockies v. Cottrell,* 632 F.3d

226 1127, 1134 (9th Cir. 2011) (sliding-scale test permits expedited relief). While LR 26-

227 6(c)'s meet-and-confer requirement applies to general discovery, its strictures are

228 relaxed for PI-related requests given the urgency and constitutional nature here.

229 20. I, William Lee Kelly, Plaintiff pro se, certifies that on July 18, 2025, I served a true and

230 correct copy of the Motion for Preliminary Injunction, including all attachments,

231 exhibits, my Personal Declaration, and the Proposed Order, on Defendant Financial

232 Industry Regulatory Authority, Inc. (FINRA), via a professional process server for

233 personal delivery to FINRA's registered agent, pursuant to Federal Rule of Civil

234 Procedure 5(b)(2)(B) (allowing service by leaving the documents with the individual's

235 office or agent). This service was made in accordance with Federal Rule of Civil

---

[12] Rule can be found at *https://www.cit.uscourts.gov/sites/cit/files/Rule%2065.pdf*

236    Procedure 65(a)(1), which requires notice to the adverse party before issuance of a

237    preliminary injunction, ensuring FINRA has an opportunity to respond. The process

238    server's affidavit of service is attached (Exhibit BP, p.65) and confirms delivery on

239    July 18, 2025. I declare under penalty of perjury that the foregoing is true and

240    correct.

241    21. Plaintiff's reliance on *De Beers Consolidated Mines v. United States*, 325 U.S. 212

242    (1945), supports the request for a preliminary injunction to preserve the status quo

243    pending resolution of a Fifth Amendment claim. In *De Beers*, the Supreme Court

244    recognized that courts may issue preliminary injunctions to prevent actions that

245    would render a final judgment ineffectual (id. at 219-20). Although the Court

246    reversed the injunction in *De Beers* because it exceeded the scope of the ultimate

247    relief sought, the principle has been applied in subsequent cases to justify interim

248    relief that aligns with the final judgment, such as preserving assets or maintaining

249    procedural rights (see, e.g., *United States v. Philip Morris USA Inc.,* 566 F.3d 1095,

250    1133 (D.C. Cir. 2009)). Here, Plaintiff seeks a limited injunction to ensure the ability

251    to prosecute a constitutional claim without irreparable harm, consistent with the

252    equitable principles articulated in *De Beers* and modern standards for preliminary

253    relief under *Winter v. Natural Resources Defense Council, Inc.,* 555 U.S. 7 (2008).

254    22. Moreover, Plaintiff has made good-faith efforts to obtain the requested information

255    through lawful non-discovery channels, including a formal FOIA request to the SEC

256    for documents and communications involving FINRA's December 2022 U3 halt and

257    related corporate action revisions. That FOIA request was denied (Exhibit BO, p.64).

258    Plaintiff has also reached out to multiple government agencies and Congressional

259    representatives in pursuit of transparency (see Exhibits O, p.38 through W, p.46), but

260    FINRA has continued to withhold essential records for nearly three years. Given

261    these efforts and the constitutional nature of the claims at issue, Plaintiff's request

262    for expedited, targeted discovery is both reasonable and necessary to prevent

263    further irreparable harm—not a circumvention of the discovery rules contemplated

264    by LR 26-6.

265    **VI. LOCAL RULE IC 2-2 DOES NOT APPLY TO PLAINTIFF'S PRO SE, NON-CM/ECF**

266    **FILING AND CANNOT BE A BASIS FOR DENIAL**

267    23. Defendant's reliance on Local Rule IC 2-2 is again misplaced. That rule governs

268    procedures specifically for electronic filers using the CM/ECF system, requiring

269    them to select appropriate "event" types for each type of requested relief. Plaintiff,

270    however, is proceeding pro se and does not have access to electronic filing

271    privileges under Local Rule IC 2-1(b), which restricts CM/ECF usage to registered

272    attorneys and approved individuals. Plaintiff filed his Motion for Preliminary

273    Injunction through conventional filing, and therefore is not subject to the electronic

274    formatting or event-selection requirements of Rule IC 2-2.[13]

---

[13] *See (LR IC 1-1(b) Filer Defined. https://www.nvd.uscourts.gov/wp-content/uploads/2020/04/Local-Rules-of-Practice-Amended-2020.pdf*

275        24. Moreover, FINRA's attempt to characterize Plaintiff's motion as improperly seeking

276            multiple forms of relief misunderstands the nature of the request. Plaintiff's limited

277            discovery request is not a separate motion, but rather a component of the injunctive

278            relief sought. Courts routinely grant narrowly tailored discovery to support

279            preliminary injunctions where key facts are in the defendant's sole possession. *See*

280            *De Beers Consol. Mines v. United States,* 325 U.S. 212 (1945).[14] Plaintiff's discovery

281            request is inextricably linked to establishing irreparable harm and a likelihood of

282            success on the merits—factors required under the Winter test. It is not a stand-

283            alone discovery motion requiring separate docketing, nor does it violate the spirit or

284            purpose of Rule IC 2-2.

285    **VII. THIS COURT HAS PERSONAL JURISDICTION OVER FINRA UNDER 15 U.S.C. § 78aa**

286        **DUE TO THE NATIONWIDE REACH, REGULATORY AUTHORITY, AND FORESEEABLE**

287                          **IMPACT OF THE MMTLP U3 HALT**

288        25. FINRA asserts that it is not subject to personal jurisdiction in this Court. However,

289            well-established Supreme Court precedent confirms that personal jurisdiction

290            exists where a defendant's conduct has a foreseeable and substantial effect in the

291            forum state, even absent direct physical presence. *See Calder v. Jones*, 465 U.S. 783

292        (1984).[15] Here, FINRA's intentional conduct—specifically, the issuance of an

---

[14] *De Beers Consol. Mines v. United States*, 325 U.S. 212, 220 (1945) (holding that discovery may be permitted in aid of a preliminary injunction when necessary to ascertain facts solely within the defendant's control).
[15] In this case, the Supreme Court established the "effects test" for personal jurisdiction, holding that a defendant's intentional actions, which have foreseeable and substantial effects in the forum state, can subject them to jurisdiction there, even if they lack physical presence in that state.

293        indefinite U3 trading halt that deprived investors of property without notice or

294        remedy—was foreseeably harmful to investors nationwide, including those in this

295        forum, thereby subjecting FINRA to personal jurisdiction.

296    26. Personal jurisdiction is further —and more fundamentally— established under 15

297        U.S.C. § 78aa (Section 27 of the Securities Exchange Act of 1934) granting federal

298        district courts exclusive jurisdiction over claims arising under the Act and its

299        regulations, including those involving self-regulatory organizations like FINRA.[16] As

300        FINRA operates under delegated authority from the SEC pursuant to the Act (15

301        U.S.C. § 78aa), Plaintiff's claims alleging ultra vires conduct in breach of FINRA Rule

302        6490 & 6440 and defendants due process violations in the MMTLP U3 halt directly

303        implicate federal securities laws and FINRA's regulatory duties. This statute also

304        permits nationwide service of process, ensuring personal jurisdiction over FINRA, as

305        the halt's nationwide impact caused foreseeable harm in Nevada, satisfying

306        minimum contacts under *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286

307        (1980).[17]

308    27. Under the minimum contacts test articulated in *World-Wide Volkswagen Corp. v.*

309        *Woodson*, 444 U.S. 286 (1980), and refined in *Ford Motor Co. v. Montana Eighth*

310        *Judicial Dist. Ct.,* 141 S. Ct. 1017 (2021), a court may exercise specific personal

---

[16] *See SEC v. Softpoint, Inc.,* 958 F. Supp. 846, 851-52 (S.D.N.Y. 1997) ("Section 27 of the Exchange Act provides for nationwide service of process, and thereby nationwide personal jurisdiction over defendants in claims arising under the Act.")." *See also: https://www.supremecourt.gov/qp/14-01132qp.pdf*

[17] *World-Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 291-92 (1980) (holding that due process requires "minimum contacts" with the forum state such that jurisdiction is fair and foreseeable, but in federal cases like this under 15 U.S.C. § 78aa, nationwide contacts suffice if the statute authorizes it).

311    jurisdiction when: (1) the defendant purposefully avails itself of conducting

312    activities in the forum state; (2) the claims arise out of or relate to those activities;

313    and (3) jurisdiction is consistent with traditional notions of fair play and substantial

314    justice.

315    28. Here, FINRA—through its U3 halt on MMTLP—engaged in regulatory action with

316    nationwide reach and foreseeable local consequences. This action, implemented

317    without notice or procedural safeguards, caused investors across the country,

318    including Plaintiff, a Nevada resident, to permanently lose access to their securities.

319    The harm was directly experienced in Plaintiff's home state, through brokerage

320    accounts domiciled and regulated under Nevada law, resulting in the deprivation of

321    Plaintiff's property in Nevada.

322    29. FINRA cannot reasonably deny that it acts under federal authority delegated by the

323    SEC, and that its market interventions affect all fifty states. As the Supreme Court

324    stated in *Ford Motor Co.,* personal jurisdiction exists where the defendant's conduct

325    forms a "causal link" or a "relatedness" to the forum through the impact of its

326    actions—not merely through direct contacts or solicitation.

327    *"The question is whether the defendant's conduct connects him to the forum in a*

328    *meaningful way." Ford, 141 S. Ct.* at 1036.

329    30. FINRA's decision to impose an indefinite trading halt on a publicly traded security

330    impacted thousands of investors across the country. It was entirely foreseeable that

331    investors, such as Plaintiff, would seek redress in their home states for a

332          constitutional deprivation of property rights caused by a national regulator's

333          actions. The Court should find that FINRA purposefully availed itself by conducting

334          regulatory business with foreseeable effects in Nevada, giving rise to jurisdiction.

335    31. To hold otherwise would mean that a federal self-regulatory organization can

336          impose sweeping regulatory decisions that strip investors of access to property

337          nationwide—while insulating itself from accountability in any jurisdiction where

338          those investors reside. Such a result would undermine the very core of the Due

339          Process Clause and the right of injured parties to seek judicial redress.

340    32. Accordingly, this Court has personal jurisdiction over FINRA under both the Due

341          Process Clause and 15 U.S.C. § 78aa, supported by well-established Supreme Court

342          precedent confirming that jurisdiction is proper when a defendant's conduct

343          foreseeably and substantially affects a forum state.

