**EPG LAW GROUP**
Elias George, NV Bar No. 12379
elias@epglawgroup.com
5940 South Rainbow Blvd.
Las Vegas, NV 89118
Phone: 702-358-0933
*Attorneys for Defendant FINRA*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| WILLIAM LEE KELLY, an individual, | CASE NO.:  2:25-cv-01195-APG-DJA |
| Plaintiff, | |
| vs. | **DEFENDANT FINANCIAL INDUSTRY REGULATORY AUTHORITY, INC'S MOTION TO DISMISS PLAINITFF'S FIRST AMENDED COMPLAINT** |
| FINANCIAL INDUSTRY REGULATORY AUTHORITY (FINRA), | |
| Defendant. | |

Pursuant to Federal Rules of Civil Procedure 12(b)(2) and 12(b)(6), Defendant Financial Industry Regulatory Authority, Inc. ("FINRA"), by and through its undersigned counsel, respectfully moves this Court for an order dismissing Plaintiff William Lee Kelly's ("Kelly") First Amended Complaint ("FAC") [ECF No. 7].

## I.    INTRODUCTION

FINRA is a private, not-for-profit self-regulatory organization ("SRO") that is authorized by Congress to conduct the daily regulation of the national securities markets, with oversight from the Securities and Exchange Commission ("SEC"). The national securities markets are comprised of the national securities exchanges (*e.g.*, NASDAQ, New York Stock Exchange, Cboe) and the over-the-counter ("OTC") market. Equity securities not listed on a national securities exchange may be traded and quoted in the OTC market.

This case relates to an OTC equity security formerly traded on the OTC market and identified with the symbol MMTLP. On December 9, 2022, based on its authority to regulate its members who quote and trade equity securities on the OTC market, FINRA directed its member firms to halt trading and quoting of MMTLP shares. The FAC in this case is one in a series of *pro se* lawsuits filed by individual investors who previously held MMTLP shares and are seeking to



1  lay blame for their purported losses at the feet of regulators like FINRA and the SEC, among other

2  defendants.

3         Like other prior, unsuccessful MMTLP investor lawsuits,[1] Kelly's claims against FINRA

4  are fatally flawed for multiple reasons. First, this Court lacks personal jurisdiction over FINRA.

5  In addition, all of Kelly's claims against FINRA are barred by absolute immunity because they

6  relate to FINRA's regulatory activities. Further, neither the Exchange Act nor any other statute or

7  common law principle provides Kelly with a private right of action against an SRO for acts or

8  omissions in connection with its regulatory duties. Finally, FINRA is not a state actor, thus

9  precluding any due process claim against FINRA.

10        For the reasons outlined in this Motion, the FAC must be dismissed with prejudice, and

11 without leave to amend because any amendment would be futile.

12 **II.    FACTUAL BACKGROUND**

13        **A.    The First Amended Complaint**

14        Kelly's FAC is one in a series of investor complaints, filed by *pro se* litigants, seeking relief

15 for claims against FINRA that arise exclusively from its regulatory activities related to MMTLP—

16 an equity security that traded on the OTC market. Several such cases have been dismissed by other

17 federal district courts pursuant to orders that have become final. *See supra* fn. 1.

18        The FAC asserts three separate counts against FINRA: Count I (Abuse of Regulatory

19 Authority Resulting in Due Process Violations committed by FINRA), Count II (Negligent Failure

20 to Adhere to Mandated Regulatory Procedures committed by FINRA), and Count III (Deprivation

21 of Property Without Due Process of Law (Fifth Amendment Violation) Committed by FINRA. All

22

23 _____

[1] *See, e.g.*, *Hensley v. TD Ameritrade, Inc.,* No. 23-cv-5159, slip op. (W.D. Wash. Oct. 2, 2023) (a
24 true and correct copy of this decision is attached as Exhibit A to FINRA's Request for Judicial
Notice in Support of its Motion to Dismiss Plaintiff's First Amended Complaint, ECF No. 23);
25 *Park v. FINRA*, No. 2:23-CV-69-RWS, 2023 U.S. Dist. LEXIS 238130 (N.D. Ga. Sep. 25, 2023);
*Hofman v. Fidelity Brokerage Servs., LLC*, No. 2:23-cv-00881-MCS-PVC, 2023 U.S. Dist. LEXIS
26 81166 (C.D. Cal. May 8, 2023); *Tawil v. FINRA*, 2 No. 4:22cv440-RH-MAF, 2023 U.S. Dist.
LEXIS 117247 (N.D. Fla. May 24, 2023); *Traudt v. Rubenstein et al.*, No. 2:24-cv-782, 2025 U.S.
Dist. LEXIS 123280, *15 (D. Vt. June 30, 2025) (denying motion for leave to assert claims against
27 FINRA "because amendment would be futile" due to the fact that: (a) "FINRA has absolute
immunity from Plaintiff's claims for damages[;]" and (b) "[b]ecause FINRA is not a state actor,
28 the [proposed complaint] fails to state a claim" for constitutional violations).

1  of Kelly's claims are based on speculative and unsupported conclusions about FINRA's regulatory

2  activities related to MMTLP. The FAC begins with Kelly acknowledging that his claims are based

3  on "FINRA's publication of an incomplete and misleading corporate action notice, and its

4  subsequent decision to halt trading" of the MMTLP shares, FAC ¶ 10, both of which were

5  regulatory actions taken pursuant to FINRA rules promulgated under the Exchange Act and

6  approved by the SEC.[2]

7  
      **B.**      **FINRA is a Private Company That Regulates its Broker-Dealer Members,**

8                   **Subject to SEC Oversight**

9        FINRA is a private, not-for-profit Delaware corporation and SRO headquartered in the

10 District of Columbia.[3] *See* FAC ¶ 6 (FINRA is a "private corporation acting under Congressional

11 mandate as a [SRO]" and "is headquartered is" Washington D.C.); *see also Webb v. FINRA*, 889

12 F.3d 853, 856 (7th Cir. 2018). It is not a government agency: the government neither appoints

13 FINRA board members, officers, or employees, SEC Release No. 34-56145, 72 Fed. Reg. 42160,

14 42170-72 (Jul. 26, 2007), nor provides it public funding. Instead, it is funded by registration,

15 membership, and transaction fees charged to its members. *See* FINRA By-Laws, Art. VI, § 1,

16 *publicly      available      at*      https://www.finra.org/rules-guidance/rulebooks/corporate-

17 organization/power-corporation-fix-and-levy-assessments.