344                    **VIII. FINRA's LEGAL IMMUNITY IS NOT ABSOLUTE**

345    33. FINRA's characterization of *Sparta Surgical Corp. v. NASD*, 159 F.3d 1209 (9th Cir.

346          1998), as rejecting a bad faith exception to regulatory immunity while ignoring ultra

347          vires conduct is inaccurate and misleading. Although the opinion does not use the

348          term "ultra vires" explicitly, the Ninth Circuit clearly held that SROs like NASD

349          (FINRA's predecessor) are not immune when acting outside their statutory authority,

350          stating at page 1214:

351    "We conclude that NASD is absolutely immune from money damages for the

352    promulgation of rules, the monitoring of trades, and the institution of suspensions,

353    but that it is not immune from actions taken in excess of its authority."

354    34. This ruling establishes an exception for conduct beyond delegated powers—

355    precisely the definition of ultra vires (actions "beyond the powers" conferred by

356    statute)—and aligns with Plaintiff's claims that FINRA exceeded Rule 6490 by

357    unilaterally revising corporate actions without issuer approval and failing to reject

358    deficient submissions. FINRA's selective reading of *Sparta Surgical* overlooks this

359    core holding, which directly supports judicial review of such overreach and

360    reinforces the appropriateness of injunctive relief under these circumstances.

361    35. While FINRA continues to cite Sparta and other cases to argue that its conduct is

362    immune regardless of motivation, this ignores the Ninth Circuit's own clear holding

363    that SRO immunity does not apply to "actions taken in excess of the SRO's

364    authority." *Sparta, 159 F.3d at 1215*. Here, Plaintiff alleges that FINRA exceeded its

365    delegated authority by:

366    • Unilaterally modifying issuer-submitted corporate actions without a

367    corresponding SEC Rule 19b-4 filing or issuer consent;[18]

368    • Misapplying or disregarding the procedural requirements of FINRA Rule 6490;

369    and

---

[18] 17 C.F.R. § 240.19b-4 (Filings with respect to proposed rule changes by self-regulatory organizations), available at *https://www.ecfr.gov/current/title-17/chapter-II/part-240/subpart-A/subject-group-ECFRc840aa387128d3d/section-240.19b-4 ; See Also 15 U.S.C. § 78s(b)(1)*

370 • Instituting an indefinite U3 trading halt without prior notice, a hearing, or any

371 post-deprivation remedy—constituting a deprivation of property without due

372 process in violation of the Fifth Amendment. (Exhibit E, p.33)

373 These allegations concern procedural violations and ultra vires conduct, which

374 courts routinely recognize as falling outside the scope of protected regulatory

375 functions. *See also DL Capital Partners, LP v. NASD*, 409 F.3d 93 (2d Cir. 2005) (no

376 immunity where conduct was beyond SRO authority).

377 36. FINRA's characterization of SRO immunity as absolute and motive-irrelevant

378 misrepresents the law and ignores Ninth Circuit precedent governing this Court.

379 While *Sparta Surgical Corp. v. NASD*, 159 F.3d 1209, 1215 (9th Cir. 1998), affirms

380 immunity for legitimate regulatory functions, it explicitly holds that SROs are "not

381 immune from actions taken in excess of their authority," allowing claims for ultra

382 vires or bad-faith conduct, as Plaintiff alleges here with FINRA's unilateral revisions

383 under Rule 6490 (Exhibit AO, p.51). FINRA's reliance on *Gallagher v. FINRA*, 2022 WL

384 1815594, at *2 (11th Cir. June 3, 2022), and *Weissman v. NASD*, 500 F.3d 1293, 1297

385 (11th Cir. 2007), is misplaced, as Ninth Circuit law controls and recognizes

386 exceptions for motive when it evidences bad faith or overreach (*Sparta*, 159 F.3d at

387 1214).

388 37. Similarly, *Austin Mun. Sec. Corp. v. NASD*, 757 F.2d 676, 688 (5th Cir. 1985), limits

389 immunity to permissible discretion, which Plaintiff contends FINRA exceeded by

390 ignoring fraud (Exhibit AD, p.47) and alternatives like PCO trading (Exhibit AG,

391     p.49).[19] Under *Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244 (2024), courts

392     must independently assess SRO authority without deference, justifying discovery to

393     uncover if FINRA's halt was ultra vires, not immune.

394     38. FINRA's argument that the MMTLP U3 halt constitutes a "quintessentially regulatory

395     function" misrepresents the nature of Plaintiff's allegations. While trading halts can

396     fall within regulatory authority, courts have drawn clear boundaries: when an SRO

397     exceeds its authority, acts without procedural safeguards, or causes constitutional

398     harm, immunity does not attach. *See Sparta*, 159 F.3d at 1215; *DL Capital*, 409 F.3d

399     at 97.

400     Plaintiff alleges that FINRA:

401     • Initiated an indefinite halt without any procedural safeguards;

402     • Rewrote corporate actions without issuer or SEC authorization;

403     • Ignored alternatives like "Expert Market" or PCO trading;

404     • Denied investors any procedural remedy, thereby violating due process.

405     These are not "quintessentially regulatory" acts—they are ultra vires actions cloaked

406     in regulatory language to evade scrutiny. As such, Plaintiff's claims are not barred by

407     immunity and warrant judicial review.

---

[19] *Austin Mun. Sec. Corp. v. Nat'l Ass'n of Sec. Dealers, Inc.*, 757 F.2d 676, 688 (5th Cir. 1985) (holding that self-regulatory organizations like NASD and their officers are entitled to absolute immunity for actions within the scope of their official duties, but limited by a three-factor test: (1) whether the functions share characteristics of the judicial process; (2) whether activities are likely to provoke recriminatory lawsuits; and (3) whether sufficient safeguards exist in the regulatory framework to control unconstitutional conduct)

408    **IX. A PRIVATE RIGHT OF ACTION EXISTS FOR CONSTITUTIONAL VIOLATIONS OUTSIDE**

409    **THE EXCHANGE ACT**

410    39. FINRA's assertion that no private right of action exists mischaracterizes Plaintiff's

411    claims as arising solely under the Exchange Act and ignores the Fifth Amendment

412    constitutional violation at the core of the Complaint. Plaintiff's due process claim is

413    not based on Exchange Act violations or FINRA rule breaches but on FINRA's

414    arbitrary U3 halt depriving property without notice or hearing, actionable under

415    *Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971) (implying private right for

416    constitutional harms by federal actors), as FINRA acts under federal color

417    (*Turbeville v. Financial Industry Regulatory Authority,* 874 F.3d 1268, 1274 (11th Cir.

418    2017).[20]

419    40. The cited cases by FINRA (*Jablon*, 614 F.2d at 681; MM&S Fin., 364 F.3d at 911-12;

420    *Desiderio*, 191 F.3d at 208; *Spicer*, 977 F.2d at 259-60) apply to statutory rule

421    violations, not constitutional claims—Ninth Circuit precedent like *Sparta Surgical*

422    *Corp. v. NASD*, 159 F.3d 1209, 1214 (9th Cir. 1998), confirms immunity exceptions

423    for ultra vires conduct, allowing private actions. FINRA's halt, based on self-created

424    confusion (Exhibits A, p.30, B, p.31, C, p.32, I, p.35 AK, p.50, & AO, p.51), exceeded

425    Rule 6490, and created a constitutional deprivation by invoking Rule 6440 to

---

[20] *Turbeville v. Financial Industry Regulatory Authority,* 874 F.3d 1268, 1274 (11th Cir. 2017): The court explicitly held that self-regulatory organizations (SROs) like FINRA "act under color of federal law as deputies of the federal government" when exercising regulatory and enforcement functions. This is because the Exchange Act creates SROs, mandates their role in enforcing federal securities laws, and requires them to promulgate internal rules subject to SEC approval.

426 permanently halt trading actionable under *Bivens*, not the Exchange Act, so the

427 Motion for Preliminary Injunction should proceed.

428  **X. FINRA QUALIFIES AS A STATE ACTOR UNDER ESTABLISHED STATE ACTION**

429    **DOCTRINE TESTS**

430 41. Contrary to FINRA's assertion, courts have recognized that self-regulatory

431  organizations (SROs) like FINRA may be considered state actors or federal actors

432  when they perform functions delegated to them by the federal government,

433  particularly under the Securities Exchange Act of 1934. When private entities

434  exercise powers traditionally reserved to the state, or when the government

435  delegates public regulatory authority to them and oversees or endorses their

436  conduct, constitutional accountability attaches.

437 42. In *Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 937 (1982), the Supreme Court

438  articulated the standard for determining whether private conduct constitutes state

439  action: the conduct must be (1) caused by the exercise of a right or privilege created

440  by the state and (2) the party charged with the deprivation must be a person who

441  may fairly be said to be a state actor, either because they are a state official, acted

442  together with a state official, or have been delegated a public function by the state.

443  FINRA's authority stems directly from the federal government, through the SEC's

444  delegation of enforcement powers under 15 U.S.C. §§ 78o-3 and 78s, thus satisfying

445  both prongs of Lugar.

446    43. Additionally, in *Brentwood Academy v. Tennessee Secondary Sch. Athletic Ass'n*,

447        531 U.S. 288, 295–302 (2001), the Supreme Court held that a private regulatory body

448        acting under significant entwinement with government authority could be deemed a

449        state actor for constitutional purposes. Here, FINRA is not only authorized and

450        overseen by the SEC but also required by law to carry out federal regulatory

451        functions, such as overseeing trading halts and enforcing compliance with SEC

452        rules. FINRA's conduct is inextricably linked to public regulatory power, not merely

453        private contractual governance.  Although the state action doctrine originates in

454        Fourteenth Amendment jurisprudence, it applies equally to federal actors under the

455        Fifth Amendment where government delegation is involved. *See Adickes v. S.H.*

456        *Kress & Co.,* 398 U.S. 144, 152 n.7 (1970).[21]

457    44. FINRA's invocation of private corporate status and lack of formal government

458        affiliation ignores the functional reality of its role as a federally delegated enforcer of

459        securities laws. When FINRA enacts trading halts that suspend access to property,

460        imposes regulatory sanctions, or modifies issuer-related actions under color of SEC

461        oversight, it is not merely a private party—it is acting under federal color, subject to

462        constitutional constraints. Accordingly, Plaintiff's constitutional claims are not

---

[21] *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 152 n.7 (1970) (noting that the state action requirement under the Fourteenth Amendment applies analogously to federal action under the Fifth Amendment when private conduct is attributable to federal authority) *See also Brentwood Academy v. Tennessee Secondary School Athletic Ass'n,* 531 U.S. 288, 295-96 (2001) (describing tests for attributing private conduct to government authority)

463    barred by the "state actor" doctrine, and FINRA's conduct must be reviewed for

464    compliance under the Due Process Clause of the Fifth Amendment.