18       Congress "established a system of 'cooperative regulation'" in the Securities Exchange Act

19 of 1934 ("Exchange Act") in which it imposed duties upon self-regulatory organizations ("SROs")

20 to conduct day-to-day regulation of the national securities markets. *See Sparta Surgical Corp. v.*

21 *NASD, Inc.*, 159 F.3d 1209, 1210-11, 1213 (9th Cir. 1998), *abrogated in part on other grounds by*

22 *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Manning*, 578 U.S. 374 (2016) (citation omitted);

23 

---

24 [2] The FAC also seeks equitable relief where Kelly seeks an order compelling production of
documents, among other relief. FAC, p. 13, Prayer for Relief IV. FINRA is filing a

25 contemporaneous motion to stay discovery in this action pending the Court's ruling on this Motion
to Dismiss.

26 

27 [3] FINRA was formed in 2007 when its predecessor, the National Association of Securities Dealers,
Inc. ("NASD"), consolidated its member-firm regulation and enforcement functions with the

28 regulatory and enforcement functions of the New York Stock Exchange. *See* Order Approving
Proposed Rule Change to Amend the By-Laws of NASD, 72 Fed. Reg. 42169 (Aug. 1, 2007).

1   *Turbeville v. FINRA*, 874 F.3d 1268, 1270-71 (11th Cir. 2017); *Austin Mun. Sec., Inc. v. NASD.*,

2   757 F.2d 676, 680 (5th Cir. 1985) (Congress established "a comprehensive system of federal

3   regulation of the securities industry"). The Exchange Act generally requires any broker or dealer

4   transacting in securities to join an association of broker-dealers registered as a national securities

5   association, which is one type of SRO, *see* 15 U.S.C. § 78o(a)(1), (b)(1), and FINRA is such an

6   association. *See Balabon v. Ketchum,* 785 Fed. App'x 263, 263 (5th Cir. 2019); *Turbeville v.*

7   *FINRA*, 874 F.3d 1268, 1270 & n.2 (11th Cir. 2017); *Merrill Lynch, Pierce, Fenner & Smith, Inc.*

8   *v. NASD*, 616 F.2d 1363, 1365 (5th Cir. 1980) (addressing NASD).

9       In that role, FINRA establishes rules "designed to prevent fraudulent and manipulative acts

10  and practices, to promote just and equitable principles of trade, to foster cooperation and

11  coordination with persons engaged in regulating, clearing, settling, processing information with

12  respect to, and facilitating transactions in securities, . . . and, in general, to protect investors and

13  the public interest." 15 U.S.C. § 78o-3(b)(6). In other words, FINRA is "responsible for the self-

14  regulation of member brokerage firms, exchange markets, and individuals associated with those

15  firms and markets." *Wiley v. SEC*, 663 Fed. App'x 353, 356 n.1 (5th Cir. 2016). So impactful is

16  FINRA's role within the securities market that its rules are "part of the apparatus of federal

17  securities regulation." *Kurz v. Fid. Mgmt. & Rsch. Co.*, 556 F.3d 639, 641 (7th Cir. 2009).

18      FINRA exercises its regulatory authority in accordance with the requirements of the

19  Exchange Act and under close supervision by the SEC. *See* FAC ¶ 6 ("FINRA operates under the

20  oversight of the [SEC]"); *Sparta* Surgical, 159 F.3d at 1214 ("The legislative history of the 1975

21  amendments [to the Exchange Act] underscored that self-regulatory organizations 'are intended

22  to be subject to the SEC's control and have no governmentally derived authority to act

23  independently of SEC oversight.'") (citation omitted); *see also NHBPA v. Black*, 107 F.4th 415,

24  435 (5th Cir. 2024), *vacated on other grounds*, *Horseracing Integrity & Safety Auth., Inc. v.*

25  *NHBPA*, No. 24-433, 2025 WL 1787684, at *1,  2025 U.S. LEXIS 2516, at *1 (U.S. June 30,

26  2025) (the SEC has "formidable oversight power to supervise, investigate, and discipline

27  [FINRA] for any possible wrongdoing or regulatory missteps") (quoting *In re NYSE Specialists*

28  *Sec. Litig.*, 503 F.3d 89, 101 (2d Cir. 2007)) (quotation marks omitted); *Austin Mun. Sec.,* 757

1  F.2d at 680 (the SEC has "broad supervisory responsibilities over [SROs]" and correspondingly

2  broad power to enforce their compliance with these obligations); *Empire Fin. Grp., Inc. v.*

3  *FINRA, Inc*., No. 08-80534-CIV, 2009 U.S. Dist. LEXIS 133643, *20 (S.D. Fla. Jan. 15, 2009)

4  ("[U]nder the comprehensive regulatory scheme for the securities industry that was established

5  by Congress, FINRA's performance of its responsibilities is subject to the strict, on-going

6  oversight of the SEC."); *see also see also* FAC ¶ 6 ("FINRA operates under the oversight of the

7  [SEC]").

8      If FINRA violates the Exchange Act, federal regulations, or its own rules, the SEC may

9  suspend or revoke FINRA's registration as an SRO, limit FINRA's activities, functions, and

10  operations, or impose other sanctions. *See* 15 U.S.C. § 78s(c), (h)(1)-(4). The SEC is also

11  authorized to initiate judicial proceedings against FINRA to enjoin activities that would violate

12  the Exchange Act or FINRA's rules and to seek civil penalties. *See* 15 U.S.C. § 78u(d)(1),

13  (d)(3)(A). Thus, "Congress has vested in the SEC the obligation of ensuring that FINRA

14  performs its statutory responsibilities." *Empire Fin.*, 2009 U.S. Dist. LEXIS 133643, at *20.

15      **C.    FINRA Regulates the National Securities Markets**

16      The national securities markets are comprised of the national securities exchanges and the

17  OTC market. FINRA does not operate a market, and it does not issue, cancel, settle, or clear

18  securities that are traded in the national securities markets. Instead, FINRA performs oversight

19  functions and regulates its members that trade and quote securities in the national securities

20  markets to ensure compliance with FINRA rules, the federal securities laws, and the rules and

21  regulations thereunder. 15 U.S.C. § 78o-3(b).