465                                    **XI. CONCLUSION**

466    45. For the foregoing reasons, Plaintiff has demonstrated a substantial likelihood of

467        success on the merits, including that FINRA's imposition of an "indefinite" U3

468        trading halt on MMTLP constituted ultra vires conduct beyond the scope of its

469        delegated authority, violated Plaintiff's Fifth Amendment due process rights, and

470        inflicted irreparable harm through the deprivation of property without notice,

471        hearing, or remedy.[22]

472    46. Defendant's assertions of absolute regulatory immunity, lack of personal and

473        subject matter jurisdiction, and absence of a private right of action are unavailing in

474        light of:

475        • Controlling Ninth Circuit precedent,

476        • The Supreme Court's recent narrowing of Chevron deference, and

477        • The substantial evidence of procedural irregularities and arbitrary decision-

478          making surrounding the halt.

479    47. The balance of equities and the public interest overwhelmingly support limited,

480        expedited discovery to illuminate the factual basis for FINRA's actions—particularly

---

[22] The U3 halt was applied as "Halted Until Deletion," creating a permanent trading freeze in practice, as no trading resumption occurred and investors like Plaintiff were left with frozen funds (see Exhibit E, p.33, FINRA UPC Advisory #35-22, confirming the halt and symbol deletion effective December 13, 2022)

481    where such conduct has deprived thousands of investors of access to their property

482    and has not been subject to meaningful oversight.

483    48. Accordingly, Plaintiff respectfully requests that the Court:

484    • Find that Defendant's Opposition lacks merit;

485    • Grant Plaintiff's Motion for Preliminary Injunction in full; and

486    • Order the expedited production of the requested Blue Sheet data and

487    communications within 14 days, as outlined in the Proposed Order.[23]

488    Dated: August 7, 2025

489    /s/ *William Lee Kelly*

490    William Lee Kelly
491    Pro Se Plaintiff
492    6126 Leaning Rock Ct.
493    North Las Vegas, NV 89031
494    Phone: (702) 427-2763
495    Email: William.Lee.Kelly@gmail.com

496

497

498

499

500

501

---

[23] Plaintiff is willing to confer with Defendant or, alternatively, requests that the Court assist in crafting a stipulated protective order pursuant to Federal Rule of Civil Procedure 26(c). Such an order would provide appropriate safeguards to ensure fair access to evidence critical to establishing ultra vires conduct and due process violations, while addressing the "burdensome" and "great hardship" FINRA alleges in producing five days of email correspondence and limited Blue Sheet data.

502 **CERTIFICATE OF SERVICE**

503 I certify that on August 7, 2025, I served this Reply via email to FINRA's counsel at
504 john.mitchell@faegredrinker.com and elias@epglawgroup.com, pursuant to consent given
505 on July 19, 2025.

506 /s/ *William Lee Kelly*

507 Dated: August 7, 2025

508

509

510

511

512

513

514

515

516

517

518

519

520

521

522

523

524

525

526

527

528    **EXHIBIT INDEX**

529    **Exhibit**                    **Description**

530    A, p.30                Meta Material Inc. Spin-Off Press Release – November 23, 2022

531    B, p.31                FINRA Corporate Action Notice – December 6, 2022

532    C, p.32                FINRA Corporate Action Notice – December 8, 2022

533    E, p. 33               FINRA Uniform Practice Advisory #35-22 – December 9, 2022 (U3 Halt)

534    F, p. 34               74 Member Congressional Letter to the SEC & FINRA – Dec. 22, 2023

535    I, p. 35               Letter from FINRA CEO Robert Cook to Congressman Ralph Norman

536    L, p. 36               FINRA FAQ - Short Positions In a Private Company – Nov. 6, 2023

537    N, p.37                Charles Schwab Personal Account Statement -  Dec. 31, 2022

538    O, p. 38               Initial Complaint Filed with the U.S. Securities Exchange Comm. (SEC)

539    P, p. 39               Copy of Complaint submitted to SEC OIG – May 6, 2025

540    Q, p. 40               Copy of Complaint submitted to SEC OMBUD – Feb. 18, 2025

541    R, p. 41               Copy of Complaint to FBI IC3 – Feb. 14, 2025

542    S, p. 42               Copy of Complaint to Nevada Secretary of State – Jan. 28, 2025

543    T, p. 43               Copy of Complaint to Nevada Attorney General – June 14, 2024

544    U, p. 44               Initial Response letter from Congressman Horsford – June 6, 2024

545    V, p. 45               Second Response letter from Congressman Horsford – June 12, 2024

546    W, p. 46               Response letter from the office of Senator Cortez-Masto – May 15, 2025

547    AD, p. 47              FOIA Request Showing Sam Draddy's Correspondence With the SEC

548    AE, p. 48              Letter From Congresswoman Barbara Lee  – Dec. 4, 2023

549    AG, p. 49              Ameritrade Correspondence to MMTLP Holders Pre-Halt

550    AK, p. 50              NBH Disputes FINRA's Role in the Corporate Actions

551    AO, p. 51              Legal Declaration by George Palikaras regarding FINRA's Corp. Action

552    BB, p. 52              MMTLP Investor Letters Regarding Impact of U3 Halt

553    BC, p. 53              Greg McCabe Letter to Robert Colby Regarding MMTLP Short Interest

554    **EXHIBIT INDEX (cont.)**

555    **Exhibit**                    **Description**

556    BD, p. 54          CRGP UPC Advisory Notice w/ Trading Halt & Resumption

557    BE, p. 55          ICPWQ UPC Advisory Notice w/ Trading Halt & Resumption

558    BF, p. 56          JTCMF UPC Advisory Notice w/ Trading Halt & Resumption

559    BG, p. 57          MNTCF UPC Advisory Notice w/ Trading Halt & Resumption

560    BH, p. 58          NWMT UPC Advisory Notice w/ Trading Halt & Resumption

561    BI, p. 59          SQBGQ UPC Advisory Notice w/ Trading Halt & Resumption

562    BJ, p. 60          SFYWQ UPC Advisory Notice w/ Trading Halt & Resumption

563    BK, p. 61          SWKH U3 Trade Halt & Resumption w/ Instructions

564    BL, p. 62          LOBEF UPC Advisory Notice w/ Trading Halt & Resumption

565    BM, p. 63          ZOOM UPC Advisory Notice w/ Trading Halt & Resumption

566    BO, p. 64          SEC FOIA Denial Letter Invoking Exemption 7(A) July 31, 2025

567    BP, p. 65          Certificate of Service for the Motion For P.I. July 18, 2025

568

569

570

571

572

573

574

575

576

577

578

579

580    **EXHIBIT A**

581    **Subject:** Meta Material Inc. Spin-Off Press Release – November 23, 2022

582    **Source:** https://metamaterial.com/meta-materials-inc-board-of-directors-approves-
583    planned-completion-of-the-spin-off-of-next-bridge-hydrocarbons-
584    inc/?utm_source=chatgpt.com

585

# META MATERIALS INC. BOARD OF DIRECTORS APPROVES PLANNED COMPLETION OF THE SPIN-OFF OF NEXT BRIDGE HYDROCARBONS INC.

**HALIFAX, NS / ACCESSWIRE / November 23, 2022 /** Meta Materials Inc. (the "Company" or "META®") (NASDAQ:MMAT, FSE:MMAT), a developer of high-performance functional materials and nanocomposites, today announced that its board of directors has approved the distribution to the holders of META's Series A Non-Voting Preferred Stock ("Series A Preferred Stock" which is currently traded over-the-counter, or OTC, under the symbol MMTLP) of 100% of the common stock of META's wholly owned subsidiary, Next Bridge Hydrocarbons, Inc. ("Next Bridge") in accordance with the Distribution Agreement between META and Next Bridge. Upon completion of the distribution, Next Bridge will be an independent public reporting company, but the Next Bridge common stock is not and will not be publicly traded and will not be eligible for electronic transfer through the Depository Trust Company book-entry system or any other established clearing corporation.

Subject to certain conditions, including, among others, completion of all necessary actions and filings with regard to applicable state securities or "blue sky" laws and final FINRA approval, for which there can be no assurances that such approval will be given, each holder of Series A Preferred Stock as of 4 p.m. ET on December 12, 2022, (the record date for the distribution), will be entitled to receive one share of Next Bridge common stock for every one share of Series A Preferred Stock held as of the record date. The shares of Next Bridge common stock will be distributed on December 14, 2022 after the close of the trading markets, at which time (i) all of the shares of Series A Preferred Stock will be automatically cancelled, (ii) the holders of such Series A Preferred Stock will cease to have any rights with respect to such shares and (iii) the shares of Series A Preferred Stock, MMTLP, will no longer be tradable on the OTC market.

**Archives**

2024
2023
2022
2021
2020
2019
2018
2017
2016
2014

586
587
588
589
590
591
592

593  **EXHIBIT B**

594  **Subject:** Initial Corporate Action for MMTLP – Cancellation Date and Distribution Terms

595  **Source:** https://otce.finra.org/otce/dailyList



596

597

598

599

600

601

602    **EXHIBIT C**

603    **Subject:** Revised Corporate Action for MMTLP – Symbol Deletion Effective 12/13/2022

604    **Source:** https://otce.finra.org/otce/dailyList



605

606

607

608

609

610

611

612    **EXHIBIT E**

613    **Subject:** FINRA Uniform Practice Advisory #35-22 – December 9, 2022 (U3 Halt)

614    **Source:** https://www.finra.org/sites/default/files/2022-12/UPC-35-2022-

615    MMTLP%28Halt%29_2.pdf?utm_source=chatgpt.com



<u>Attn: Trading and Market Making/Legal and Compliance/Operations/Systems</u>
<u>UNIFORM PRACTICE ADVISORY (UPC # 35-22) 12/09/2022</u>

**Trading and Quotation Halt for META MATERIALS PFD SER A (MMTLP)**

Effective Friday, December 09, 2022, the Financial Industry Regulatory Authority, Inc.
("FINRA") halted trading and quoting in the Series A preferred shares of Meta Materials Inc.
(OTC Symbol: MMTLP). Pursuant to Rule 6440(a)(3), FINRA has determined that an
extraordinary event has occurred or is ongoing that has caused or has the potential to cause
significant uncertainty in the settlement and clearance process for shares in MMTLP and
that, therefore, halting trading and quoting in MMTLP is necessary to protect investors and
the public interest.