22      Specifically, FINRA performs multiple regulatory functions to oversee the OTC market

23  for equity securities, like MMTLP, that are not listed on a national securities exchange. For

24  example, FINRA: (1) maintains a symbol directory for OTC equity securities and can issue and

25  delete security symbols, *see* https://otce.finra.org/otce/symbol-directory; (2) adopts rules

26  regarding quoting and trading in OTC equity securities, *see* FINRA Rule 6400 Series;[4] (3)

27
28

---

[4]  The FINRA Rule 6400 Series is publicly available at https://www.finra.org/rules-guidance/rulebooks/finra-rules/6400.

5

1  reviews, processes, and announces information about corporate actions regarding OTC equity

2  securities, *see* SEC Rule 10b-17, 17 C.F.R. § 240.10b-17; *see also* FINRA Rule 6490;[5] and (4) is

3  authorized to halt trading and quoting of OTC equity securities if FINRA determines that doing

4  so is necessary to protect investors and the public interest, *see* FINRA Rule 6440.[6]

5       **D.    Procedural History**

6       In 2021, Torchlight Energy Resources, Inc. ("Torchlight") completed a reverse merger to

7  create Meta Materials, Inc. ("Meta"). FAC ¶ 12. As part of that merger, Torchlight shareholders

8  received Non-Voting Series A Preferred Shares ("Series A Shares"). FAC ¶ 12. In June 2021, the

9  Options Clearing Corporation ("OCC") issued a memorandum stating that the trading status of the

10 Series A Shares was "not yet known," and based on the Proxy Statement filed by the company,

11 those shares were not expected to be listed on a national securities exchange. *See* FINRA's Request

12 for Judicial Notice, ECF No. 23, Exhibit B (OCC Memo). That memorandum also explains how

13 transactions in the Series A Shares would be expected to clear if an OTC market developed and if

14 such a market did not develop. *See id.* at 1.

15      In October 2021, a market developed, and the Series A Shares began trading on the OTC

16 market under the symbol MMTLP. FAC ¶ 20. In 2022, Meta initiated a corporate action pursuant

17 to which the Series A Shares, which represented a shareholder's interest in Torchlight's oil and

18 gas assets, were spun off into Next Bridge Hydrocarbons ("Next Bridge"). FAC ¶¶ 12-13 & FAC

19 Exh. B. Pursuant to FINRA Rule 6490, on December 6, 2022, as modified on December 8, 2022,

20 FINRA announced Meta's plan to distribute shares of Next Bridge's common stock to holders of

21 its Series A Shares on a one-for-one basis (the "Announcement"). FAC Exh. B (12/6/2022

22 Corporate Action Notice); FAC Exh. C (12/8/2022 Corporate Action Notice); *see also* FAC ¶¶ 13,

23 15. The Announcement explained that "MMTLP shareholders with settled positions as of

24 [December 12, 2022] will receive one (1) share of [Next Bridge] for every one (1) share of

25

26 _____

[5] FINRA Rule 6490 is publicly available at https://www.finra.org/rules-guidance/rulebooks/finra-rules/6490.

[6] FINRA Rule 6440 is publicly available at https://www.finra.org/rules-guidance/rulebooks/finra-rules/6440-0.

MMTLP held." *See* FAC Exhs. B & C. Among other things, the Announcement further explained that any "[p]urchases of MMTLP executed after [December 8, 2022] will not receive the distribution.… Symbol: MMTLP will be deleted effective [December 13, 2022]." *See id.*; *see also* FAC ¶¶ 13, 15.[7]

On December 9, 2022, pursuant to FINRA Rule 6440, FINRA notified its members to halt trading and quoting of MMTLP on the OTC market because "an extraordinary event has occurred or is ongoing that has caused or has the potential to cause significant uncertainty in the settlement and clearance process for shares in MMTLP." *See* FAC Exh. E (Notice of Trading Halt). As announced, "[t]he trading and quoting halt will end concurrent with the deletion of the symbol effective Tuesday, December 13, 2022." *Id.* The Meta distribution was finalized on December 14, 2022, *see* Next Bridge Press Release (Dec. 20, 2022),[8] and Meta cancelled the MMTLP Shares on or about that same date. *See* FINRA's Request for Judicial Notice, ECF No. 23, Exhibit C (Amendment); *see also* Next Bridge Investor FAQs.[9]

## III.    LEGAL ARGUMENT

### A.    Legal Standard

A plaintiff bears the burden to establish jurisdiction over a defendant moving to dismiss pursuant to Rule 12(b)(2) of the Federal Rules of Civil Procedure. *See Picot v. Weston*, 780 F.3d 1206, 1211 (9th Cir. 2015). In deciding whether a court has personal jurisdiction over the

---

[7] The Announcement was modified on December 8, 2022, in part, to clarify that FINRA would *delete* the MMTLP trading symbol on December 13, 2022. FAC Exh. C; *see also* FAC ¶ 15. While the original version of the Announcement, published on December 6, 2022, stated that MMTLP *shares will be cancelled* effective December 13, 2022, *see* FAC Exh. B, FINRA does not *and cannot* cancel a company's securities. FINRA may, however, delete a trading symbol for a security when it learns that the security has been cancelled. Thus, the Announcement was modified to reflect that FINRA would delete the MMTLP symbol because the Series A Shares would be cancelled as part of Meta's corporate action. FAC Exh. C.

[8] *Available at* https://uploads-ssl.webflow.com/6169e69d0075ec7c66221a8b/63a376a38add926dd316f36a_NBH%20News%20Release%2012-20-2022%20.pdf ("Next Bridge Press Release") (last visited May 7, 2025).

[9] *Available at* https://web.archive.org/web/20230106094030/https://www.nextbridgehydrocarbons.com/investors ("Next Bridge FAQs") (last visited May 7, 2025).



1    defendant, a court may consider affidavits and documents submitted by the parties. *Medinah*

2    *Mining, Inc. v. Amunategui*, 237 F. Supp. 2d 1132, 1134 (D. Nev. 2002) ("As it does not appear

3    that an evidentiary hearing will be helpful to the court in making its decision, we decide the issue

4    of personal jurisdiction based upon an examination of the written materials submitted by the

5    parties.").