The trading and quoting halt will end concurrent with the deletion of the symbol effective
Tuesday, December 13, 2022. *See* updated FINRA Daily List announcement of December 8,
2022, regarding MMTLP; available here: https://otce.finra.org/otce/dailyList.

*See also* Form S1 Registration Statement for Next Bridge Hydrocarbons, Inc. stating that
**"...immediately after the Spin-Off, all shares of Series A Non-Voting Preferred
Stock of Meta shall be cancelled."**  Available here:
https://www.sec.gov/Archives/edgar/data/1936756/000119312522281275/d302576ds1a.ht
m.

Questions regarding this notice can be directed to: FINRA Market Operations at
(866) 776-0800, Option 2.

616

617

618

619

620

621

622

623  **EXHIBIT F**

624  **Subject:** Letter from Congressman Ralph Norman to FINRA CEO Robert Cook and SEC Chair
625  Gary Gensler - December 22, 2023

626  **Source:** https://norman.house.gov/uploadedfiles/rep-norman-mmtlp-letter-2023-12-22-
627  final.pdf?utm_source=chatgpt.com

Please provide a response to the following questions and requests no later than January 31, 2024:

1. Provide a timeline of trading of MMTLP on the OTC markets; the actions taken by the SEC, self-regulatory organizations, the issuers, the transfer agent, and any other relevant parties during the time MMTLP was traded; and the transaction that produced Next Bridge Hydrocarbon shares.

2. The Former CEO of Torchlight Energy Resources stated that "MMTLP was never designed to trade."[5] Please provide a detailed explanation, including the relevant statutory authority and procedures, that allowed for MMTLP shares to trade on the OTC market.

3. Provide the relevant statutory authority, jurisdiction, and adherence to established industry standards regarding the U3 trading halt of MMTLP issued on December 9, 2022.

4. Provide the exact date and circumstances surrounding FINRA's determination to implement the U3 halt, including all unredacted communications between FINRA, SEC, governmental agencies, any outside organizations, FINRA members and non-FINRA members, and any other individuals. Also include all information surrounding the SEC or FINRA's knowledge of the share price in any public or non-public exchange before issuance of the U3 halt.

5. Provide the first date and time that FINRA or its agents advised any market participant in any manner that MMTLP would no longer trade on December 9, 2022. Include any relevant documents or communication.

6. Did FINRA issue a Blue Sheet request for MMTLP during the period of October 2021 through December 2022? Why or why not?

7. How many questions, complaints, and/or inquiries have you received regarding MMTLP?

8. Provide the statutory or legal justification used by the SEC and FINRA to ignore public requests and congressional inquiries regarding MMTLP.

9. Provide the delivery of a certified audited and consolidated count of shares that were held by all U.S. and foreign financial institutions, together with their clearing firm counter-brokers including trades not reported in the consolidated audit trail (CAT), related to MMTLP on the date of December 12, 2022. Please include all shares/holdings of long and short positions, as well as IOUs held by each participating broker and market participant as record owner, beneficial owner, or in any other capacity (each reported separately) including but not limited to: all shares registered at AST, all shares held in

628

629

630

631    **EXHIBIT I**

632    **Subject:** Letter from FINRA CEO Robert Cook to Congressman Ralph Norman - Jan. 31, 2024

633

634    **Source:** https://norman.house.gov/uploadedfiles/2024-01-31-finra-response-to-rep-norman-

635    regarding-mmtlp.pdf?utm_source=chatgpt.com

Some investors continue to question FINRA's reasons for imposing the halt, and we continue to observe inaccurate information circulating on some social media about trading in MMTLP and the trading halt. While we discuss these questions in greater detail below and in our FAQs, it is helpful to first highlight several key facts about trading in MMTLP and FINRA's role:

- FINRA's decision to halt trading was due to clearance and settlement concerns in light of the structure and timing of the corporate action. As a result, ongoing trades after December 8, 2022 would not be settled by December 12, 2022, or predictably thereafter, risking significant investor confusion and harm. Contrary to some theories circulated on social media, FINRA did not initiate the halt because there were problems with a "share imbalance" and "counterfeit shares," or because of short positions held by hedge funds. FINRA also did not provide advance notice of the trading halt to broker-dealers, hedge funds, or any other market participant.

- Investors have expressed confusion regarding whether Meta Materials needed to approve the commencement of trading in MMTLP. Generally, an issuer's approval is not needed for a security to trade outside of a securities exchange, *i.e.*, "over the counter" (OTC), although an issuer may take steps to limit such trading. The issue of whether a security can be publicly traded is governed by the Securities Act and SEC rules; for purposes of these provisions, it does not appear that Meta Materials took effective steps to restrict public trading in MMTLP.

636

637

638

639

640

641

642

643

644

645

646

647     **EXHIBIT L**

648     **Subject:** FINRA FAQ - Short Positions In a Private Company – Nov. 6, 2023

649     **Source:** https://www.finra.org/investors/insights/supplemental-faq-mmtlp-corporate-action-and-
650     trading-halt

### 14. How much short selling was there in MMTLP around the time of the Next Bridge / MMTLP corporate action? Was there a large short position in MMTLP shares?

FINRA periodically collects short interest information from broker-dealers and publishes short interest reports twice each month based on that information. As explained in the March 16, 2023, MMTLP FAQs, Question No. 8, these reports reflect a snapshot of the total open short positions existing in a security on the books and records of broker-dealers on a given reporting settlement date. The last short interest reporting settlement date available for MMTLP was November 30, 2022, because the issuer cancelled the MMTLP shares and the symbol was deleted prior to the next short interest reporting settlement date. Thus, short interest data for MMTLP around the time of the corporate action was not made publicly available.[11]

Based on FINRA's subsequent regulatory efforts, FINRA estimates that there was an aggregate short interest position in MMTLP in accounts held at broker-dealers as of December 12[12] of approximately 2.65 million shares out of 165.47 million total shares outstanding, which is not a significant percentage—only 1.6%—of the total shares outstanding.[13] The short interest position in MMTLP had therefore decreased substantially—by nearly 60%—between November 15 and December 12. Specifically, short interest in MMTLP as of November 15, 2022, (approximately 6.4 million shares) declined around 27% to approximately 4.7 million shares as of November 30, 2022, and declined about a further 32% to approximately 2.65 million shares as of December 12.

651

652

653

654

655

656

657

658

659

660

661

662

663    **EXHIBIT N**

664    **Subject:** Charles Schwab Personal Account Statement -  Dec. 31, 2022

665    **Source:** https://client.schwab.com/app/accounts/statements/#/



| charles SCHWAB | Schwab One® Account of **WILLIAM LEE KELLY** | | **Account Number** 1712-6093 | **Statement Period** December 1-31, 2022 |
|---|---|---|---|---|

**Account Value as of 12/31/2022: $ 174.19** △

| Change in Account Value | This Period | Year to Date |
|---|---|---|
| Starting Value | $ 187,445.87 | $ 36,815.47 |
| Credits | 0.02 | 0.07 |
| Debits | 0.00 | (0.02) |
| Transfer of Securities (In/Out) | 0.00 | 0.00 |
| Income Reinvested | 0.00 | 0.00 |
| Change in Value of Investments | (187,271.70) | (36,641.33) |
| Ending Value on 12/31/2022 △ | $ 174.19 | $ 174.19 |
| Total Change in Account Value | $ (187,271.68) (99.91)% | $ (36,641.28) (99.53)% |



Account Value [in Thousands]

| Asset Composition | Market Value | % of Account Assets |
|---|---|---|
| Bank Sweep X,Z | $ 58.65 | 34% |
| Equities | 103.15 | 59% |
| Exchange Traded Funds | 12.39 | 7% |
| **Total Assets Long** △ | **$ 174.19** | |
| Net Loan Balance | 0.00 | |
| **Total Account Value** △ | **$ 174.19** | **100%** |



■ 34% Bank Sweep [X,Z]
▨ 59% Equities
☐ 7% Exchange Traded Funds

666

667

668

669

670

671

672

673    **EXHIBIT O**

674    **Subject:** Initial Complaint Filed with the U.S. Securities and Exchange Commission (SEC)

675    **Source:** Personal Email Account



SEC Response HO::~01271164~::HO    Inbox ×    MMTLP Lawsuit ×

"Help" <help@sec.gov> <help@sec.gov>                Mon, Dec 12, 2022, 10:18 AM    ☆    ☺    ↩    ⋮

to me ▾

Dear William Kelly:

Thank you for contacting the U.S. Securities and Exchange Commission (SEC).

The SEC's Office of Investor Education and Advocacy processes many comments from individual investors and others. We keep records of the correspondence we receive in a searchable database that SEC staff may make use of in inspections, examinations, and investigations. In addition, some of the correspondence we receive is referred to other SEC offices and divisions for their review. If they have any questions or wish to respond directly to your comments, they will contact you.

Please note that securities exchanges and self-regulatory organizations (SROs), not the SEC, determine whether to impose a trading halt in a stock. Please see https://www.finra.org/investors/investing/investment-products/stocks/trading-halts-delays-suspensions for more information.

Information regarding the trading halt of Meta Materials (MMTLP) is available at https://www.finra.org/sites/default/files/2022-12/UPC-35-2022-MMTLP%28Halt%29_2.pdf

Sincerely,

Office of Investor Education and Advocacy
U.S. Securities and Exchange Commission
(800) 732-0330
www.sec.gov
www.investor.gov

676    www.twitter.com/SEC_Investor_Ed

677

678

679

680

681

682    **EXHIBIT P**

683    **Subject:** Complaint Filed with the SEC Office of Inspector General (OIG)

684    **Source:** Personal Email Account

Complaint received by the SEC OIG; Hotline Report No. 2025066507    MMTLP Lawsuit ×

**OIG**                                                    Wed, Jun 11, 10:54 AM (6 days ago)
to me ▾

Thank you for contacting the U.S. Securities and Exchange Commission (SEC) Office of Inspector General (OIG).  We received the report of your complaint.