6        When considering a Rule 12(b)(6) motion to dismiss, courts accept "[a]ll well-pleaded

7    allegations of material fact in the complaint … as true" and construe them "in the light most

8    favorable to the non-moving party." *Tohono O'Odham Nation v. United States Dep't of Interior*,

9    138 F.4th 1189, 1199 (9th Cir. 2025) (quoting *Faulkner v. ADT Sec. Servs., Inc.*, 706 F.3d 1017,

10   1019 (9th Cir. 2013) (internal quotation marks omitted)). To survive a motion to dismiss, a

11   complaint must contain enough facts for the allegations to be plausible on their face. *See Bell Atl.*

12   *Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see also Fayer v. Vaughn*, 649 F.3d 1061, 1064

13   (9th Cir. 2011) (dismissal appropriate "if the complaint fails to allege 'enough facts to state a

14   claim to relief that is plausible on its face'") (quoting *Bell Atl. Corp.*, 550 U.S. at 570); *Marcelli*

15   *v. Edwards*, No. 3:14-cv-00559, 2016 U.S. Dist. LEXIS 68031, *5 (D. Nev. May 24, 2016)

16   (same)). "Although factual allegations are taken as true, [courts] do not assume the truth of legal

17   conclusions merely because they are cast in the form of factual allegations" and therefore

18   "conclusory allegations of law and unwarranted inferences are insufficient to defeat a motion to

19   dismiss." *Fayer*, 649 F.3d at 1064 (internal quotation marks and citations omitted). Further,

20   "[f]actual allegations must be enough to rise above the speculative level." *Marcelli*, 2016 U.S.

21   Dist. LEXIS 68031, at *5 (quoting *Bell Atl. Corp.*, 550 U.S. at 555).

22       **B.    The Court Has No Jurisdiction Over FINRA In This Action**

23       There is a dearth of jurisdictional allegations in the FAC. The FAC concedes that FINRA's

24   principal place of business and headquarters are in Washington, D.C. FAC ¶¶ 3, 6. Kelly's sole

25   allegation concerning personal jurisdiction is that FINRA's "conduct had direct and harmful

26   effects on investors nationwide, including the Plaintiff in this District." FAC ¶ 3. Kelly's claims

27   arise from allegations regarding FINRA's broad regulatory conduct: namely, the publication of

28   corporate action notices and issuing a trading halt. *See, e.g.*, FAC ¶¶ 8-10. The FAC does not allege

1  that these regulatory activities occurred in Nevada. *See generally* FAC.

2  A court must have jurisdiction over both the parties and the claims asserted in a plaintiff's

3  complaint to decide the case. "Federal courts may exercise either general or specific personal

4  jurisdiction over a defendant." *Kehoe v. Walker*, No. 2:25-cv-01146, 2025 U.S. Dist. LEXIS

5  137446, *4 (D. Nev. June 30, 2025) (internal citations omitted). Because FINRA is neither subject

6  to general nor specific personal jurisdiction in this Court, the FAC must be dismissed.

7          1.        FINRA is Not Subject to General Personal Jurisdiction in Nevada

8  Corporations are subject to general personal jurisdiction solely where "their affiliations

9  with the State are so 'continuous and systematic' as to render them essentially at home in the forum

10 State." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011); *see also*

11 *Gerwaski v. Nevada*, No.: 2:24-cv-00985, 2025 U.S. Dist. LEXIS 84645, *9 (D. Nev. May 5,

12 2025); *Kehoe*, 2025 U.S. Dist. LEXIS 137446, at *4. A corporation is considered "essentially at

13 home" in two places: (1) its state of incorporation, and (2) the state in which its principal place of

14 business is located. *See Daimler AG v. Bauman,* 571 U.S. 117, 137 (2014).

15 FINRA is not incorporated in Nevada, and it does not maintain its principal place of

16 business in Nevada. FINRA is incorporated in Delaware and its principal place of business is in

17 Washington, D.C. FAC ¶ 6; *see also Webb*, 889 F.3d at 856. Accordingly, because FINRA is not

18 "essentially at home" in Nevada, the Court lacks general personal jurisdiction over FINRA.

19         2.        FINRA is Not Subject to Specific Jurisdiction in Nevada

20 Likewise, FINRA is not subject to specific personal jurisdiction in Nevada because there

21 is no connection (nor has Kelly alleged one) between FINRA's alleged conduct and Nevada. A

22 forum may exercise specific personal jurisdiction over an out-of-state defendant not otherwise

23 subject to personal jurisdiction in the forum where the defendant has "certain minimum contacts

24 with [the State] such that the maintenance of the suit does not offend 'traditional notions of fair

25 play and substantial justice.'" *Goodyear*, 564 U.S. at 923 (*citing Int'l Shoe Co. v. Washington*, 326

26 U.S. 310, 316 (1945)) (alteration in original). In other words, there must be "some act by which

27 the defendant purposefully avail[ed] itself of the privilege of conducting activities within the forum

28 State, thus invoking the benefits and protections of its laws." *Id.* at 924 (quoting *Hanson v.*

epg
LAW GROUP

1   *Denckla*, 357 U.S. 235, 253 (1958)). It is not enough that an act was allegedly directed at the

2   plaintiff. Instead, to be consistent with due process, the defendant's actions must be "purposefully

3   directed toward the forum State." *Asahi Metal Ind. Co., v. Sup. Court of Cal.*, 480 U.S. 102, 112

4   (1987).

5         "Determining whether specific jurisdiction exists over an out-of-state defendant involves

6   two inquiries: [first] whether a forum state's long-arm statute permits service of process, and

7   [second] whether the assertion of personal jurisdiction would violate due process." *Kehoe*, 2025

8   U.S. Dist. LEXIS 137446, at *4 (citing *Action Embroidery Corp. v. Atl. Embroidery, Inc.*, 368

9   F.3d 1174, 1177, 1180 (9th Cir. 2004)). Where, as here, "there is no applicable federal statute

10  governing personal jurisdiction, the district court applies the law of the state in which the district

11  court sits." *Schwarzenegger v. Fred Martin Motor Co.,* 374 F.3d 797, 800 (9th Cir. 2004).

12  "Nevada's longarm statute is co-extensive with federal standards, so [the court] may exercise

13  personal jurisdiction if doing so comports with federal constitutional due process." *Gerwaski*, 2025

14  U.S. Dist. LEXIS 84645, at *8-9 (citing*, inter alia,* NEV. REV. STAT. § 14.065(1)); *Kehoe*, 2025

15  U.S. Dist. LEXIS 137446, at *4.

16        The Ninth Circuit has a three-prong test for analyzing specific personal jurisdiction:

17        a)   The non-resident defendant must purposefully direct his activities or
             consummate some transaction with the forum or resident thereof; or perform
18           some act by which he purposefully avails himself of the privilege of
             conducting activities in the forum, thereby invoking the benefits and
19           protections of its laws;

20        b)   the claim must be one which arises out of or relates to the defendant's forum-
             related activities; and
21

22        c)   the exercise of jurisdiction must comport with fair play and substantial justice,
             i.e. it must be reasonable.