We will evaluate the information provided and determine an appropriate action.  Options include opening an OIG review; referring the matter to a SEC Division or Office for review, if warranted; and taking no further action.  In this regard, please note the following:

- The SEC OIG is an independent office within the SEC that conducts audits and evaluations of SEC programs and operations and investigates allegations of fraud, waste, or abuse at or against the SEC.
- The OIG derives its authority from the Inspector General Act of 1978, as amended.  In accordance with that statute, we cannot perform SEC operating responsibilities, such as investigation of alleged securities law violations.
- Our authority is limited to issues that relate to SEC programs, operations, and personnel.
- We have no authority to direct SEC action with regard to SEC operations, such as (1) change its policies, (2) commence or conclude any particular investigation, (3) implement new securities rules for market participants, or (4) initiate administrative disciplinary action.
- Due to privacy interests, we do not provide complainants with updates on, or the results of, a complaint or investigative matter.  However, our audit reports are published on www.sec.gov/office-inspector-general.
- General questions about the Federal securities laws and complaints about financial investment professionals can be directed to the SEC's Office of Investor Education and Advocacy at www.sec.gov/oiea/QuestionsAndComments.html, www.sec.gov/oiea/Complaint.html, help@sec.gov, 202-551-6500 or 1-800-732-0330.  [Note: The SEC staff cannot act as a personal representative or attorney.  Thus, they cannot represent investors and may be unable to assist you in private disputes with other parties.]
- Allegations of Federal securities law violations should be reported using the online Web form located at www.sec.gov/tcr.  You should detail how the individual(s) violated U.S. Federal securities laws.  Tips, Complaints, and Referral Filing Guidance is available at www.sec.gov/complaint/info.  [Note: SEC investigations are conducted confidentially.  As a result, the SEC generally will not confirm or deny the existence of an investigation unless and until it becomes a matter of public record.  www.sec.gov/answers/investg.htm.]

Respectfully,

The Office of Inspector General
U.S. Securities and Exchange Commission
100 F Street, NE, Washington, DC  20549-2977
oig@sec.gov

685

686

687

688

689

690

691

692    **EXHIBIT Q**

693    **Subject:** Submission to the SEC Office of the Ombudsman

694    **Source:** Personal Email Account

SEC Ombuds Matter Management System (OMMS) Submission – Matter ID Number 20250214-
00015901    MMTLP Lawsuit ×

**Ombuds OMMS** <ombudsmanomms@sec.gov>                                    Tue, Feb 18, 9:22 AM    ★    ☺    ↩    ⋮
to me ▾

U.S. SECURITIES AND
EXCHANGE COMMISSION

Dear William Kelly:

Thank you for contacting the Ombuds of the U.S. Securities and Exchange Commission (SEC) regarding your concerns about preferred shares
issued by Meta Materials Inc. (Meta Materials) previously trading over-the-counter as MMTLP. The Office of the Ombuds handles retail
investor recommendations, questions and complaints about the SEC and the self-regulatory organizations (SROs) that it oversees.

The Ombuds generally treats matters as confidential and takes reasonable steps to maintain the confidentiality of communications. However, our
Office may need to contact other SEC divisions or offices, SROs, entities, and/or individuals to disclose information without permission under
certain circumstances including, but not limited to: a threat of imminent risk or serious harm; assertions, complaints, or information relating to
violations of the securities laws; allegations of government fraud, waste, or abuse; or if otherwise required by law. Information received by the
Ombuds may also be used in future recommendations to the SEC.

With regard to your specific requests, seeking: (1) "a complete independently audited share count of the TOTAL outstanding shares of MMTLP
and the 2 days of trading that investors should have had, so all outstanding positions can be closed and settled"; and (2) "answers from the SEC
regarding their oversight of FINRA for breaking rule 6490, FINRA Rule 6432, SEC Rule 15c2-11, FINRA Rule 2010, and FINRA Rule 6440
which they used to issue the U3 Halt," please be advised that our Office has been, and continues to be, in communication with certain
individuals, Offices, and Divisions here at the SEC regarding these and similar investor concerns.

695    Thank you again for contacting the SEC Ombuds. We appreciate your views.

696

697

698

699

700

701

702

703

704

705    **EXHIBIT R**

706    **Subject:** FBI IC3 Complaint Submission

707    **Source:** Personal Email Account



William Kelly <william.lee.kelly@gmail.com>                    Fri, Feb 14, 4:22 PM
to me ▾

**Submission ID:**
02eda4cc184849d5b5ee772771514181
**Date Filed:**
2/14/2025 7:20:36 PM EST
**Were you the one affected in this incident?**
Yes

↩ Reply    ↪ Forward    ☺

708

709

710

711

712

713

714

715

716

717

718

719   **EXHIBIT S**

720   **Subject:** Complaint Filed with Nevada Secretary of State

721   **Source:** Personal Email Account

## Nevada Secretary of State: Online Securities Complaint Submission

Inbox ×    MMTLP Lawsuit ×

**nvsec@sos.nv.gov**

to me

Tue, Jan 28, 11:34 AM

A new entry to a form/survey has been submitted.

| | |
|---|---|
| **Form Name:** | Securities Complaint |
| **Date & Time:** | 01/28/2025 11:34 AM |
| **Response #:** | 311 |
| **Submitter ID:** | 9678 |
| **IP address:** | 167.154.231.5, 198.143.33.41 |
| **Time to complete:** | 40 min. , 40 sec. |

722

723

724

725

726

727

728

729

730

731

732

733

734

735

736    **EXHIBIT T**

737    **Subject:** Complaint Filed with the Nevada Attorney General

738    **Source:** Personal Email Account

[agdb.ag.state.nv.us #63955] AutoReply: Complaint :Kelly ,William |Agency - FINRA    Inbox ×    MMTLP Lawsuit ×

**AG Intake Investigations Department via RT** <agrequest...    Fri, Jun 14, 2024, 4:00 PM    ★    ☺    ↰    ⋮

to me ▾

Greetings,

The Office of the Nevada Attorney General, Constituent Services Unit acknowledges receipt of your complaint. You will be notified upon completion of the review process between 14 to 45 business days. We do not provide emergency services. If additional information is required, you will be contacted by a member of our staff. Please note that pursuant to NRS 241.039(7), Open Meeting Law complaints are public records.

----------------------------------

This message has been automatically generated in response to the creation of a trouble ticket regarding **Complaint :Kelly ,William |Agency** - FINRA, a summary of which appears below.

There is no need to reply to this message right now. Your ticket has been assigned an ID of **[agdb.ag.state.nv.us #63955]**.

Please include the string **[agdb.ag.state.nv.us #63955]** in the subject line including the brackets of all future correspondence about this issue. To do so, you may reply to this message. Ex: [agdb.ag.state.nv.us #42]

Thank you,

---------------------

--------------------Section 1 Requestor Information-----------------------------
1.Please Enter Your Email Address

739    william.lee.kelly@gmail.com

740

741

742

743

744

745

746

747

748    **EXHIBIT U**

749    **Subject:** Response Letter from the Office of Congressman Steven Horsford

750    **Source:** Personal Email Account



751

752

753

754

755    **EXHIBIT V**

756    **Subject:** Second Response Letter from the Office of Congressman Steven Horsford

757    **Source:** Personal Email Account

June 12, 2024

Dear Mr. Kelly,

Here is the response I received from the SEC:

*June 12, 2024*

*The Honorable Steven Horsford*
*U.S. House of Representatives*
*2250 Las Vegas Blvd. North, Ste. 500*
*North Las Vegas, NV 89030*
*Attention: Ruby Scott (via email)*
*Re: Mr. William Kelly ES#162455/HO::~01395772~::HO*

*Dear Representative Horsford:*

*Thank you for your June 6, 2024 letter to the U.S. Securities and Exchange Commission (SEC) on behalf of the above-referenced constituent. Your correspondence was forwarded to the SEC's Office of Investor Education and Advocacy.*

*Mr. Kelly seeks assistance with the Financial Industry Regulatory Authority's (FINRA) trading halt of Meta Materials Inc. (MMTLP). FINRA, which imposed the halt, has posted information regarding the MMTLP trading halt on its website. Please see FAQ: MMTLP Corporate Action and Trading Halt | FINRA.org. Securities exchanges and self-regulatory organizations, rather than the SEC, determine whether to impose a trading halt in a stock. For more information about trading halts generally, please see "Trading Halts and Delays" in the SEC's Investor.gov glossary.*

*The SEC's Office of Investor Education and Advocacy processes many comments and complaints from individual investors and others. We keep records of the correspondence we receive in a searchable database that SEC staff may make use of in inspections, examinations, and investigations. In addition, some of the correspondence we receive is referred to other SEC offices and divisions for their review. If they have any questions or wish to respond directly to Mr. Kelly's complaint, they will contact Mr. Kelly.*

*Sincerely,*

758    *Ruby Scott*

759

760

761   **EXHIBIT W**

762   **Subject:** Response Letter from the Office of Senator Catherine Cortez Masto

763   **Source:** Personal Email Account

---

Contact for Agencies to Reach Out to Regarding MMTLP    Inbox ×    MMTLP Lawsuit ×

**Hoffecker, Craig** <choffecker@lcb.state.nv.us>     📎 Thu, May 15, 10:06 AM    ☆    🙂    ↩    ⋮

to me ▾

William Lee Kelly
William.lee.kelly@gmail.com

Dear Mr. Kelly,

I am sorry to hear of you situation with MMTLP.  I learned of your situation as you recently contacted members of the Nevada Legislature.

It appears that you have already contacted the United States Securities and Exchange Commission (SEC) with your concerns.  I found the same comments you sent to the Nevada Legislature also listed on the SEC's website as "File No. 365-28" dated March 4, 2025.  There is an "investor complaint form" and "investor question form" where you may submit your concerns and explanation to the SEC if you have further concerns to make to the agency. The federal agency may be the best route for you to voice your concerns about MMTLP, possible early close of trading, and related matters.

The Financial Industry Regulatory Authority (FINRA) you may have also already reached out to with your concerns. Since FINRA may have more involvement with regulation of brokers and their firms, I do not know if contacting FINRA will be as useful to you as the SEC.  However, you may wish to contact FINRA in Washington, D.C. at (301) 590-6500 to see what type of information or service it may provide to you.

Finally, if you wish to call or write your federal officials representing Nevada regarding the MMTLP, you may find their contact information within the attached file for Nevada's major elected officers.