23  *Schwarzenegger,* 374 F.3d at 802; *see also Gerwaski,* 2025 U.S. Dist. LEXIS 84645, at *10;

24  *Kehoe*, 2025 U.S. Dist. LEXIS 137446, at *5. Further, "[w]hen a plaintiff relies on specific

25  jurisdiction, he must establish that jurisdiction is proper for 'each claim asserted against a

26  defendant.'" *Picot*, 780 F.3d at 1211 (quoting *Action Embroidery Corp.,* 368 F.3d at 1180).

27        Kelly alleges nothing that ties FINRA's challenged conduct to Nevada. He alleges no

28  facts that establish FINRA's regulatory activities here were "purposefully directed" to Nevada,

1  nor any contacts reflecting purposeful availment of Nevada's laws sufficient to support specific

2  jurisdiction. *See generally* FAC. Rather, Kelly challenges the propriety of FINRA's broad

3  regulatory decisions related to MMTLP—namely the publication of corporate action notices and

4  the issuance of a trading halt—but these are nationwide regulatory decisions, not Nevada-

5  specific conduct. *See e.g.,* FAC ¶¶ 8-10. In short, Kelly does not describe any activity or

6  transaction occurring in Nevada, and exercising jurisdiction here would stretch due process

7  beyond recognition and would offend the basic requirement of fairness.

8      In sum, none of the allegations contained in the FAC establishes general or specific

9  personal jurisdiction over FINRA in Nevada. As such, there is no basis to support the finding of

10  personal jurisdiction over FINRA here, and the FAC must be denied. *See e.g., Proteinhouse*

11  *Franchising, LLC v. Gutman*, No. 2:17-cv-02816, 2017 U.S. Dist. LEXIS 185468, at *11 (D. Nev.

12  Nov. 8, 2017) (finding that plaintiffs had failed to allege personal jurisdiction over one of the

13  defendants, and thus the court could not issue a TRO enjoining that defendant).

14      **C.    FINRA's Regulatory Immunity Is Absolute and Bars All Claims**

15      An SRO such as FINRA is "immune from liability based on the discharge of its duties

16  under the Exchange Act." *Sparta Surgical*, 159 F.3d at 1213 (citation omitted); *see also P'ship*

17  *Exch. Sec. Co. v. NASD,* 169 F.3d 606, 608 (9th Cir. 1999) (SRO immune from suit when acting

18  under the aegis of the Exchange Act's authorization); *DL Cap. Grp. LLC v. NASDAQ Stock Mkt.,*

19  *Inc.*, 409 F.3d 93, 97 (2d Cir. 2005) (when an SRO engages in conduct consistent with the powers

20  delegated to it pursuant to the Exchange Act and the regulations and rules promulgated thereunder,

21  SRO is immune from suit). This form of absolute immunity is "an integral part of the American

22  system of securities regulation." *Dexter v. Depository Tr. & Clearing Corp.*, 406 F. Supp. 2d 260,

23  263 (S.D.N.Y. 2005), *aff'd*, 219 F. App'x 91 (2d Cir. 2007).

24      Every circuit that has considered the issue has held that SROs are absolutely immune "from

25  suit for conduct falling within the scope of [their] regulatory and general oversight functions."

26  *D'Alessio v. NYSE*, 258 F.3d 93, 105 (2d Cir. 2001), *cert. denied*, 534 U.S. 1066 (2001); *see also*

27  *In re: Series 7 Broker Qualification Exam Scoring Litig.*, 548 F.3d 110, 114 (D.C. Cir. 2008)

28  ("When an SRO acts under the aegis of the Exchange Act's delegated authority it is absolutely

immune from suit for the improper performance of regulatory, adjudicatory, or prosecutorial duties delegated by the SEC."); *Weissman v. NASD, Inc.*, 500 F.3d 1293, 1296 (11th Cir. 2007) ("Because they perform a variety of vital governmental functions, but lack the sovereign immunity that government agencies enjoy, SROs are protected by absolute immunity when they perform their statutorily delegated adjudicatory, regulatory, and prosecutorial functions."). Such protection is crucial to an SRO's ability to perform its regulatory tasks within the federal framework and is consistent with the system of cooperative regulation enacted by Congress "under which [SROs] … exercise a primary supervisory role subject to ultimate SEC control." *Sparta Surgical,* 159 F.3d at 1213-14.

When determining an SRO's entitlement to immunity, courts examine the nature of the function performed and not "an SRO's subjective intent or motivation." *Weissman,* 500 F.3d at 1297; *see also Sparta Surgical,* 159 F.3d at 1214; *Gallagher v. FINRA, Inc.,* No. 21-13605, 2022 U.S. App. LEXIS 15309, *4 (11th Cir. June 3, 2022) (courts must examine the nature and function of the alleged misconduct to determine if immunity applies); *In re NYSE Specialists Sec. Litig.,* 503 F.3d at 96 (courts look to the nature of the function performed to determine whether immunity applies to an SRO's conduct); *Empire Fin. Grp.*, 2009 U.S. Dist. LEXIS 133643, at *19 ("[Regulatory] immunity applies regardless of FINRA's alleged motives, and despite [plaintiff's] disagreement with how FINRA carried out this function.").

Here, the allegations against FINRA in the FAC arise entirely from FINRA's regulatory activities, including the decision to halt trading of MMTLP shares and other alleged acts and omissions undertaken by FINRA related to MMTLP. *See* FAC ¶¶ 8-10, 13, 15, 22, 32, 35-38, 44-45. While *ultra vires* conduct by FINRA falling beyond its immunity is vaguely alleged without any supporting factual allegations, at bottom, all of Kelly's contentions against FINRA relate to a regulatory activity for which FINRA is immune from suit. *See, e.g., Sparta Surgical,*159 F.3d at 1214 ("[T]here are few functions more quintessentially regulatory than suspension of trading."); *DL Cap.,* 409 F.3d 93, 98 (2d Cir. 2005) (absolute immunity precludes claims related to an SRO's announcement regarding the suspension or cancellation of trades); *Traudt*, 2025 U.S. Dist. LEXIS 123280, at *13-15 (noting "the immunity depends only on whether specific acts and forbearances