Thank you for taking the time to reach out and all the best to you in finding a resolution to the issues with MMTLP.

Craig



**Craig Hoffecker**
Manager of Constituent Services
Nevada Legislative Counsel Bureau, Research Division
Constituent Services
401 S. Carson St., Carson City, NV 89701-4747
(775) 684-6740 | https://www.leg.state.nv.us/Division/Research/

764

765

766

767

768

769    **EXHIBIT AD**

770    **Subject:** FOIA Request Showing Sam Draddy's Correspondence With the SEC

771    **Source:** https://x.com/RareDealsHere/status/1909256130574057870/photo/3

From: Draddy, Sam <Sam.Draddy@finra.org>
Sent: Monday, December 5, 2022 9:07 AM
To: (b)(6); (b)(7)(C)                          @SEC.GOV>
Cc: (b)(6); (b)(7)(C)                          @SEC.GOV>; (b)(6); (b)(7)(C)          @SEC.GOV>; Boyle,
Richard <Richard.Boyle@finra.org>; Gibbon, Jay <Jay.Gibbon@finra.org>
Subject: RE: Inquiry

**CAUTION:** This email originated from outside of the organization. Do not click links or open
attachments unless you recognize the sender and know the content is safe.

(b)(6);
(b)(7)(C)    --looks like this MMAT/MMTLP matter has now hit my Fraud team's radar screen (and
seemingly a lot of other radar screens as well). I know you have spoken to Patti Casimates and our
General Counsel's office—but was wondering if it made sense for my Fraud team to have a
conversation directly with you and your folks working on the matter so we are not duplicating
efforts. We are looking at the two issuers from a fraud/manipulation angle and, in fact, bluesheeting
both MMAT and MMTLP as we speak.

If you think a comparison of notes is worth a quick call—let me know a good day/time. I can set up a
zoom and feel free to let me know if (b)(6); (b)(7)(C)    or anyone else should be included.

Thanks (b)(6); (b)(7)(C)

772    Sam

773

774

775

776

777

778

779

780

781

782  **EXHIBIT AE**

783  **Subject:** Letter from Congresswoman Barbara Lee regarding MMTLP Resolution

784  **Source:** https://x.com/xMarketNews/status/1731863801522168131/photo/1

## Congress of the United States
### Washington, DC 20515

December 4, 2023

The Honorable Gary Gensler
Chairman
U.S. Securities and Exchange Commission
100 F St. NE Washington, D.C. 20549

Dear Chairman Gensler,

I am writing regarding an action taken by the Financial Industry Regulatory Authority (FINRA) on META Material's Series A Preferred Shares (MMTLP). This has been brought to my attention by a number of my constituents who have expressed concerns with the holding and status of their MMTLP shares. On December 8th, 2022, FINRA halted trading of MMTLP and announced deletion of the MMTLP symbol five days later. My constituents have expressed that as a result, they were left without clarify on the future of their investments.

The U.S. Securities and Exchange Commission (SEC) and FINRA have a responsibility to protect investors and safeguard the integrity of our public markets. Given the financial distress constituents have experienced because of these decisions, I want to ensure that market decisions are being made by regulators in an efficient and transparent manner.

I request that you fully investigate the events surrounding the trading halt of MMTLP and ensure no wrongdoing took place. Furthermore, I request that you make any findings publicly available and that you to provide clear guidance to my constituents about what they should expect to occur regarding their current MMTLP holdings and under what timeline they should expect a resolution to take place. I also ask that you identify any regulatory or legislative gaps that could be addressed to better protect investors and market integrity.

Thank you for your attention to this matter and I look forward to your response.

                                        Sincerely,

Barbara Lee
Member of Congress

785

786    **EXHIBIT AG**

787    **Subject:** Ameritrade Correspondence to MMTLP Holders Pre-Halt

788    **Source:** https://x.com/JunkSavvy/status/1905727232414494981/photo/2



Wed Mar 8 2023 12:06:00 am ET

**Re: MMTLP Finra Corporate Action Notice**
From: Institutional Message Center | Date: 12/09/22 9:30 AM  Message available until 12/08/24.

Hello

Good Morning! Thank you for taking the time to respond to our message and I hope you are having a wonderful day so far! My name is Bob, and I am happy to continue helping you with your account today!

We did receive some information from MMTLP. These are the details and guidance they provided.

MMTLP shareholders with settled positions as of 12/12/22 (Record Date) will receive one share of Next Bridge Hydrocarbons, Inc for every one share of MMTLP. Scheduled Pay Date for this distribution is 12/14/22.

New long purchases (BUYS) of MMTLP executed after 12/08/22 will NOT receive Next Bridge Hydrocarbons, Inc shares. As such, after market close on 12/8/2022:
New long BUY orders of MMTLP placed after market close on 12/8/2022 will be routed for review and canceled.
New closing SELL orders of MMTLP should be routed normally, but there may be liquidity issues on 12/9/22 and 12/12/22.
Current open long BUY orders that are GTC will be canceled after market close on 12/8/22.
In addition, MMTLP shares will be canceled 12/13/22 and no trading will occur.
Clients should trade or hold this security at their own risk.

Hope this helps! Thank you so much for being a client here at TD Ameritrade, Tim! I truly appreciate it! I hope you have a fantastic day!

We greatly appreciate your business and know you have a choice where you invest. If there is anything else we can do for you, or could have done better, please let us know.

We look forward to serving your needs for years to come.

Respectfully,

Robert Mangan
Client Services

TD Ameritrade
1-800-669-3900

789

790

791

792

793

794

795

796

797    **EXHIBIT AK**

798    **Subject:** Next Bridge Disputes FINRA's Role in The Corporate Actions

799    **Source:** https://cdn.prod.website-
800    files.com/6169e69d0075ec7c66221a8b/65c66057134fd3d64ee87721_NBH%20Statement
801    %20vF%202-8-24.pdf

Third, we believe there is an onus on FINRA to help resolve ongoing investor concerns due to the role it played in the events that led to the U3 halt, and the subsequent confusion resulting from the halt itself. FINRA stated that it determined the U3 halt was "necessary and appropriate to protect investors and ensure a fair and orderly marketplace." Unfortunately, many investors continue to communicate great frustration that the halt accomplished quite the opposite and could have been avoided. We do not intend to litigate FINRA's decision-making in this release, but we also would like to ensure that we clarify certain points on which we have a divergent view from FINRA in regards to the corporate action announcing the NBH spinoff and subsequent U3 halt, since the issues are actively being discussed in public releases to our investors and publicized letters to Congress. As an initial matter, we take issue with FINRA's repeated assertion that "FINRA's role is limited to reviewing and processing the (corporate action) submission and announcing the corporate action to market participants (unless the corporate action documentation is found to be deficient under Rule 6490, in which case FINRA may determine not to process the corporate action)." We do not believe this describes the role that FINRA played in the MMTLP corporate action submission process, nor does it offer a complete recitation of FINRA's authority under Rule 6490. First, FINRA drafted the initial and revised corporate action notices on December 6th and 8th of 2022, with an instruction that the issuer was not to edit or interpret it, and included language that we believe itself became the source of market confusion. For example, while FINRA describes the notice to Congressman Norman as "consistent with the information provided by Meta Materials," it is notable that the notice actually introduced a new instruction that MMTLP shares would be "deleted" on December 13th – a date never before contemplated or referenced by the issuers, and which many found difficult to reconcile with Meta's announcement that the distribution of Next Bridge shares would take place the next day– on December 14th. Indeed, it was never proposed to FINRA to add a December 13 cancellation date or deletion date, and adding such a date created an unnecessary restriction to the corporate action and shareholders of MMTLP. In addition, FINRA's Rule 6490 allows it to refrain from processing requested corporate actions altogether if it "determines not processing is necessary to protect investors and the public interest and to maintain fair and orderly markets." In other words, the justification FINRA ultimately used for issuing the U3 halt was available to it at the outset of the process,

802

803

804

805

806

807

808

809

810    **EXHIBIT AO**

811    **Subject:** Legal Statements by George Palikaras regarding FINRA Corporate Actions

812    **Source:** https://www.dropbox.com/scl/fi/tbp2nwed5ldbopmjfclwb/Inter-Coastal-v.-TradeStation-
813    Decl.-ISO-Georgios-Pallikaras-
814    Signed_GP.pdf?rlkey=2wgw6dvot12b0km16szm4zrpn&e=1&st=z6nvgdol&dl=0



Case 0:24-cv-60891-AHS    Document 39-1    Entered on FLSD Docket 08/16/2024    Page 9 of

> 31.    Further, on or about December 8, 2022, FINRA notified the Company that it had
> unilaterally revised the language of the Company's December 6, 2022 corporate action and
> required the revised notice to be published on the Daily List. This revision was made without the
> input or authorization of the Company and took place on or about December 7, 2022, *after* FINRA
> had a call discussion with DTCC. I was informed that META II and Next Bridge's counsel were
> not invited to participate in the call between FINRA and DTCC.[14]

815

816

817

818

819

820

821

822

823

824

825

826    **EXHIBIT BB**

827    **Subject:** MMTLP Personal Statements on the impact of the U3 HALT

828    **Source:** Personal Email

829    *See Attachments*

830

831

832

833

834

835

836

837

838

839

840

841

842

843

844

845

846

847

848

849

850

851

852    **EXHIBIT BC**

853    **Subject:** McCabe Letter to FINRA Executive Robert Colby Disputing Short Estimates

854    **Source:** https://www.finra.org/sites/default/files/2024-02/nbh-finra-letter-01-23-24.pdf

January 23, 2024

Mr. Robert Colby
Executive Vice President
and Chief Legal Officer

██████████████

████████████████████

Mr. Colby,
Next Bridge Hydrocarbons has been gathering a significant amount of data regarding
the imbalance in our shareholder ledger. As stated in our press release, the very early
results of our data gathering suggests a number considerably higher than the 2.65mm
shares of aggregate short interest stated in FINRA's most recent FAQ.

Per your request, the investment banking firm representing Next Bridge on our
proposed S-1 has received several inbound calls from financial institutions needing to
buy our shares to get their books in balance. One of the inquiries was of a size so large
that I requested to be on a call with this group. From this call, I now have knowledge
of an admitted shareholder imbalance from one single financial institution that is
multiples more that 2.65mm shares. We continue to collect additional data regarding
imbalances from multiple sources.