were incident to the exercise of regulatory power, and not on the propriety of those actions or inactions" and that therefore "FINRA has absolute immunity from Plaintiff's claims for damages") (citations and internal quotation marks omitted); *Hofman*, 2023 U.S. Dist. LEXIS 81166, at *14 ("Facilitating trading of Meta Materials securities and publishing corporate action notices are functions within the ambit of FINRA's regulation and oversight of the over-the-counter market."); *Tawil*, 2023 U.S. Dist. LEXIS 117247 at *2-3 ("Suspending trading—when warranted—is precisely the kind of activity FINRA can undertake in its quasi-regulatory capacity."); *In re Facebook, Inc., IPO Sec. and Derivative Litig.*, 986 F. Supp. 2d 428, 454 (S.D.N.Y. 2013) (dismissing claim against an SRO alleging its decision not to halt trading of a security was negligent on regulatory immunity grounds because "[t]he capacity to suspend trading… is a quintessentially regulatory function"); *Opulent Fund, L.P. v, Nasdaq Stock Mkt., Inc*., No. C-07-03683, 2007 U.S. Dist. LEXIS 79260, *13 (N.D. Cal. Oct. 12, 2007) (identifying suspension of trading as regulatory in nature).

Kelly's contention that FINRA violated its own rules does not affect the applicability of regulatory immunity. FAC ¶ 28; *see also, e.g., Pee Pee Pop Trust v. FINRA*, No. 3:19-cv-00240, 2019 U.S. Dist. LEXIS 165024, *11-12 (D. Nev. Sept. 26, 2019) (dismissing complaint alleging FINRA's violation of its own rules in its application of them on grounds of regulatory immunity); *In re NYSE Specialists Secs. Litig*., 503 F.3d at 99 n.4 (dismissing claims that SRO "violated its own internal rules" because the "enforcement (or nonenforcement) of these rules clearly implicates the quasi-governmental functions" for which an SRO is entitled to absolute immunity); *Standard Inv. Chartered, Inc. v. NASD*, 637 F.3d 112, 116 (2d Cir. 2011) (FINRA's enforcement and regulatory decisions constitute regulatory functions for which FINRA is immune from suit).

The fact that Kelly seeks equitable relief also does not change the immunity analysis. Regulatory immunity "provides protection not only from liability, but also from the burdens of litigation, including discovery, and should be 'resolved at the earliest stage in litigation.'" *In re Facebook,* 986 F. Supp. 2d at 448 (quoting *Hunter v. Bryant*, 502 U.S. 224, 227 (1991)); *see also Rabin v. Nasdaq OMX PHLX LLC,* 182 F. Supp. 3d 220, 238 (E.D. Pa. 2016) ("[A]bsolute immunity is designed to shield entities from litigation, not just liability[.]"). Indeed, courts have

consistently applied the absolute immunity afforded to SROs to bar claims where the relief sought was equitable in nature. *See Cashmore v. FINRA*, No. 18-CV-1198S, 2020 U.S. Dist. LEXIS 209451, *14 (W.D.N.Y. Nov. 9, 2020) ("FINRA's absolute immunity is *not* restricted by the types of claims asserted against it by Plaintiff[.] . . .*This immunity also covers declaratory or injunctive relief*."); *see also Tawil,* 2023 U.S. Dist. LEXIS 117247, at *2 (denying equitable relief because "[a] claim that FINRA got it wrong—that trading should not have been suspended—is precisely the kind of claim from which FINRA should and does have immunity") (collecting cases); *Hofman*, 2023 U.S. Dist. LEXIS 81166, at *18 ("The Court adopts the persuasive reasoning of *Cashmore* and dismisses all claims [including declaratory relief] against FINRA … based on immunity."); *Buscetto v. FINRA,* No. 11-6308, 2012 U.S. Dist. LEXIS 65116, *11 n.4 (D.N.J. May 9, 2012) (finding FINRA "is entitled to immunity" where plaintiff sought to expunge and vacate his disciplinary record maintained by FINRA); *Lucido v. Mueler,* No. 08-15269, 2009 U.S. Dist. LEXIS 89775, *19-20 (E.D. Mich. Sept. 29, 2009) (denying injunctive relief on the ground of FINRA's regulatory immunity), *aff'd,* 427 Fed. App'x 497 (6th Cir. 2011); *Am. Benefits Grp., Inc. v. NASD,* No. 99 Civ. 4733, 1999 U.S. Dist. LEXIS 12321, *24-25 (S.D.N.Y. Aug. 5, 1999) (denying claim for injunctive relief against FINRA on immunity grounds).

FINRA's regulatory immunity precludes all of Kelly's claims as a matter of law. Accordingly, the FAC should be dismissed with prejudice.

### D.    Kelly's Lack of a Private Right of Action Bars the FAC

The FAC proffers that FINRA's acts and omissions amount to violations of its own rules and of the Exchange Act. FAC, ¶¶ 28-29, COUNT II. The Exchange Act, however, does not provide any private right of action to potential plaintiffs for such alleged violations. *See Jablon v. Dean Witter & Co*., 614 F.2d 677, 681 (9th Cir. 1980) (finding no private right of action for violations of stock association rules); *see also Sparta Surgical*, 159 F.3d at 1213 ("[A] party has no private right of action against an exchange for violating its own rules or for actions taken to perform its self-regulatory duties under the" Exchange Act) (citation omitted).

To the contrary, courts routinely hold that no private right of action exists against an SRO like FINRA for its regulatory acts, omissions, or alleged violations of its own rules. *In re: Series*



7 , 548 F.3d at 114 ("By specifically adopting an appeals process which does not provide monetary relief, Congress has displaced claims for relief based on state common law."); *MM&S Fin., Inc. v. NASD*, 364 F.3d 908, 911-12 (8th Cir. 2004) ("[T]he Exchange Act does not create a private right of action against the NASD defendants for violating their own rules" and a party's attempt to bypass the absence of a private right of action by asserting a claim under state contract law is "fruitless."); *Feins v. Am. Stock Exch., Inc.*, 81 F.3d 1215, 1223-24 & n. 6 (2d Cir. 1996) (no private right of action exists against an SRO under Section 19 of the Exchange Act); *Spicer v. Chicago Board of Options Exch., Inc.,* 977 F.2d 255, 259-61 (7th Cir. 1992) (no private right of action exists under the Exchange Act against an SRO for failing to enforce its rules); *Matyuf v. NASD Dispute Resolution, Inc.,* No. 04-540, 2004 U.S. Dist. LEXIS 25174, *10-11 (W.D. Pa. Oct. 4, 2004) (noting that there is no cause of action against NASD to enforce its own rules); *In re Olick*, No. 99-CV-5128, 2000 U.S. Dist. LEXIS 4275, *11 (E.D. Pa. Apr. 4, 2000) (a party "may not maintain a private cause of action against the NASD under the Exchange Act, or at common law, for regulatory actions taken by the NASD"); *Meyers v. NASD*, No. 95-CV-75077, 1996 U.S. Dist. LEXIS 6044,  *14 (E.D. Mich. Mar. 29, 1996) (dismissing action against FINRA because allegations were "an unsuccessful attempt to create a private cause of action for the violation of [FINRA's] rules where none exists").