There is a significant disconnect between our growing data and FINRA's stated
number of 2.65mm shares of outstanding short interest. I believe this highlights the
need for a more exhaustive review of the total shares in all accounts and through all
categories of security, long or short, onshore or offshore, and by parties registered
with FINRA or not. The ultimate goal of this investigation is to make sure that every
shareholder who purchased a share of MMTLP has the corresponding one-for-one
share of Next Bridge Hydrocarbons. Furthermore, any party that sold shares short of
MMTLP, or was short Torchlight Energy and carried that short position through the
merger with Meta Materials, and, for whatever reason, has not provided the
corresponding sold share to the rightful owner, needs to consummate the final step of
the "short" transaction, and purchase those shares they sold without a borrow and
deliver them to the rightful owners.

855

856

857   **EXHIBIT BD**

858   **Subject:** CRGP Trading Halt and Resumption

859   **Source:** https://www.finra.org/sites/default/files/UPC_22-15_CRGP.pdf



**Attn:  Manager P&S/Traders/Cashier/Manager Reorganization/Manager Dividends**
**UNIFORM PRACTICE ADVISORY (UPC #22-15) September 8, 2015**

**Calissio Resources Group, Inc. Common Stock (CRGP)**

On August 26, 2015, FINRA Operations halted all trading and quoting in CRGP.  Please be advised that trading in CRGP will resume effective at 08:00 AM EST on September 9, 2015.


Questions regarding this notice should be directed to: FINRA Operations 1-866-776-0800.

860

861

862

863

864

865

866

867

868

869

870    **EXHIBIT BE**

871    **Subject:** ICPW UPC Notice Share Cancelation With Trading after cancelation

872    **Source:** https://www.finra.org/sites/default/files/UPC_14-2018_ICPWQ.pdf

**Attn: Trading and Market Making/Legal and Compliance/Operations/Systems**
**UNIFORM PRACTICE ADVISORY (UPC #14-18) 03/22/2018**
**ICPW Liquidation Corporation (ICPWQ)**

Notice has been received that the above Debtors' and the Official Committee of Equity Security Holders' Joint Plan of Liquidation filed under Chapter 11 of the Federal Bankruptcy Code, became effective on 02/28/2018. Pursuant to the Plan, On the Effective Date, all of the outstanding shares of common stock of ICPW Nevada (the "Common Stock") existing on the Effective Date will be cancelled, and the Record Holders who owned shares of Common Stock on February 12, 2018 (the "Record Date") will become holders of non-transferable beneficial interests in the Trust in exchange for those shares. The purpose of the Trust is, among other matters, to distribute proceeds to holders of beneficial interests in the Trust (the "Trust Beneficiaries") and investigate and, if appropriate, pursue all claims and causes of action that belong to the Debtors' bankruptcy estates that are assigned to the Trust for the benefit of the Trust Beneficiaries. Summary details of the estimated initial distribution as provided by the Plan are provided below for your convenience; however, shareholders should read the Trust Agreement and the Plan if they want to understand more details[1].

| Security Description | (Approximate) Initial Cash Distribution per share |
|---|---|
| ICPW Liquidation Corporation Common Stock | $0.1128 |

Members are reminded of their obligations under FINRA Rule 2111 if they continue to engage in transactions in the above security after the effective date.

Pursuant to FINRA Rule 11530, members are advised that, among other things, in contracts for securities where a public announcement or publication of general circulation discloses that the securities have been deemed worthless, deliveries shall consist a) the worthless securities or; or b) a Letter of Indemnity which shall grant the purchaser any rights and privileges which might accrue to the holders of the physical securities. Such deliveries shall operate to close-out the contract and shall be settled at the existing contract price pursuant to FINRA Rule 11530.

873

874

875

876

877

878    **EXHIBIT BF**

879    **Subject:** JTCMF Trading Halt and Resumption

880    **Source:** https://www.finra.org/sites/default/files/UPC_33-2016_JTCMF.pdf



**Attn: Trading and Market Making/Legal and Compliance/Operations/Systems**
**UNIFORM PRACTICE ADVISORY (UPC #33-16) 8/8/2016**
**Jetcom Inc. (JTCMF)**

On Friday, August 5, 2016, the Financial Industry Regulatory Authority, Inc. ("FINRA") temporarily halted trading and quotation in the securities of Jetcom Inc. (OTC Symbol: JTCMF) pursuant to Rule 6440(a)(3). Please be advised that trading in JTCMF will resume effective 08:00 a.m. E.T. on Tuesday, August 9, 2016.

Questions regarding this notice can be directed to: FINRA Market Operations at (866) 776-0800, Option 2.

881

882

883

884

885

886

887

888

889

890

891    **EXHIBIT BG**

892    **Subject:** MNTCF Trading Halt and Resumption

893    **Source:** https://www.finra.org/sites/default/files/2019-09/UPC_29-2019_MNTCF.pdf



**Attn: Trading and Market Making/Legal and Compliance/Operations/Systems**
**UNIFORM PRACTICE ADVISORY (UPC #29-19) 09/19/2019**
**European Metals Corporation (MNTCF)**

On Thursday, September 19, 2019, the Financial Industry Regulatory Authority, Inc. ("FINRA") temporarily halted trading in the securities of European Metals Corporation (OTC Symbol: MNTCF) pursuant to Rule 6440(a)(3). FINRA determined to impose a temporary halt because the CUSIP number (29880P108) trading in the U.S. for MNTCF had not been updated in a timely manner to reflect the 1-500 reverse-split effected on or about August 22, 2019. FINRA has announced the new, post-split CUSIP (29880P207) on the Daily List. In the view of FINRA, confusion regarding the CUSIP number may have the potential to cause significant uncertainty in the settlement and clearing process. The trading and quotation halt began Thursday, September 19, 2019, at 15:37:40 E.T. and will terminate the trading halt on Tuesday, September 24, 2019, at 9:30:00 E.T.

Questions regarding this notice can be directed to: FINRA Operations at (866)-776-0800.

894

895

896

897

898

899

900

901

902    **EXHIBIT BH**

903    **Subject:** NWMT Trading Halt and Trade Resumption

904    **Source:** https://www.finra.org/sites/default/files/UPC_26-2017_NWMT.pdf



**Attn: Trading and Market Making/Legal and Compliance/Operations/Systems**
**UNIFORM PRACTICE ADVISORY (UPC # 26-17) 6/1/2017**
**Newmarkt Corp. (NWMT)**

On Wednesday, May 17, 2017, the Financial Industry Regulatory Authority, Inc. ("FINRA")
temporarily halted trading and quoting in the securities of Newmarkt Corp. (OTC Symbol:
NWMT) pursuant to Rule 6440(a)(3). See UPC #24-17. FINRA determined to impose a
temporary halt because FINRA believed that an extraordinary event occurred that caused or
had the potential to cause significant uncertainty in the settlement and clearance process
for shares in NWMT.  FINRA believes there was confusion in the marketplace between
Newmarkt Corp. (Cusip 65163M107) and a similarly-named company (NewMarket
Technology Inc., Cusip 651627309) that previously was assigned the NWMT symbol.

Members are hereby advised that FINRA is lifting the trading and quoting halt in NWMT
(Newmarkt Corp) effective Friday, June 2, 2017 at 8:00:00 a.m. E.T.

Questions regarding this notice can be directed to: FINRA Market Operations at
(866) 776-0800, Option 2.

905

906

907

908

909

910

911

912

913 **EXHIBIT BI**

914 **Subject:** Sequential Brands Trading Halt Notice and Resolution

915 **Source:** https://www.finra.org/sites/default/files/2022-03/UPC-08-2022-SQBGQ.pdf



### Attn: Trading and Market Making/Legal and Compliance/Operations/Systems UNIFORM PRACTICE ADVISORY (UPC #08-22) 03/04/2022 Sequential Brands Group Inc (SQBGQ)

Notice has been received that the above Company's First Amended Joint Plan Of Liquidation became effective on 03/03/2022. Pursuant to the plan, on the effective date, or as soon thereafter as reasonably practicable, all Existing Parent Equity Interests shall be cancelled and Extinguished. Holders of Existing Parent Equity Interests shall not receive any distribution or retain any property pursuant to the plan.[1]

Members are reminded of their obligations under FINRA Rule 2111 if they continue to engage in transactions in the above security after the effective date.

Pursuant to FINRA Rule 11530, members are advised that, among other things, in contracts for securities where a public announcement or publication of general circulation discloses that the securities have been deemed worthless, deliveries shall consist a) the worthless securities or; or b) a Letter of Indemnity which shall grant the purchaser any rights and privileges which might accrue to the holders of the physical securities. Such deliveries shall operate to close-out the contract and shall be settled at the existing contract price pursuant to FINRA Rule 11530.

Questions regarding this notice should be directed to: FINRA Operations- 1-866-776-0800.

916

917

918

919

920

921

922

923    **EXHIBIT BJ**

924    **Subject:** SFYWQ Trading Halt Allowing Continued trading after cancelling

925    **Source:** https://www.finra.org/sites/default/files/UPC_14-2016_SFYWQ.pdf

**Attn: Trading and Market Making/Legal and Compliance/Operations/Systems**
**UNIFORM PRACTICE ADVISORY (UPC 14-16) 4/26/2016**
**Swift Energy Company (SFYWQ)**

Notice has been received that the above Debtor's Joint Plan of Reorganization filed under Chapter XI of the Federal Bankruptcy Code, became effective on 4/22/2016. Pursuant to the plan, On the Effective Date, Stock Interests of Swift shall be cancelled and discharged and shall be of no further force or effect, whether surrendered for cancellation or otherwise. On or as soon as practicable after the Effective Date, holders of Stock Interests of Swift shall receive, in exchange for the surrender or cancellation of their Interests and for the releases by such holders of the Released Parties, their Pro Rata share of (a) the Shareholder Equity Distribution and (b) the Warrants; provided, however, that any holder of a Stock Interest of Swift that opts not to grant the voluntary releases contained in Section IV.I.3.b of the Plan shall not be entitled to receive its Pro Rata share of the Shareholder Equity Distribution and Warrants and shall not receive any consideration in exchange for the surrender or cancellation of its Interests or any Distribution whatsoever under the Plan; and provided, further, that, notwithstanding Section VI.E, the Debtors may provide any holder of a Stock Interest of Swift that would otherwise be entitled to receive a Distribution of less than one share of the New Swift Common Stock with a Distribution of one share of New Swift Common Stock; provided, however, in no event shall such Distribution alter the respective percentages of the outstanding New Swift Common Stock allocated to any Class or Claim holder. Summary details of the distribution as provided by the Plan are provided below for your convenience; however, please consult the Company's bankruptcy filings for thorough details.[1]

Distribution to holders that granted the voluntary releases contained in Section IV.I.3.b of the Plan:

| Description | New Swift Energy Common Stock | New 2019 Warrants | New 2020 Warrants |
|---|---|---|---|
| Old Swift Energy Common Stock | 0.00892078 Shares | 0.04778898 Shares | 0.04778898 Shares |

Members are reminded of their obligations under FINRA Rule 2111 if they continue to engage in transactions in the above security after the effective date.