### E.     Kelly's Constitutional Claims (Count I and Count III) Are Subject to Dismissal.

Kelly's constitutional claims collapse at the threshold because FINRA is not a state actor. But even setting that aside, his takings and due process allegations do not state a claim as a matter of law.

#### 1.   FINRA is Not a State Actor

Kelly's constitutional claims are fatally flawed because, as "a general matter the protections of the [U.S. Constitution] do not extend to private conduct abridging individual rights." *NCAA v. Tarkanian*, 488 U.S. 179, 191 (1988) (internal quotation marks and citation omitted). Constitutional claims—like due process and takings clause claims under the Fifth Amendment to the U.S. Constitution—thus require "state action." *Duffield v. Robertson Stephens & Co.*, 144 F.3d

1182, 1200 (9th Cir. 1998) ("A threshold requirement of any constitutional claim is the presence of state action."), *overruled on other grounds by EEOC v. Luce, Forward, Hamilton & Scripps*, 345 F.3d 742 (9th Cir. 2003); *Rank v. Nimmo*, 677 F.2d 692, 701 (9th Cir. 1982) ("The Due Process Clause of the Fifth Amendment applies to actions of the federal government and not to individual activities of private actors … [unless] the action of the latter may be fairly treated as that of the [government] itself.") (cleaned up).

To assert a constitutional violation, a plaintiff must "demonstrate 'that in denying plaintiff's constitutional rights, the defendant's conduct constituted state action.'" *D.L. Cromwell Invs., Inc. v. NASD Reg., Inc.*, 279 F.3d 155, 161 (2d Cir. 2002) (quoting *Desiderio v. NASD*, 191 F.3d at 206 (2d Cir. 1999)); *see also Sybalski v. Indep. Grp. Home Living Program, Inc.*, 546 F.3d 255, 256-60 (2d Cir. 2008) (dismissing First Amendment claims and other claims where plaintiff failed to plead state action); *Desiderio*, 191 F.3d at 206-07 (affirming dismissal of plaintiff's Fifth Amendment claim because plaintiff failed to show NASD's actions constituted state action); *Kim v. FINRA*, 698 F. Supp. 3d 147, 154 (D.D.C. 2023) ("Plaintiff's [constitutional] claims require establishing that FINRA is a state actor, which 'clearly requires permanent government control.' But Plaintiff concedes, and the record reflects, that the government does *not* control FINRA.") (internal citations omitted) (emphasis in original).

Every court that has considered the issue has held that FINRA, like its predecessor, the NASD and other SROs, "is a private actor, not a state actor." *Desiderio*, 191 F.3d at 206; *see also Epstein v. SEC*, 416 F. App'x 142, 148 (3d Cir. 2010) ("Epstein cannot bring a constitutional due process claim against the NASD, because the NASD is a private actor, not a state actor.") (alterations, citation, and internal quotation marks omitted); *Perpetual Secs., Inc. v. Tang*, 290 F.3d 132, 138 (2d Cir. 2002) ("It is clear that NASD is not a state actor[.]"); *D.L. Cromwell, Inc.*, 279 F.3d at 162; *First Jersey Sec., Inc. v. Bergen*, 605 F.2d 690, 699 n.5 (3d Cir. 1979), *cert. denied*, 444 U.S. 1074 (1980); *Kim*, 698 F. Supp. 3d at 161 "[E]very court to have considered this state actor arguments has rejected it."); *Mohlman v. FINRA*, No. 3:19-cv-154, 2020 U.S. Dist. LEXIS 31781, *14 (S.D. Ohio Feb. 24, 2020) (collecting cases), *aff'd*, 977 F.3d 556 (6th Cir. 2020); *Dobbins v. NASD*, No. 5:06CV2968, 2007 U.S. Dist. LEXIS 61767, *8-9 (N.D. Ohio Aug. 22,

1    2007); *Scher v. NASD*, 386 F. Supp. 2d 402, 407-08 (S.D.N.Y. 2005), *aff'd* 218 Fed. Appx. 46 (2d

2    Cir. 2007); *Weinraub v. Glen Rauch Sec., Inc.*, 399 F. Supp. 2d 454, 463 (S.D.N.Y. 2005); *Am.*

3    *Benefits Grp. Inc. v. NASD*, No. 99 Civ. 4733, 1999 U.S. Dist. LEXIS 12321, *23-24 (S.D.N.Y.

4    Aug. 5, 1999); *Graman v. NASD*, No. 97-1556, 1998 U.S. Dist. LEXIS 11624, *9 (D.D.C. Apr.

5    24, 1998); *Meyers*, 1996 U.S. Dist. LEXIS 6044, at *23-26. This wall of precedent includes a

6    recent decision involving another former MMTLP shareholder whose motion for leave to amend

7    to assert constitutional claims against FINRA was denied as futile "[b]ecause FINRA is not a state

8    actor." *Traudt*, 2025 U.S. Dist. LEXIS 123280 at *17.

9        FINRA is a private entity[10] organized as a not-for-profit corporation under Delaware law

10   that does not receive state or federal funding. *Desiderio*, 191 F.3d at 206; *Santos-Buch v. FINRA*,

11   32 F. Supp. 3d 475, 484-85 (S.D.N.Y. 2014), *aff'd* 591 Fed. Appx. 32 (2d Cir. 2015); *See Meyers*,

12   1996 U.S. Dist. LEXIS 6044 at *2. No government official serves as a FINRA employee, and the

13   government does not appoint any FINRA employees or officers. *Id.* Because FINRA is not a state

14   actor, Kelly's purported constitutional claims fail as a matter of law.