Members are further advised that deliveries in settlement of contracts in the OLD securities, which were executed prior to the announcement that the securities had been deemed worthless, shall be evidenced by either a) the OLD security; or b) a

926

927

928    **EXHIBIT BK**

929    **Subject:** SWKH U3 Trade Halt Resumes With Instructions

930    **Source:** https://www.finra.org/sites/default/files/UPC_25-15_SWKH.pdf



**Attn: Trading and Market Making/Legal and Compliance/Operations/Systems**
**UNIFORM PRACTICE ADVISORY (UPC # 25-15) 9/16/2015**

**Trading Halt for SWK Holdings Corporation ("SWKH")**

On Wednesday, September 16, 2015, the Financial Industry Regulatory Authority, Inc. ("FINRA") halted trading in the Common Shares of SWKH pursuant to FINRA Rule 6440 because of issues related to perceived post-split trading and subsequent price adjustments. FINRA initiated the trading halt on Wednesday, September 16, 2015, at 09:53:28 AM E.T. and trading can resume in SWKH at 8:00:00 AM E.T. on Thursday, September 17, 2015. Trading in the security will **resume on a pre-split basis**.

Additionally, pursuant to Rule 11893(a), FINRA has reviewed the trading in SWKH for September 16, 2015, and has determined to rule all such transactions in SWKH to be null and void in order to maintain a fair and orderly market and to protect investors and the public interest. Pursuant to 11893(a), FINRA has determined that this ruling is not eligible for appeal. All firms with executions in SWKH on 9/16/15 are required to cancel all trades.

Members are reminded to observe Ex-Dividend dates announced by FINRA on the Daily List. The Daily List provides members with critical information, including the issuer name and symbol, amount of distribution, ex-dividend date, record date, payable date and additional information, as applicable, and is available at: http://otce.finra.org/DailyList

Questions regarding this notice can be directed to: FINRA Operations at (866) 776-0800.

931

932

933

934

935

936

937

938

939    **EXHIBIT BL**

940    **Subject:** U3 Trading Halt For LOBEF and Resumption

941    **Source:** https://www.finra.org/sites/default/files/2022-06/UPC-13-2022-LOBEF.pdf



**Attn: Trading and Market Making/Legal and Compliance/Operations/Systems**
**UNIFORM PRACTICE ADVISORY (UPC #13-22) (06/09/2022)**

**Resumption of Trading and Quotations for Lobe Sciences Ltd. (LOBEF)**

On 06/09/2022, the Financial Industry Regulatory Authority, Inc. ("FINRA") temporarily halted trading and quotations in the securities of Lobe Sciences Ltd. (LOBEF).  See UPC Notice #11-22.  Pursuant to Rule 6440(a)(3), FINRA determined to impose a temporary halt because an extraordinary event had occurred or was ongoing that caused or had the potential to cause significant uncertainty in the settlement and clearance process for shares in LOBEF and that, therefore, halting trading and quoting in LOBEF was necessary to protect investors and the public interest.

Members are hereby advised that trading and quoting in LOBEF may resume, effective 06/10/2022 at 7:30:00 am EST

Questions regarding this notice can be directed to: FINRA Market Operations at (866) 776-0800, Option 2.

942

943

944

945

946

947

948

949

950

951

952    **EXHIBIT BM**

953    **Subject:** ZTNO Trading Halt and Resumption

954    **Source:** https://www.finra.org/sites/default/files/2020-04/UPC_12-2020_ZOOM-ZTNO.pdf



UPDATE: Trading and Market Making/Legal and Compliance/Operations/Systems
UNIFORM PRACTICE ADVISORY (UPC #12-20) 4/10/2020
Zoom Technologies, Inc. (ZOOM) TRADING HALT & SYMBOL CHANGE TO (ZTNO)

On Thursday, April 9, 2020, the Financial Industry Regulatory Authority, Inc. ("FINRA") halted quoting and trading in the common stock of Zoom Technologies, Inc. (OTC: ZOOM) pursuant to Rule 6440(a)(3). The halt began at 8:01:20 a.m. E.T.  *See* UPC #10-20.  FINRA imposed the temporary halt because FINRA believed that trading in ZOOM demonstrated a widespread misunderstanding between the Nasdaq-listed stock of Zoom Video Communications, Inc. (Nasdaq: ZM) and the over-the-counter stock of Zoom Technologies, Inc. (OTC: ZOOM).

For the avoidance of further confusion, FINRA has determined to effect a symbol change for the common stock of Zoom Technologies, Inc.  Members hereby are advised that the symbol for the common stock of Zoom Technologies, Inc. will be changed from ZOOM to ZTNO and that quoting and trading in Zoom Technologies, Inc. will resume under the new symbol, ZTNO, effective Tuesday, April 14, 2020 at 8:00:00 a.m. E.T.

Questions regarding this notice can be directed to: FINRA Operations at (866) 776-0800.

955

956

957

958

959

960

961

962

963    **EXHIBIT BO**

964    **Subject:** FOIA Request Denial Letter Invoking Exemption 7(A)

965    **Source:** Personal Email

    We are withholding records that may be responsive to your
request under 5 U.S.C. § 552(b)(7)(A). This exemption protects
from disclosure records compiled for law enforcement purposes,
the release of which could reasonably be expected to interfere
with enforcement activities. Since Exemption 7(A) protects the
records from disclosure, we have not determined if other
exemptions apply. Therefore, we reserve the right to assert
other exemptions when Exemption 7(A) no longer applies. Please be
advised that we have considered the foreseeable standard of harm
in preparing this response.

    It is the general policy of the Commission to conduct its
investigations on a non-public basis. Thus, subject to the
provisions of FOIA, the Commission does not disclose the
existence or non-existence of an investigation or information
gathered unless made a matter of public record in proceedings
brought before the Commission or in the courts. Accordingly,
the assertion of this exemption should not be construed as an
indication by the Commission or its staff that any violations of
law have occurred with respect to any person, entity, or
security. Please be advised that we have considered the
foreseeable harm standard in preparing this response.

966

967

968

969

970

971

972

973

974

975

976

977  **EXHIBIT BP**

978  **Subject:** Certificate of Service for the Motion For Preliminary Injunction July 18, 2025

979  **Source:** Direct From Process Server via Personal Email

# Affidavit of Process Server

UNITED STATES DISTRICT COURT, DISTRICT OF NEVADA

| WILLIAM LEE KELLY | VS | FINANCIAL INDUSTRY REGULATORY AUTHORITY, INC. (FINRA) | 2:25-CV-01195-APG-DJA |
|---|---|---|---|
| PLAINTIFF/PETITIONER | | DEFENDANT/RESPONDENT | CASE NUMBER |

I, KEVIN S. DUNN _____ being first duly sworn, depose and say: that I am over the age of 18 years and not a party to this action, and that within the boundaries of the state where service was effected, I was authorized by law to perform said service.  RECEIVED 07/18/2025

**Service:** I served FINANCIAL INDUSTRY REGULATORY AUTHORITY, INC. (FINRA)
NAME OF PERSON / ENTITY BEING SERVED

with (list documents) ORDER GRANTING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION; MOTION FOR PRELIMINARY INJUNCTION; CERTIFICATE OF INTERESTED PARTIES; REQUEST FOR JUDICIAL NOTICE; EXHIBITS

by leaving with CORPORATION SERVICE COMPANY AS REGISTERED AGENT, ACCEPTED BY: LYNANNE GARES  At
(MANAGING AGENT EMPLOYED BY REGISTERED AGENT)

☒ Business  251 LITTLE FALLS DRIVE, WILMINGTON, DE 19808
ADDRESS                                          CITY / STATE

On  _____07/18/2025_____  AT  _____3:05 PM_____
DATE                                              TIME

Thereafter copies of the documents were mailed by prepaid, first class mail on _____
DATE

from _____
CITY          STATE          ZIP

**Manner of Service:**
☒  CORPORATE
☐ **Personal:** By personally delivering copies to the person being served.
☐ **Substituted at Residence:** By leaving copies at the dwelling house or usual place of abode of the person being served with a member of the household over the age of _____ and explaining the general nature of the papers.
☐ **Substituted at Business:** By leaving, during office hours, copies at the office of the person/entity being served with the person apparently in charge thereof.
☐ **Posting:** By posting copies in a conspicuous manner to the front door of the person/entity being served.

**Non-Service:** After due search, careful inquiry and diligent attempts at the address (es) listed above, I have been unable to effect process upon the person/entity being served because of the following reason(s):

☐ Unknown at Address   ☐ Moved, Left no Forwarding   ☐ Service Canceled by Litigant ☐ Unable to Serve in Timely Fashion
☐ Address Does Not Exist ☐ Other_____

**Service Attempts:** Service was attempted on: (1)_____ _____  (2)_____ _____
DATE    TIME            DATE    TIME

(3)_____ _____  (4)_____ _____  (5)_____ _____
DATE    TIME            DATE    TIME            DATE    TIME

Age  55   Sex FEMALE  Race WHITE  Height 5'5  Weight 150   HAIR  BROWN

KEVIN S. DUNN
BRANDYWINE PROCESS SERVERS, LTD.,
PO BOX 1360, WILMINGTON, DE 19899

SUBSCRIBED AND SWORN to before me this 18TH day of JULY _____ ,2025.

DENORRIS ANGELO BRITT
NOTARY PUBLIC
STATE OF DELAWARE
My Commission Expires May 1, 2028

SIGNATURE OF NOTARY PUBLIC

NOTARY PUBLIC for the state of  DELAWARE

NATIONAL ASSOCIATION OF PROFESSIONAL PROCESS SERVERS

980