15       2.  <u>Kelly's Takings and Due Process Claims Fail for Other Reasons</u>

16       Kelly's constitutional claims (Counts I and III) fail for additional reasons. A procedural

17   due process claim requires a plaintiff to establish two elements: (1) a deprivation of a

18   constitutionally protected liberty or property interest, and (2) a denial of adequate procedural

19   protections. *Miranda v. City of Casa Grande*, 15 F.4th 1219, 1224 (9th Cir. 2021). However,

20   "governmental action allegedly causing a decline in property values has never been held to deprive

21   a person of property within the meaning of the Fourteenth Amendment." *Fulilar v. Irwindale*, 760

22   F. Supp. 164, 166 (C.D. Cal. 1991); *see also Fusco v. Connecticut*, 815 F.2d 201, 206 (2d Cir.

23   1987).

24       Here, Kelly does not identify any specific protected property interest that FINRA took from

25   him. Instead, he alleges that FINRA deprived him and other MMTLP shareholders of "the

26   opportunity to sell, transfer, or manage their securities, effectively locking their assets without

27

28   ---
     [10] In the FAC, Kelly acknowledges that FINRA is a "private corporation." *See* FAC ¶ 6.

advance notice, an opportunity to be heard, or from any recourse" and that by imposing the trading halt, "FINRA effectively froze Plaintiff's assets, denying all market access, communications and transaction options." *See* FAC ¶¶ 36, 50. But, as FINRA announced, the trading halt ended when the MMTLP symbol was deleted on December 13, 2022. *See* FAC Exh. E (Notice of Trading Halt). Further, Meta announced that the 1-for-1 distribution of Next Bridge shares to holders of MMTLP shares was completed on December 14, 2022, and Meta cancelled the MMTLP shares on the same date. *See* Next Bridge Press Release (Dec. 20, 2022). In other words, the MMTLP shares were not "taken" from Kelly – instead, Kelly was entitled to receive one Next Bridge share for each MMTLP share he held on December 12, 2022. *Id.*

In addition, longstanding U.S. Supreme Court precedent establishes that a "taking" of contractual rights does not occur when the government engages in lawful regulatory activity that merely impacts or frustrates the performance of a private contract, even if the regulatory action renders the contract valueless. *See Omnia Co. v. United States*, 261 U.S. 502 (1923). In *Omnia*, the plaintiff contracted with the Allegheny Steel Company to purchase a large quantity of steel below market price. *Omnia*, 261 U.S. at 507. The contract, if performed, would have resulted in substantial profits to Omnia. *See id*. Before any deliveries were made, however, the U.S. government requisitioned all of Allegheny's steel and directed Allegheny not to perform its contract with Omnia. *Id.* The U.S. Supreme Court held that if "property is taken for public use, the government is liable; but, if injured or destroyed by lawful action, without a taking, the government is not liable." *Id*. at 510 (emphasis removed). The Supreme Court thus held that the U.S. government had not "taken" Omnia's contract because "[i]n exercising the power to requisition, the Government dealt only with the Steel Company." *Id*. at 511 "As a result of this lawful government action, the performance of the contract was rendered impossible. It was not appropriated, but ended." *Id*.

Following *Omnia*, federal courts have repeatedly rejected takings claims premised on injury or impairment to contract rights arising from lawful regulatory action. For example, the Federal Circuit rejected a takings claim brought by an airport security company whose contracts with airlines were rendered valueless after the federal government assumed responsibility for

airport screening services following September 11. *Huntleigh USA Corp. v. United States*, 525 F.3d 1370, 1373-74 (Fed. Cir. 2008). That circuit—the exclusive venue for takings claims against the U.S. government under the Tucker Act (28 U.S.C. § 1491(a)(1))—rejected another takings claim by a helicopter business that was unable to resume flights in Washington, D.C. following a Federal Aviation Administration ("FAA") ban. *Air Pegasus of D.C., Inc. v. United States*, 424 F.3d 1206, 1216 (Fed. Cir. 2005). The court held that while the FAA's ban "no doubt injured" the plaintiff and "frustrated its business expectations," it was not a taking of private property under the Fifth Amendment. *Id.; see also Monolith Portland Midwest Co. v. Reconstruction Fin. Corp.*, 282 F.2d 439, 447 (9th Cir. 1960) ("Termination of the contract pursuant to the Contract Settlement Act of 1944 frustrated Monolith in obtaining anticipated profits and advantages therefrom. But … [t]here was here no taking of Monolith's property which entitled the company to just compensation under the Fifth Amendment.").

Thus, as a matter of law, FINRA's lawful regulatory activity to halt trading of MMTLP shares does not constitute a taking of Kelly's private property. The *Omnia* doctrine bars Kelly's constitutional takings claim. Kelly does not allege that FINRA "appropriated" his MMTLP shares but instead alleges that the trading halt injured or impaired the value of his shares and his ability to manage or liquidate them. *See* FAC ¶¶ 40, 46, 56, (citing Exhibit N), Prayer for Relief (regarding compensatory damages seeking "loss of investment value, unrealized gains and financial harm caused by the inability to manage or liquidate Plaintiff's MMTLP shares").

/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /



**IV.    CONCLUSION**

For the foregoing reasons, FINRA respectfully requests that the Court dismiss Kelly's First Amended Complaint with prejudice and without leave to amend. Kelly has already amended his pleading once and, given FINRA's absolute regulatory immunity, the Court's lack of personal jurisdiction, Kelly's lack of any private right of action, and Kelly's inability to establish state action to pursue his constitutional claims, further amendment would be futile. *See Carrico v. City and County of San Francisco*, 656 F.3d 1002, 1008 (9th Cir. 2011) (leave to amend properly denied where amendment would be futile).

DATED: August 29, 2025

**EPG LAW GROUP**

Elias George, NV Bar No. 12379
elias@epglawgroup.com
5940 South Rainbow Blvd.
Las Vegas, NV 89118
Phone: 702-358-0933
*Attorneys for Defendant FINRA*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on August 29, 2025, I served a true and correct copy of the foregoing **DEFENDANT FINANCIAL INDUSTRY REGULATORY AUTHORITY, INC'S MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT** through the CM/ECF system of the United States District Court for the District of Nevada (or, if necessary, by United States Mail at Las Vegas, Nevada, postage fully prepaid) upon the following:

William Lee Kelly
6126 Leaning Rock Ct.
North Las Vegas, NV 89031
William.Lee.Kelly@gmail.com
Phone: (702) 427-2763
*Plaintiff, Pro Se*

_____
Kimberly Rupe, EPG Law Group

